CLOSED,APPEAL,MJLC1,PROSE

# U.S. District Court
## DISTRICT OF KANSAS (Topeka)
## CIVIL DOCKET FOR CASE #: <u>5:21−cv−04080−EFM−ADM</u>

| | |
|---|---|
| Harsay v. Luckert et al | Date Filed: 11/10/2021 |
| Assigned to: Chief District Judge Eric F. Melgren | Date Terminated: 08/16/2022 |
| Referred to: Magistrate Judge Angel D. Mitchell | Jury Demand: None |
| Case in other court:  10CCA, 22−03182 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Edina Harsay**
*E−Filing & ECF Notifications*

represented by   **Edina Harsay**
1100 Stone Meadows Drive
Lawrence, KS 66049
785−813−1757
Email: <u>eharsay@icloud.com</u>
PRO SE
*Bar Number:*
*Bar Status:*

V.

**Defendant**

**Marla Luckert**
*Chief Justice of Kansas Supreme Court,*
*in her official Capacity*

represented by   **Stephen O. Phillips**
Office of Attorney General – Kansas
120 SW 10th Avenue
Topeka, KS 66612−1597
785−368−8421
Fax: 785−296−6296
Alternative Phone:
Cell Phone: 785−207−5675
Email: <u>steve.phillips@ag.ks.gov</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

**Dan Biles**
*Justice of Kansas Supreme Court, in his*
*official capacity*

represented by   **Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

represented by

1

**Evelyn Z. Wilson**
*Justice of Kansas Supreme Court, in her official capacity*

**Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

**Keynen Wall, Jr.**
*Justice of Kansas Supreme Court, in his official capacity*

represented by **Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

**Melissa Taylor Standridge**
*Justice of Kansas Supreme Court, in her official capacity*

represented by **Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

**Eric S. Rosen**
*Justice of Kansas Suprement Court, in his official capacity*

represented by **Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

**Defendant**

**Kansas Supreme Court, The**

represented by **Stephen O. Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14130*
*Bar Status: Active*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/10/2021 | 1 | | COMPLAINT (Summons Issued) with trial location of Topeka filed by Edina Harsay. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(msb) (Entered: 11/12/2021) |
| 11/10/2021 | 2 | | CIVIL COVER SHEET: Re 1 Complaint by Plaintiff Edina Harsay. (msb) (Entered: 11/12/2021) |
| 11/12/2021 | | | |

| | | | |
|---|---|---|---|
| | | | NOTICE OF RELATED CASE: Case Number 5:21−cv−04017−KHV as to Edina Harsay (msb) (Entered: 11/12/2021) |
| 11/12/2021 | | | FILING FEE PAID in the amount of $402.00, receipt number T4631015221. (smnd) (Entered: 11/12/2021) |
| 11/12/2021 | | | SUMMONS ISSUED as to Dan Biles, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson, Kansas Attorney General (issued to Returned to plaintiff for service) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (msb) (Entered: 11/12/2021) |
| 11/12/2021 | 3 | | ORDER REASSIGNING CASE: Case reassigned to District Judge Eric F. Melgren for all further proceedings. District Judge John W. Lungstrum no longer assigned to case. Signed by District Judge John W. Lungstrum on 11/12/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(as) (Entered: 11/12/2021) |
| 02/07/2022 | 4 | | CLERKS ORDER EXTENDING TIME for Defendants Melissa Taylor Standridge, Dan Biles, Eric S. Rosen, Marla Luckert, Kansas Supreme Court, Evelyn Z. Wilson, and Keynen Wall, Jr. to answer or otherwise plead. Signed by deputy clerk on February 7, 2022. Mailed to pro se party Edina Harsay by regular mail. (mls) (Entered: 02/07/2022) |
| 02/18/2022 | 5 | | MOTION to Dismiss by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson (Phillips, Stephen) (Entered: 02/18/2022) |
| 02/18/2022 | 6 | | MEMORANDUM IN SUPPORT of 5 MOTION to Dismiss by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson(Phillips, Stephen) (Entered: 02/18/2022) |
| 03/08/2022 | | | <span style="color:red">DOCKET ANNOTATION:</span> Plaintiff Edina Harsay is a registered pro se participant with e−filing & ECF notifications. (gw) (Entered: 03/08/2022) |
| 03/08/2022 | 7 | | MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss by Plaintiff Edina Harsay (Harsay, Edina) (Entered: 03/08/2022) |
| 03/08/2022 | | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 7 MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss. The motion will be resolved by the District Judge. (kks)** (Entered: 03/08/2022) |
| 03/09/2022 | 8 | | RESPONSE by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson re 7 Motion for Extension of Time to File Response/Reply (Phillips, Stephen) (Entered: 03/09/2022) |
| 03/09/2022 | 9 | | ORDER granting 7 MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss . Response deadline 3/25/2022. Signed by Chief District Judge Eric F. Melgren on 3/9/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm) (Entered: 03/09/2022) |
| 03/22/2022 | 10 | | Second MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss by Plaintiff Edina Harsay (Harsay, Edina) (Entered: 03/22/2022) |

| 03/23/2022 | | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 10 Second MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss. The motion will be resolved by the District Judge. (kks)** (Entered: 03/23/2022) |
|---|---|---|---|
| 03/23/2022 | 11 | | RESPONSE by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson re 10 Motion for Extension of Time to File Response/Reply (Phillips, Stephen) (Entered: 03/23/2022) |
| 03/23/2022 | 12 | | ORDER granting 10 Second MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss . Response deadline 4/8/2022. Signed by Chief District Judge Eric F. Melgren on 3/23/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm) (Entered: 03/23/2022) |
| 04/06/2022 | 13 | | UNOPPOSED MOTION for Extension of Time to File Response as to 5 Motion to Dismiss by Plaintiff Edina Harsay. (Harsay, Edina) (Entered: 04/06/2022) |
| 04/07/2022 | | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 13 Unopposed MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss . The motion will be resolved by the District Judge.(ht)** (Entered: 04/07/2022) |
| 04/07/2022 | 14 | | ORDER granting 13 Unopposed MOTION for Extension of Time to File Response as to 5 MOTION to Dismiss . Response deadline 4/22/2022. No further extensions will be granted. Signed by Chief District Judge Eric F. Melgren on 4/7/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm) (Entered: 04/07/2022) |
| 04/22/2022 | 15 | | RESPONSE by Plaintiff Edina Harsay re 5 Motion to Dismiss (Attachments: # 1 Exhibit_1_Judgment)(Harsay, Edina) Modified on 4/25/2022 to remove repeated word (ca). (Entered: 04/22/2022) |
| 04/26/2022 | 16 | | REPLY TO RESPONSE TO MOTION by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson re: 5 Motion to Dismiss (Phillips, Stephen) (Entered: 04/26/2022) |
| 05/05/2022 | 17 | | MOTION to Amend Complaint re 1 Complaint by Plaintiff Edina Harsay (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit Exhibit_1_FirstAmendedComp)(Harsay, Edina) (Entered: 05/05/2022) |
| 05/09/2022 | 18 | | RESPONSE by Defendants Dan Biles, Kansas Supreme Court, The, Marla Luckert, Eric S. Rosen, Melissa Taylor Standridge, Keynen Wall, Jr, Evelyn Z. Wilson re 17 Motion to Amend Complaint (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Phillips, Stephen) (Entered: 05/09/2022) |
| 05/23/2022 | 19 | | REPLY TO RESPONSE TO MOTION by Plaintiff Edina Harsay re: 17 Motion to Amend Complaint *Response in Opposition* (Harsay, Edina) (Entered: 05/23/2022) |
| 05/31/2022 | 20 | | REPORT AND RECOMMENDATION regarding 17 Motion to Amend Complaint filed by Edina Harsay. Objections to R&R due within 14 days after being served with a copy. Signed by Magistrate Judge Angel D. Mitchell on |

| | | | |
|---|---|---|---|
| | | | 5/31/2022. Mailed to pro se party Edina Harsay by regular mail and by certified mail. (bal) (Entered: 05/31/2022) |
| 06/13/2022 | 21 | | MOTION for Extension of Time to File an Objection to 20 Report and Recommendation by Plaintiff Edina Harsay. (Harsay, Edina) Modified on 6/13/2022 to re–title, wrong event type used. (mam) (Entered: 06/13/2022) |
| 06/13/2022 | | | NOTICE OF DOCKET TEXT MODIFICATION by Deputy Clerk re 21 : Originally filed as an Objection to 20 the Report and Recommendation, this has be changed to a Motion for Extension of Time to File an Objection to 20 Report and Recommendation. (mam) (Entered: 06/13/2022) |
| 06/13/2022 | 22 | | ORDER granting 21 MOTION for Extension of Time, 20 REPORT AND RECOMMENDATIONS. Response deadline 6/28/2022. Signed by Chief District Judge Eric F. Melgren on 6/13/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm) (Entered: 06/13/2022) |
| 06/27/2022 | 23 | | Second MOTION for extension of time *to file Objection to* 20 *Report and Recommendation* by Plaintiff Edina Harsay (Harsay, Edina) Modified on 6/27/2022 to add link to DE 20 Report and Recommendations (jal). (Entered: 06/27/2022) |
| 06/27/2022 | | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 23 Second MOTION for extension of time** *to file Objection to Report and Recommendation*. **The motion will be resolved by the District Judge.(bal)** (Entered: 06/27/2022) |
| 06/27/2022 | 24 | | ORDER: Plaintiff's second motion for an extension of time of 14 days in which to file her objections to the Report and Recommendation, Doc. 23, is GRANTED. Plaintiff's two extensions have been sought, and granted, based on her representation of illness. Any further extensions will be granted only upon a good cause showing of a more detailed or compelling need for a continuance. Objections to R&R due by 7/12/2022. Signed by Chief District Judge Eric F. Melgren on 6/27/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm) (Entered: 06/27/2022) |
| 07/12/2022 | 25 | | OBJECTION to 20 Report and Recommendations by Plaintiff Edina Harsay(Harsay, Edina) (Entered: 07/12/2022) |
| 08/16/2022 | 26 | | MEMORANDUM AND ORDER granting 5 Motion to Dismiss; denying 17 Motion to Amend Complaint; adopting Report and Recommendations 20 . Signed by Chief District Judge Eric F. Melgren on 8/16/22. (cs) (Entered: 08/16/2022) |
| 08/16/2022 | 27 | | JUDGMENT. Signed by deputy clerk on 8/16/2022. (ca) (Entered: 08/16/2022) |
| 09/15/2022 | 28 | | NOTICE OF APPEAL re 26 Memorandum and Order and 27 Judgment by Plaintiff Edina Harsay. Filing fee $505, Internet Payment Receipt Number AKSDC–5868852. (Harsay, Edina) Modified on 9/16/2022 to update text and links to DE 26 & 27 . (jal). (Entered: 09/15/2022) |
| 09/16/2022 | 29 | | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 28 Notice of Appeal. (Attachments: # 1 Preliminary Packet)(ca) (Entered: 09/16/2022) |
| 09/16/2022 | 30 | | |

| | | | |
|---|---|---|---|
| | | | REVISED PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 28 Notice of Appeal. (ca) (Entered: 09/16/2022) |
| 09/16/2022 | 31 | | APPEAL DOCKETED in 10CCA on 9/16/2022 and assigned Appeal No. 22–3182 re 28 Notice of Appeal. (ca) (Entered: 09/16/2022) |

# IN THE UNITED STATES DISTRICT COURT
### FOR THE
## DISTRICT OF KANSAS

Edina Harsay,              )
        *Plaintiff,*     )
                        )    Case No.  21-4080-JWL
vs.                   )
                        )
Kansas Supreme Court, et al.,  )
        *Defendants.*    )
                        )
_____)

## CIVIL COMPLAINT

### I. Parties to this civil action

  A. The Plaintiff:

    Edina Harsay
    1100 Stone Meadows Dr.
    Lawrence, Douglas County
    Kansas, 66049
    Phone: (785) 813-1757
    email: eharsay@icloud.com

  B. The Defendants:

    1. Supreme Court of the State of Kansas

    2. Honorable Marla Luckert, in her Official Capacity
      Chief Justice of the Kansas Supreme Court
      Kansas Judicial Center
      301 SW 10th Ave.
      Topeka, KS 66612-1507

    3. Honorable Eric S. Rosen, in his Official Capacity
      Justice of the Kansas Supreme Court
      Kansas Judicial Center
      301 SW 10th Ave.
      Topeka, KS 66612-1507

4. Honorable Dan Biles, in his Official Capacity
   Justice of the Kansas Supreme Court
   Kansas Judicial Center
   301 SW 10th Ave.
   Topeka, KS 66612-1507

5. Honorable Evelyn Z. Wilson, in her Official Capacity
   Justice of the Kansas Supreme Court
   Kansas Judicial Center
   301 SW 10th Ave.
   Topeka, KS 66612-1507

6. Honorable Keynen Wall Jr., in his Official Capacity
   Justice of the Kansas Supreme Court
   Kansas Judicial Center
   301 SW 10th Ave.
   Topeka, KS 66612-1507

7. Honorable Melissa Taylor Standridge, in her Official Capacity
   Justice of the Kansas Supreme Court
   Kansas Judicial Center
   301 SW 10th Ave.
   Topeka, KS 66612-1507

## II. Basis for Jurisdiction

This case raises federal claims under the Equal Protection Clause and the Due Process Clause of Section 1 of the Fourteenth Amendment of the U. S. Constitution. This Court has jurisdiction to hear this case under 28 U.S.C. § 1331.

## III. History of the Case

The Kansas Supreme Court filed an Opinion on Nov. 21, 2018, which concerned a petition for judicial review case that I brought against the University of Kansas ("University") (Exhibit 1, Appendix A). The Kansas Court of Appeals had ruled in my favor in the case (Exhibit 1, Appendix B), but the Kansas Supreme

Court overturned that decision. I timely filed a Motion for Rehearing or
Modification (Exhibit 2), and the Kansas Supreme Court denied my motion on
Feb. 28, 2019, which was its final decision in my case (Exhibit 1, Appendix C). I
subsequently brought a Petition for Writ of Certiorari to the Supreme Court of the
United States, in which I sought to overturn the Feb. 28, 2019 decision. That case is
necessarily different from the current one, since I can no longer challenge the
judgment of the Kansas Supreme Court in my case. However, I include my Writ of
Certiorari as Exhibit 1, because it contains concise summaries of the most critical
aspects of this case, and because it gives careful and precise citations to the Record
that was under review. In addition, Exhibit 1 also gives precise citations to earlier
court filings in Kansas state courts. Those filings, which may be judicially noticed,
gave careful and precise citations to the Record for all factual statements. My
factual statements were not refuted either by the courts or by the University in
filings in Kansas state courts, but most of my statements are omitted from court
opinions. Therefore, the documentation that I provide in Exhibit 1 is critical for a
fair consideration of the legitimacy this case. Furthermore, because the present
Complaint is not an appeal, it is not sufficient or appropriate to consider solely prior
court opinions that are relevant to the Complaint. It is not possible to evaluate the
facts in an Equal Protection and Due Process case by considering solely the
statements in the Kansas Supreme Court Opinion that is the focus of such a case.

On March 1, 2021, I timely filed a Complaint at the U.S. District Court for the
State of Kansas, which is substantially the same as the current Complaint. That
case, No. 5:21-cv-04017-KHV-ADM, was assigned to the Honorable Judges U.S.
District Judge Kathryn H. Vratil and U.S. Magistrate Judge Angel D. Mitchell. On
May 10, 2021, I timely filed an Objection to a Report and Recommendation for the
case. Among my arguments, a key problem I cited with the Report and

– 3 –

Recommendation is that it cited (in a publicly available document, readily viewed on the World Wide Web) only the misleading statements from the Defendants' Opinion, and not my factual statements that corrected those harmful inaccuracies. Thus, the Report and Recommendation exacerbated the harmful, factually inaccurate and/or misleading, and publicly-available, record for this case. Judge Vratil dismissed the case without prejudice on June 28, 2021. Among other deficiencies, Judge Vratil stated that I failed to comply with D. Kansas Rule 15.1 with regard to a proposed amendment to my complaint. Judge Vratil further stated that "in the event that plaintiff re-files this suit, she should address the deficiencies which Judge Mitchell has identified, and perhaps try to obtain a hoped-for waiver of sovereign immunity." (The decision was stated in Document 11 for the case, which was "text entry only.") This case may be opened as an original proceeding pursuant to K.S.A. § 60.518.

## IV.  Statement of Claim

I have listed as Defendants for this case the current justices of the Kansas Supreme Court, in their official capacities, with the exception of Justice Stegall, who had recused himself from the case that led to this Complaint. Three justices who had participated in that case, including the sole Justice who signed the Opinion, are now retired (Justices Carol Beier, Lawton Nuss, and Lee Johnson), and thus I have listed their replacements, in their official capacities, as Defendants. The term "Defendants" in this Complaint refers to the Kansas Supreme Court and the "Justices of the Kansas Supreme Court" in a general sense, because it is the current Kansas Supreme Court that is capable of providing a remedy in this case.

Eleventh Amendment Immunity grants immunity to state agencies, including state courts, but such immunity can be waived if the Defendants consent to this suit. While I recognize the very long odds of defendants waiving immunity in any

suit, I believe (and hope) that my case is highly unusual, and I believe that the Justices might want to take action in this case that would be both just and would prevent further harm to me. It is very unlikely that Kansas Supreme Court opinions routinely make misleading or incorrect statements that cause serious, lasting, harm to litigants, and I do not believe that court opinions routinely fail to address, or even acknowledge the existence of, legal arguments that are critical for fairly deciding a case. Furthermore, state supreme court justices are generally highly ethical individuals who value accountability and who value honestly. And this case is fundamentally about accountability and about honesty.

Accountability and honesty were also at the heart of my legal case against the University of Kansas, which eventually led to this Complaint. The present case does not directly involve the University, but a brief summary of my petition for judicial review case against the University is helpful in explaining the present Complaint. The judicial review case is succinctly summarized and carefully documented, citing both the Record that was under review and the filings for the case, in Exhibit 1, at 6-23. I also briefly summarize the case here. I brought my case against the University following my tenure-review year while I was an Assistant Professor in the Department of Molecular Biosciences. The *sole reasons* that the University gave for denying me tenure were factually incorrect: an intermediate-level of review incorrectly concluded that I had produced just two papers and "two small grants" when in fact I had generated three papers and five grants during my probationary period, and I was funded for almost my entire probationary period, thereby demonstrating my ability to secure funding. *No other reason was given, at any stage of the review process,* for the denial of tenure, and *no other reasons were claimed in filings by the University,* which did not counter the accuracy of my factual statements regarding either the quality or quantity of my research. In fact, my

– 5 –

impression was that the University did not put up much of a fight, and that it was primarily interested in the clarification of the relevant laws.

The factually correct assessment of my research productivity (papers and grants) was confirmed by an extensive, in-depth, lengthy, Department-level review which rated the research portion of my review as "Very Good" (Exhibit 1, at 7); the majority of tenured (and thus voting-eligible) faculty in my department, as well as the department's Chair, voted for granting me tenure. The "quantity" of my research productivity (papers and grants) was *the sole negative issue in my tenure evaluation*; both the quality of my research and my teaching were strongly praised, a fact that is entirely, and very misleadingly, omitted from the Defendants' Opinion. The Defendant's Opinion did acknowledge that the number of my grants was mis-stated at review steps subsequent to the Department-level of review. However, the Opinion made no mention at all of the fact that the number of my papers was also mis-stated in review steps subsequent to the Department, and in fact repeated the inaccurate assessment without correction or clarification (Exhibit 1, at 19-20) even though the University never argued that my assertions on paper count were inaccurate.

Perhaps most harmful of all, the Opinion misleadingly states, and this Court's subsequent Report and Recommendation cites, that "the inaccuracy [in grant count] was just 'one feature of one criterion in the three-criterion evaluation process [and] did not fatally pollute that process or necessarily detract from or destroy the many accurate elements the decision makers had before them.' Harsay, 430 P.3d at 38." (Report and Recommendation, at 5; Exhibit 1, at 19). That this Court's Report would cite the misleading statement as justification for recommending the dismissal of my case (without also citing my arguments against that very same statement from the Opinion, Exhibit 1, at 19) is proof of the powerful, harmful, effect of the

statement, and it also demonstrates that the statement is assumed by nearly everyone reading it to be an accurate and just rationale for ruling against me.

The "three-criterion review process" in the above statement from the Opinion refers to the three components to which tenure review was constrained at the time of my review: 1) Research; 2) Teaching; 3) Service. My teaching and service were praised; there was no criticism or other negative "elements" before decision makers concerning these other two criteria, whatsoever, either in my tenure review records or in court filings. (Exhibit 1, at 19.) Furthermore, the criterion of Research had just two "features": quality and quantity. The quality of my research was highly praised; there was no criticism or other negative "elements" before decision makers concerning the quality of my research, whatsoever, either in my tenure review records or in court filings. (Exhibit 1, at 19.) Thus, *quantity of research was the sole criticism, and the sole reason given, for denial of tenure.* To imply that there were additional criteria or "features" in my record that had been criticized (that is, teaching, service, and quality of research) was wrong. It falsely implied that I had other performance issues in addition to the mis-assessed "quantity" issue, or even worse, that I had personality issues that made me undesirable as a colleague and provoked the dishonesty during my review. This makes my legal case against a former employer appear foolish and unsupported by the facts and, as I detail below, also appear unsupported by legal arguments. And this has made it impossible for me to gain employment that is appropriate for my level of education and experience[1]. If not corrected, the inaccurate and misleading statements in the

---

[1] Prior to my legal case but subsequent to the tenure review, before my situation became widely known, I was awarded a Fulbright Scholar Visiting Professorship in the Natural Sciences in Graz, Austria. Therefore, my level of scholarly achievements at the time of my review made me competitive for appropriate positions. Because any new long-term position would have required selling my house and moving long-distance (very undesirable especially because I grew up mostly in the Kansas City area and my elderly mother lives in Topeka), I stayed put and put up a fight in what I felt was an easy-win legal case. I was severely harmed by my faith in the justice system.

Opinion will continue to severely harm me for the rest of my life. It is a threat to my long-term ability to survive. It is mostly the hope for eventual justice in this case, to the somewhat limited extent that justice is still possible, that has given me the strength to fight to survive.

Although the above examples are the most serious factual inaccuracies and misleading statements in the Defendants' Opinion, there are many additional examples, so the inaccuracies are a clear "pattern" in the Opinion. The Opinion misleadingly omits my arguments, also present in my Department's evaluation, that while external reviewers were qualified to assess the *quality* of my research (which they praised), they could not adequately address the *quantity* (which they did criticize), because, as allowed by University rules, I added to the quantity subsequent to the early deadline for external reviewer feedback in what was a nearly year-long review process (Exhibit 1, at 20-21). It was also misleading for the Defendants to not cite additional critical information that my Departmental review committee, but not external reviewers, had concerning my productivity. As I explained in Exhibit 1 (at 23), this information, as well as other expertise and knowledge that only Department-level reviewers had, was extremely important in light of the law under which the Defendants reviewed my case, and thus its omission was not insignificant. Most critically, my Department had a letter from my postdoctoral mentor that asserted my intellectual independence, which was an issue in my case because my mentor had funded an early stage of the work for one of my papers[2]. In that letter, my mentor stated: "I can assure you and your colleagues at

---

[2] Although I mentioned in my filings that proper credit for me was an issue in my case because my mentor was very well-known, I understated the situation because I worried that the Defendants, too, would assume I was undeserving of credit. But the Opinion seems to mock the situation in a manner that caused me great distress (Exhibit 1, at 23). What I had not mentioned in any filings until now is that my postdoctoral mentor shared a Nobel Prize in Physiology or Medicine in 2013, and he had been "short-listed" for the prize for years prior to my tenure review. It was frequently assumed, sometimes with explicit statements, that I was a mere good pair of hands with others' brains behind my work. Thus, my department's unique knowledge in my case was extremely important.

Kansas that this paper and the approach that led to it were entirely Edina's inspiration and labor." (Exhibit 1, at 23.)

The factually incorrect statements were repeated in decision letters and never corrected at any stage of the tenure review process, most likely because subsequent steps of review were unaware of the inaccuracy of the summary assessments.[3] Because I was unaware of the false statements until I filed my petition for judicial review and obtained my records, I was not able to properly defend myself in my responses to the negative decisions during the review process (another fact that is completely omitted from the Defendants' Opinion, which instead misleadingly quoted my inadequate, uninformed, defenses made during the review process). The University never tried to defend the factually incorrect statements in its briefs and never explicitly stated that three papers and five grants were insufficient "productivity" in my department. Therefore, this should have been a straight-forward judicial review case in my favor under the Kansas Judicial Review Act (KJRA), K.S.A. § 77-601 *et seq.*

The KJRA was amended in 2009, and these amendments, which are critical for making the law effective, applied to my case (Exhibit 1, at 14-19). The law is modeled after the federal Administrative Procedure Act. Prior to the 2009 amendments, case law incorrectly directed courts to disregard facts that detracted from the state agency decision, thus rendering the new law nearly useless. The district court in my case followed out-dated case law that was invalidated by the 2009 amendments (and this was a pattern, as it did the same thing in at least one prior case; Exhibit 1 at 14-15), and the Defendants likewise followed the old law, at

---

[3] There were over 50 faculty members evaluated for tenure and promotion at the University during my review year (Exhibit 2, at 15). The primary responsibility for documenting the review outcome rests with the the initial (Department) and intermediate (College) level of review, since it is not practical for University-level reviewers to study thousands of pages of faculty records. The top-level University leadership depends on an accurate, honest, review conducted at lower levels.

– 9 –

least in practice, although unlike the district court, the Defendants did not cite outdated case law. I argued my case using the new definition of the law (Exhibit 1, at 9, 14-19), but the Defendants did not acknowledge the existence of my key legal arguments in their Opinion, much less address them in any way. In my Motion for Rehearing or Modification (Exhibit 2), I requested that the Defendants apply the correct standard of review as it is now restricted by rules under the KJRA, or explain why they refused to do so by addressing my arguments. I also requested that the Defendants correct the many misleading or inaccurate factual statements in their Opinion, because the Opinion misrepresents my tenure review, misrepresents my legal case, and misrepresents me, and thus is severely harmful to my reputation (Exhibit 2, at 15-16). The Defendants denied my motion without any statement or explanation (Exhibit 1, Appendix C).

Most likely, the Defendants assumed that there were additional reasons for the University's decision, absent from the record, and thus believed that their decision was just. That is why they implied that reasons in addition to the quantity of my research resulted in the denial of tenure. It is true that there were additional reasons. Of course, there were. Individuals do not misrepresent a faculty member's tenure review record for no reason. But the Defendants were incorrect to assume that any failings were mine. My judicial review case was restricted to evidence from the University's record of my review, but that is not the situation for the current case. I can present evidence, both from correspondence and testimony from faculty colleagues, that some members of my department were unhappy with my presence in the department even before I arrived or obtained the keys to my lab; indeed, they tried to prevent me from getting those keys, and I had to fight to keep the lab space with which I had been recruited (I won that fight, but not the battle). My department had been formed by the combining of three separated departments,

– 10 –

which created factions within the department that competed for faculty positions and laboratory space. Furthermore, the reason that my Department Chair misrepresented the status of my third paper was not because he did not support my tenure. He did support me. But another colleague, who had been rated lower than me for research ("Good" versus my "Very Good" rating) was also not recommended for tenure at the College level due solely to the research component of the review. My Chair chose to support him rather than me, as it was unlikely that the University-level of review would reverse the College-level recommendation for both me and my colleague. My colleague was granted tenure and I was not. My Chair did have the right to favor my colleague (probably for reasons other than that my colleague was a non-immigrant white male), but it was wrong for him to misrepresent my record in order to make my colleague appear to have a stronger case than me for tenure. I could readily document these details, but the Court could also consider these explanations as hypotheticals; indeed, there are many reasons why a faculty member might be denied tenure that have nothing whatsoever to do with his or her performance, even if University rules require a decision that is based on performance. It was thus wrong for the Defendants to assume that the University's decision was fair and just, even when the University failed to articulate accurate reasonings for its decision.

I realize that I cannot now contest the Defendant's judgment in favor of the University, and thus this case is of necessity not primarily about that judgment, nor about any action of the University. However, it was not merely the judgment of the Defendant that harmed me, but also the misrepresentation of my case: both the legal aspects (the Defendant's refusal to acknowledge the existence of my key legal arguments, much less address them) and the factual aspects (by giving a misleading, one-sided presentation of the facts in the case). This was an injustice

– 11 –

that is causing me lasting, continuous, harm. It is enormously distressing, and not a day goes by that I do not think of it. As House Speaker Pelosi wisely said recently, "[T]o heal, you have to have some justice. You just really have to have justice. You cannot heal without it." (*The Washington Post* online article, Jan. 30, 2021).

A more practical matter, and even more serious than the emotional distress, is the harm to my reputation caused by the misleading presentation of my case (Exhibit 1, at 18-23). Because of the manner in which the Defendants presented my case, I have been rendered essentially unemployable in my field. I am now seeking a degree in a completely different field (not law), and falling into serious debt from which I might never escape. The loss to me is enormous and goes far beyond the very substantial financial loss. I had dedicated my life to my research, and I was intensely passionate about my work. It was my life. Like other professions that require many years of intense effort and specialized training, the creation of a scientist is the creation of a highly specialized mind and abilities. I can't easily be someone else and not a scientist, especially since we are all on this Earth for a very limited time. Thus, the Defendants' actions resulted in a destruction, or "taking," of something of immense value. Because so much of my work, for many years, was an investment into my future research (the many years I spent creating hundreds strains, DNA constructs, and cell lines, as well as conducting unpublished experiments necessary to develop long-term research projects), the loss for me is not just the loss of my future, but also the loss of my past. I probably can no longer rescue my past. But I am filing this Complaint, and seeking a remedy, in order to rescue my reputation and therefore my future.

**Claim 1** in this case is that the Defendants violated my right to equal protection of the law under the KJRA, and thus my rights under the Equal Protection Clause of the Fourteenth Amendment of the U. S. Constitution. I

sincerely believe that my arguments were not acknowledged because they were legally correct and difficult to dispute, and acknowledging that fact would have required the Defendants to rule in my favor, which they had chosen not to do. I believe that I have been denied the benefit of a law that I was entitled to, and the Defendants gave me no reason to believe otherwise. In my Writ of Certiorari, I claimed that this denial of my rights was because I was an academic and challenging an academic administrative decision (Exhibit 1, at 11-13), but it is equally likely that my *pro se* status led to the Defendants' refusal to acknowledge and address my arguments and to properly apply the law.

**Claim 2** in this case is that by misrepresenting "my side" of the case and making misleading or inaccurate statements (Exhibit 1, at 18-23), the Defendants violated my substantive due process rights under the Due Process Clause of the Fourteenth Amendment of the U. S. Constitution (Exhibit 1, at 24-27). While the the harm to me under this claim is separate from the harm due to the judgment against me, these harms are clearly connected. The misleading, harmful statements were necessary for ruling in favor of the University, because the KJRA requires courts to base their decisions on the reasonings provided by state agency decision makers (Exhibit 1, at 14-18). This requirement makes sense; courts do not have authority to evaluate university faculty for tenure, and they are not qualified to peruse my records in order to decide whether or not I deserved tenure.

Plaintiffs are instructed not to make legal arguments in a Complaint, but I wish to convince this Court that I have carefully considered the legal aspects of this case and I am fully aware of the extremely challenging nature of a case such as this. I am prepared to make legitimate, serious, legal arguments, and I request that I be allowed to brief this case. I am aware that Eleventh Amendment Immunity (ratified in 1795) is a significant potential obstacle in my case, but I also believe that the

Fourteenth Amendment (ratified in 1868) overcomes the Eleventh Amendment obstacle in a case such as this, *precisely as it was intended to do so*. The reason for the Fourteenth Amendment was primarily to protect Americans with lower perceived status and power who had been abused by the legal system (and in 1868, this was primarily Americans of African descent). Likewise, it was my perceived low status and perceived powerlessness as a *pro se* litigant, and also as someone fighting the high-status University administration (of a beloved local institution), that led to violations of my right to equal protection under the KJRA, and also violations of my right to due process (due process surely includes addressing, or at least acknowledging, my key legal arguments, and surely includes not misrepresenting the factual aspects of my case). If that were not the case, then the Defendants would be routinely ignoring legal arguments and routinely mis-stating facts in their opinions, which seems extremely unlikely to be the case. Thus, this Court has subject matter jurisdiction to hear this case. To argue otherwise would be to fail to fully acknowledge the legitimacy of the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.

The Report and Recommendation for the previous filing of this case cited the somewhat arbitrary restrictions that had been placed on the protections that Section 1 of the Fourteenth Amendment was designed to provide, and I realize that I must address these restrictions. I am prepared to do so. One of the restrictions cited in the Report pertains to 42 U.S.C. § 1983, a statute that I had not cited in my Complaint because my case does not fall into the category of cases typically brought under § 1983. I am not alleging discrimination due to race or gender or another category of "protected status," and I am not seeking punitive or monetary damages, which is typically the situation in § 1983 case law. Nevertheless, I will address a restriction imposed by § 1983, which is that I must allege that a declaratory decree

– 14 –

was violated or declaratory relief was unavailable (Report at 7-8). The Defendants did not violate a declaratory judgment, but a declaratory judgment was not available, or appropriate, for my judicial review case, primarily because I had not sought a mere declaratory judgment, which "refers to a court's judgment stating the rights of parties without ordering any specific action or listing awards for damages."[4] I did seek the ordering of an action, including in my Motion for Rehearing or Modification, which was that the the court order the University to reverse its decision to deny tenure. The Court of Appeals did order a similar action (a repeat of the entire tenure review process). Thus a declaratory relief was not a relevant aspect of my prior case, and the restriction related to declaratory relief does not bar this Court from hearing this case.

A second obstacle cited in the Report and Recommendation is that, if the Defendants do not consent to a suit in federal court (and it is my hope that they will consent), then I must allege an ongoing violation for which I seek prospective relief (Report, at 8). I already explained in some detail my need for prospective relief, and I will now argue that such a need arose from the ongoing policy of the Defendants to grant a Motion for Rehearing or Modification only extremely rarely, so that violations of due process rights can remain uncorrected, as happened in my case. I received no explanation whatsoever for why my motion was not granted (Exhibit 1, Appendix C), and that lack of explanation suggests that denying this type of motion is routine court practice due to a desire for efficiency, and perhaps also due to a reluctance to acknowledge errors. Such a tradition and routine practice may have been more acceptable in the past, when one had to have physical access to law libraries or courthouses to gain access to opinions. Opinions were read almost exclusively by legal professionals, journalists and litigants, and this limited the

---

[4] Legal Information Institute, Cornell Law School, https://www.law.cornell.edu/wex/declaratory_relief

level of harm caused by inaccuracies. This is no longer the case. Opinions are now publicly posted forever for all on Planet Earth to see on the World Wide Web. Thus the harm from misrepresentations and inaccuracies can be severe and permanent. Because of these modern concerns, courts need to adapt their practices by writing opinions with greater care and consideration, and by granting reasonable requests for corrections. Allowing my suit to proceed, and thus demonstrating that there is at least a small chance for accountability even for state supreme courts in state law decisions, would also encourage greater care and revisions when needed, and thus make suits like mine less likely. Courts could also routinely redact sensitive portions of opinions that could be misinterpreted out of full context and cause harm. Some federal courts already do this to some extent in employment cases, so there appears to be at least some recognition of the harm caused by these types of opinions. I have not seen such redactions in Kansas state court cases.

## V. Relief

The remedy I seek from the Defendants is a revised opinion. Regardless of the judgment (which I realize is not likely to change), I seek an opinion that honestly presents my side of the case and omits or clarifies statements that are misleading and harmful. That is, I seek a representation of the case that should be expected from a court, as opposed to a one-sided, misleading one that is more typical of attorneys. And I request that the Defendants acknowledge my legal arguments and address them, as surely they would have been acknowledged and addressed, had they been made by an attorney rather than by a *pro se* litigant.

I am well aware that I am all but powerless in this situation, and I cannot demand that the Defendants craft a more just, and less harmful opinion, regardless of the outcome of the present case before this Court. But I can ask that they do so, regardless of the outcome of the present case, because it is the right thing to do. My

request has relevance for more than just me. It is critical for courts to realize that in the internet age, when court opinions are permanently posted on the World Wide Web for all to see, they now have far more power to seriously and permanently injure litigants than they did in the past. Because of this much greater power to cause harm and destroy lives, courts now have greater responsibility to write opinions with care and to make reasonable and fair corrections when litigants make a request that they do so.

## VI.  Related Litigation

This cause, or a substantially equivalent complaint, was previously filed in this court as Case No 5:21-cv-04017-KHV-ADM and assigned to the Honorable Judge Kathryn H. Vratil and the Honorable Judge Angel Mitchell. The case was dismissed without prejudice on June 28, 2021.

## VII.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
(785) 813-1757
e-mail: eharsay@icloud.com
*Plaintiff, Pro se*

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the location for the trial in this matter.

It is also acceptable for the trial to be located in Topeka, Kansas. However, Plaintiff

cannot drive (she has never had a driver's license) and there is easy public transit to

Kansas City.

_____
Signature of Plaintiff

## REQUEST ROR TIRAL BY JURY

Plaintiff does NOT request trial by jury.

_____
Signature of Plaintiff

Dated: November 10, 2021

– 18 –

No. _____

EXHIBIT 1

_____

IN THE

# Supreme Court of the United States

————

EDINA HARSAY,
*Petitioner,*

v.

UNIVERSITY OF KANSAS,
*Respondent.*

————

On Petition For Writ Of Certiorari
To The Supreme Court of the State of Kansas

————

PETITION FOR A WRIT OF CERTIORARI

————

EDINA HARSAY, PH.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
(785) 856-3924

_____

– i –

## QUESTION PRESENTED

A special "academic deference," based on the concept of academic freedom, which in turn is based on the First Amendment of the U. S. Constitution, is almost invariably invoked in federal civil rights cases which involve claims of discrimination and thus require subjective judgment for resolution. This "rule" was applied in a judicial review case that was restricted to state agency records and which could be objectively decided, so that rules prescribing degrees of deference were neither necessary nor appropriate.

The question is:

Whether a rule-like application of federal case law that accords a nearly-insurmountable level of deference to academic administrators in breach-of-contract or other academic disputes, such that other applicable laws are rendered ineffective and courts depart from the accepted and usual course of judicial proceedings, violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the U. S. Constitution.

– ii –

## LIST OF PARTIES AND PROCEEDINGS

All parties in this case, and in all related proceedings, appear in the caption of the case on the cover page.

List of related proceedings:

Case No. 2012CV625, District Court of Douglas County, Kansas. Opinion filed June 24, 2015

Case No. 15-114292-A, Court of Appeals of the State of Kansas. Opinion filed July 29, 2016.

Case No. 15-114292-S, Supreme Court of the State of Kansas. Opinion filed November 21, 2018.

– iii –

TABLE OF CONTENTS

QUESTION PRESENTED ........................................... i

LIST OF PARTIES AND PROCEEDINGS ..................... ii

TABLE OF CONTENTS ............................................ iii

INDEX TO APPENDICES ........................................... v

TABLE OF AUTHORITIES CITED ............................. vi

PETITION FOR A WRIT OF CERTIORARI .................. 1

OPINIONS AND ORDER BELOW ............................. 1

JURISDICTION ....................................................... 1

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED ...................................... 2

STATEMENT OF THE CASE .................................... 2

    A.  Introduction ............................................. 2

    B.  Summary of the case prior to judicial
        review ....................................................... 6

    C.  Preservation of the issues for the
        Question Presented .................................. 9

    D.  The Kansas Supreme Court applied
        federal law in this case and denied the
        right to Kansas judicial review ................ 11

REASONS FOR GRANTING THE WRIT .................... 24

    A. Limits on state court power serves the
        public good ................................................ 24

– iv –

    *B. Case law prescribing the rule-like application of the special "academic deference" is controversial and lacks rational basis* ............................................. 27

    *C. Accountability of public university decision-makers serves the public good* ..... 31

    *D. The quality of publicly-funded research would improve if university decision-makers were held accountable when they fail to adhere to formal rules and standards for evaluating faculty scholarship* .................................................. 33

CONCLUSION ....................................................... 35

– v –

## INDEX TO APPENDICES

APPENDIX A:
Opinion of the Kansas Supreme Court

APPENDIX B:
Opinion of the Kansas Court of Appeals

APPENDIX C:
Kansas Supreme Court's order denying review or modification

APPENDIX D:
Constitutional and Statutory Provisions Involved

– vi –

TABLE OF AUTHORITIES CITED

CASES

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ............. 24

*Bush v. Gore*, 531 U.S. 98 (2000) ..................... 24, 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................................ 17

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ................................................................. 26

*Gaskill v. Ft. Hays State Univ.*, 70 P.3d 693 (Kan. App. Ct. 2003) ......................................... 4

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ................................................................. 25

*Hudson v. Bd. of Directors of the Kansas Pub. Employees Ret. Sys.*, 388 P.3d 597 (Kan. 2016) ...................................................... 17

*Hughes v. Washington*, 389 U.S. 290 (1967) ......... 10

*Hurtado v. California*, 110 U.S. 516 (1884) .......... 25

*Jones v. Kansas Sate University*, 106 P.3d 10 (Kan. 2005) ................................................... 14, 15

*Keyishian v. Board of Regents of Univ. of State of NY*, 385 U.S. 589 (1967) ................................. 12

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................................. 5

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............. 24

*McConnell v. Howard University*, 818 F.2d 58 (D.C. Cir. 1987) ................................................. 28

– vii –

*Michigan v. Long*, 463 U.S. 1032 (1983) .............  12

*Missouri ex rel. Missouri Ins. Co. v. Gehner,*
    281 U.S. 313 (1930) ...........................  10

*Mooney v. Holohan*, 294 U.S. 103 (1935) ............  24

*Moore v. Dempsey*, 261 U.S. 86 (1923) .................  24

*Namenwirth v. Board of Regents of Univ. of*
    *Wisconsin*, 769 F.2d 1235 (7th Cir. 1985) .......  29

*Palko v. Connecticut*, 302 U.S. 319 (1937) ...........  24

*Redd v. Kansas Truck Center*, 239 P.3d 66
    (Kan. 2010) .....................................  15

*Romkes v. University of Kansas*, 317 P.3d 124
    (Kan. App. Ct. 2014) ...........................  10, 11, 15

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) .................  25

*Saunders v. Shaw*, 244 U.S. 317, 320 (1917) ........  10

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...........  16

*Stop the Beach Ren. v. Fla. Dept. of Env. Prot.,*
    560 U.S. 702 (2010) ......................... 5, 24

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ....  12

*Universal Camera v. NLRB*, 340 U.S. 474
    (1951) ..........................................  17

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ............................. i,  12

U.S. Const. amend. XIV, § 1 ................. i, 5, 9, 11,  24

– viii –

STATUTES AND RULES

28 U.S.C. § 1257(a) ................................................. 1

Kan. Stat. Ann. § 77-601 *et seq.* .................... *passim*

Kan. Stat. Ann. § 60-102 ........................................ 3

BOOKS AND ARTICLES

Armstrong and Hamilton, *Paying for the Party: How College Maintains Inequality* (Cambridge, MA: Harvard University Press, 2013) .................. 32

Brownstein, *American Higher Education Hits a Dangerous Milestone*, theatlantic.com, May 3, 2018 ............................................................ 32

Edwards and Roy, *Academic Research in the 21st Century: Maintaining Scientific Integrity in a Climate of Perverse Incentives and Hypercompetition,* 34 Environ. Eng. Sci. 51 (2017) ............................ 34

Harris, *Rigor Mortis: How Sloppy Science Creates Worthless Cures, Crushes Hope, and Wastes Billions* (New York: Basic Books, Hachette Book Group, 2017) ........................................................... 34

Meazell, *Deference and Dialogue in Administrative Law*, 111 Colum. L. Rev. 1722 (2011) ......................................................... 16

Moss, *Reluctant Judicial Factfinding: When Minimalism and Judicial Modesty Go Too Far,* 32 Seattle U.L. Rev. 549 (2009) ............................ 27

– ix –

Moss, *Against Academic Deference: How Recent Developments in Employment Discrimination Law Undercut an Already Dubious Doctrine*, 27 Berkeley J. Emp. & Lab. L. 1 (2006) ...............  28

Newfield, *Unmaking the Public University: The Forty-Year Assault on the Middle Class* (Cambridge, MA: Harvard University Press, 2008 ........................................................................  32

Newfield, *The Great Mistake: How We Wrecked Public Universities and How We Can Fix Them* (Baltimore: Johns Hopkins University Press, 2016) ....................................................................  32

Ryan, *The New Kansas Administrative Procedure and Judicial Review Acts*, 54 J.K.B.A. 53 (1985) ............................................  14

Ryan, *Judicial Review of Administrative Action—Kansas Perspectives*, 19 Washburn L.J. 423 (1980) .................................  17

Tuchman, *Wannabe U: Inside the Corporate University* (Chicago: The University of Chicago press, 2009) ............................................................  32

Sandefur, *Access to What?* Daedalus (Winter 2019) .........................................................  27

Yong, *The Inevitable Evolution of Bad Science: A simulation shows how the incentives of modern academia naturally select for weaker and less reliable results,* The Atlantic, Sept. 21, 2016 .....................  34

– x –

OTHER

Report of the Judicial Council Administrative Proce-
dure Advisory Committee, 2008
https://www.kansasjudicialcouncil.org/Documents/St
udies%20and%20Reports/Recent%20Reports/Admin
Pro_Committee_Report_(KAPA).pdf....................   17

– 1 –

## PETITION FOR WRIT OF CERTIORARI

Petitioner, Edina Harsay, respectfully prays that a writ of certiorari issue to review the judgment of the Kansas Supreme Court filed on November 21, 2018.

### OPINIONS AND ORDER BELOW

The opinion of the Kansas Supreme Court was published at 430 P.3d 30 (2018) and is in Appendix A. The opinion of the Kansas Court of Appeals is unpublished and is in Appendix B. The Kansas Supreme Court's order denying rehearing or modification is unpublished and is in Appendix C.

### JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1257(a). The opinion of the Kansas Supreme Court for which petitioner seeks review was issued on November 21, 2018 (Appendix A). Petitioner's timely motion for rehearing or modification was denied on February 28, 2019 (Appendix C). This petition was initially timely submitted on May 29, 2019 but returned for correction on June 3, 2019, with a 60-day window allowed for submitting a corrected petition, pursuant to Supreme Court Rule 14.5.

– 2 –

CONSTITUTIONAL AND STATUTORY
PROVISIONS INVOLVED

Section 1 of the U. S. Constitution's Fourteenth Amendment, and the standards of review under the Kansas Judicial Review Act, Kan. Stat. Ann. § 77-621 *et seq.,* are reproduced in Appendix D.

STATEMENT OF THE CASE

*A. Introduction*

This case started as a Kansas state case involving a challenge to a Kansas state university decision, pursuant to Kansas state law for judicial review, the Kansas Judicial Review Act (KJRA), Kan. Stat. Ann. (K.S.A.) § 77-601 *et seq*. The case could have been, and should have been, easily resolved in a Kansas state court, with reliance solely on Kansas law. The Kansas Supreme Court, however, turned the case into a federal matter by relying on federal law and by largely disregarding the appropriate Kansas law in reaching its decision.

Although this case involves an employment dispute between the University of Kansas (Respondent) and me, the legal issues before this Court have little to do with the specifics of that initial dispute. This Court is not being asked to evaluate the University's decision. The fundamental issue in this case now is a denial of a "right to be heard," and the abuse of power in our courts when a litigant is proceeding *pro se* and thus appears powerless to fight back against that abuse. This was not a frivolous case, and the Kansas Court of Appeals ruled in my favor in a *per*

– 3 –

*curiam* decision (unpublished opinion, Appendix B). It also was not a complex case, and it could have been adjudicated objectively without need of special (or academic) expertise. Yet from the earliest stages of the case I struggled to be taken seriously and treated lawfully.

The district-court stage of my case most clearly demonstrates the harm that can result from the assumption that an employment case such as mine is un-winnable (or by default, unworthy) and therefore not deserving of a court's attention. The district court took nearly two years to render an opinion after briefing for the case had been completed (Br. Aplt., at 4), even though it typically takes months at most, not years, to render an opinion. The long, unexpected, wait caused very serious financial and professional harm for me (Aplt. Mot. Rehear. Modif. Kan. Ct. Appeals, at 2), as well as daily distress for a very extended period. The delay violated Kansas state law (K.S.A. § 60-102; right to a "speedy and inexpensive determination"), the Kansas Supreme Court's rules for district courts (rule 4: "No case should be permitted to float in the system....") and the Bill of Rights of the Kansas Constitution (§ 18: "All persons, for injuries suffered in person, *reputation or property*, shall have remedy by due course of law, and justice administered without delay" (emphasis added)).

The Kansas Supreme Court Opinion made no mention at all of the district court's long delay and mentioned only my delay at the initial stages of this case (Opinion, App. A, at 11a). But that initial delay

– 4 –

and an improper dismissal of my case (on the court's own motion) was also due to mishandling of my case (Aplt. Rspnse to Apee Mot. Rehear. Modif. Kan. Ct. Appeals, at 13-15; also, Request for Judicial Notice, Nov. 27, 2017, not granted).

The exclusive state remedy for me or any professor who claims either wrongful termination or breach of contract against a Kansas state university, including the University of Kansas (Respondent), is judicial review under the KJRA. See *Gaskill v. Ft. Hays State Univ.*, 31 Kan. App. 2d 544, 546, 70 P.3d 693 (2003). Judicial review is also the sole formal procedural mechanism that allows the University to remedy an improper review for tenure once a final decision on tenure is rendered by the Chancellor. Thus, judicial review can have a crucial role in a tenure-review case when a faculty member and administrators are not aware of critical errors or misrepresentations during the review process until after a final decision is rendered by the Chancellor, as was the situation in this case.

A judicial review case under the KJRA is very different from cases involving academic employment disputes that are initiated in federal courts. Those cases involve primarily claims of discrimination and civil rights violations, and courts in such cases are asked to determine the motives behind the employment decision based on testimony and often voluminous records. Such cases inevitably require subjective judgment, and they are difficult and very laborious, so federal case law that explains why courts are reluctant to consider these types of cases should not

– 5 –

be translated to a KJRA case. Judicial review in a KJRA case is restricted to the standards of review pursuant to K.S.A. § 77-621 *et seq*. (Appendix D), and it is restricted to the state agency Record of Review. It typically involves primarily objective analysis.

The rights claimed and defended in a KJRA case are also different. First and foremost, I had a right to adjudication under the KJRA, which is a state-granted "property interest" that I am now defending. Cf. *Logan v. Zimmerman Brush Co.*, 455 U. S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause."). And while I had only an expectation of (and therefore not a property interest in) tenure and promotion, I was entitled to a tenure review pursuant to the University's rules and my department's formally-approved standards. I was also entitled to a tenure and promotion *decision* based on those rules and standards. (The University's rules do not state otherwise, and the standard practice in Kansas public universities is that tenure-track professors who meet the guidelines for tenure are granted tenure; see *infra*, at 30.) These entitlements, too, are "property interests," which I defended under the KJRA. Cf. *Stop the Beach Ren. v. Fla. Dept. of Env. Prot.*, 130 S.Ct. 2592, 2615, 560 U.S. 702 (2010). ("[P]roperty interests protected by the Due Process Clauses are those that are secured by existing rules or understandings." (Citations and internal quotation marks omitted.)) (Kennedy, J., concurring in part and in the judgment).

– 6 –

*B. Summary of the case prior to judicial review*

My department (Department of Molecular Biosciences) recommended tenure and promotion for me, and it provided a detailed, lengthy, expert review by a departmental review committee and by the department chair, with a rating of "Very Good" for all review criteria (teaching, research, and service) (Br. Aplt., at 17; R. Vol. 2, at 184). To help ensure fairness and adherence to formal rules and standards, tenure review is a multi-stage process. Following the Department's review, there was subsequent review by a committee at the College of Liberal Arts and Sciences ("College") and finally at the University level. There was only one natural scientist involved in the review process subsequent to the Department-level of review, and this individual was a member of the College review committee. Because he was not an experimentalist and worked in a field that was not related to mine, the academic expertise (deserving of "academic deference") in my case was primarily at the Department-level of review (Br. Aplt., at 10; R. Vol. 2, at 163, 166). All other reviewers from the College and University had expertise in the humanities, social sciences, arts, business, and so forth.

The College-level of review did not recommend tenure for me, but this decision (and thus the unanimous committee vote counts against me) was justified by factually inaccurate statements that were not consistent with my record. The explanation given for the negative decision was that I had insufficient research productivity: only "two smaller grants" and "two articles" (Br. Aplt., at 19-20; R. Vol.

– 7 –

2, at 172, 173). But in fact I had five grants (which
were not "small") and three papers, which my de-
partment correctly acknowledged and judged as
meeting the expectations and formally-approved
standards in my department (Br. Aplt., at 7-26). This
was described in detail and then summarized in the
Departmental committee's decision letter:

> Dr. Harsay has also been *successful at obtain-*
> *ing significant grant support* for her research.
> She has been funded by the Cancer
> Experimental Therapeutics COBRE as a pro-
> ject PI, and by an American Heart Association
> grant. Her high throughput screening and
> characterization of the compounds she identi-
> fied has been funded by an NIH R03 award, an
> NIH X01 Resource Award, and is currently
> funded by an NIH R21.... Given the compre-
> hensive nature of Dr. Harsay's three papers
> [while at KU], their expected high impact, and
> *the judgment by most of the external reviewers*
> *that Dr. Harsay's work is of very high quality*,
> the P&T committee considered that Dr. Har-
> say's research program had met the expecta-
> tions of our department. The committee voted
> for an evaluation of "Very Good" for Dr. Har-
> say's research. (Emphases added.)
> (Br. Aplt., App. A; R. Vol 2, at 181-183.)

Two brief letters from the College-level of review
were sent to University-level reviewers to explain
the negative decision, one from the College Commit-

– 8 –

tee[1] and one from the Interim Dean of the College. Both letters stated the factually inaccurate assessment of the quantity of my research productivity as the reason for not recommending tenure (Br. Aplt., at 19-20; R. Vol. 2, at 172, 173). There was no mention of the quality or importance of my work and no mention of the teaching or service components of my evaluation. Thus the decision letters did not accurately represent the Department's findings or my record. No explanation was given for the discrepancies, either in the University's Record of Review or in court filings.

Letters that were nearly identical to those sent to the University-level reviewers were sent to me at the same time, but the letters to me omitted the factually incorrect statements, so I was not aware of this issue until I filed my petition for judicial review and obtained my review records (Br. Aplt., at 17-26; R.Vol. 2, at 174, 176). I was thus not able to properly defend myself during the review process.

The University's Record contains no indication whatsoever that administrators subsequent to the College level were aware of the lack of care and accuracy in the College Committee's review, or of the lack of careful supervision of the review by the Interim Dean. The University-level reviewers, just as the Interim Dean, had access to my entire voluminous record along with the records of >50 other faculty

_____

[1] The letter was signed by the Committee Chair to indicate that it was from the Committee, but she did not write it and was not responsible for the inaccuracies; she did not participate in the review at the College level (Br. Aplt, at 8).

– 9 –

members under review for tenure and promotion during my year, so I cannot claim that they were for certain unaware of the inaccuracies. But I believe they would have taken corrective action, had they been aware of the issue.

The University-level of review provided no additional explanation for its decision to deny tenure (Br. Aplt., at 6, App. F; R. Vol. 2, at 144, 169). Therefore, judicial review of the tenure decision can be based only on the decision letters from the College and Departmental levels of review, and whether the findings and reasoning in those letters were supported by evidence in the record (Br. Aplt., at 32-41; Supp. Br. Aplt., at 1-4, 7-14; Kan. Ct. Appeals Opin., App. B, at 20b-21b).

## C. Preservation of the issues for the Question Presented

My claim under the Due Process Clause arose from the final Opinion of the Kansas Supreme Court. The court used an old "substantial evidence standard" that had been explicitly invalidated by the Kansas legislature in 2009 amendments to the KJRA and by subsequent binding precedent (see *infra*, at 14). The amendments include rules that now constrain the standards of review, and these rules were disregarded by the court in this case. Although I could not yet claim a due process violation in my briefs, my briefs do preserve the arguments that explain how the current rules that constrain the "substantial evidence" standard apply to my case (Br. Aplt, at 31-41; Sup Br. Aplt., at 1-4, 7-14).

– 10 –

The Kansas Supreme Court did not acknowledge the existence of my key arguments in its Opinion, much less address them in any way. In a Motion for Rehearing or Modification, I requested that the court either apply the correct standard of review as it is now restricted by rules under the KJRA, or explain why it refused to do so by addressing my arguments. I also requested that the court correct the many factual inaccuracies in its Opinion, because the Opinion misrepresents my tenure review and is thus severely harmful to my reputation (Aplt. Mot. Rehear. Modif. Kan. Sup. Ct., at 15-16). The court denied my motion without any explanation (Appendix C). Therefore, this Petition for Certiorari fully preserves the due process issue for this Court. See, *e.g.*, *Saunders v. Shaw*, 244 U.S. 317, 320 (1917); *Missouri ex rel. Missouri Ins. Co. v. Gehner,* 281 U.S. 313, 320 (1930).

I believe that the Kansas Supreme Court was aware that it incorrectly did not apply the required review standards in my case, and I believe that it did not address my arguments because it did not wish to set binding precedent in which it was obviously refusing to apply the correct law. Most likely, this was also the reason, rather than malicious intent to harm me, for why the court did not present my tenure review fairly and why it refused to correct the factual inaccuracies in its Opinion (see *infra*). However, if I am incorrect, and the issue is conflicting interpretation of the law, I still would have a federal case. The court cannot counter clear legislated intent, and it cannot make a sudden, dramatic change in its interpretations, such that the law is "unpredictable in terms of the relevant precedents." Cf. *Hughes v.*

– 11 –

*Washington*, <u>389 U.S. 290, 296</u> (1967) (Stewart, J., concurring). If the court intends to pick-and-choose when to fall back to the pre-2009, invalidated, version of the KJRA standards, any such unpredictable change "inevitably presents a federal question for the determination of this Court." *Id.*, at 297 (citations omitted).

My claim under the Equal Protection Clause likewise arose from the Kansas Supreme Court's Opinion. I believe that the court failed to apply the correct review standards as required by the KJRA because my case involves an academic employment decision. This is unlawful differential treatment due to my status as an academic. To explain its approach to my case, the court stated that the tenure decision was a subjective one "based in part on the business judgment of the University,"[2] and then referred to federal civil rights tenure denial cases that were cited in *Romkes v. University of Kansas*, <u>317 P.3d 124, 136-137</u> (Kan. App. Ct. 2014) (Kan. Sup. Ct. Opin., App. A, at 19a). The quotes in *Romkes* from the cited cases make clear that all those cases invoked a special academic deference, and thus the court's approval of academic deference was the purpose of the citation, although the court did not use such terminology or further explain the citation. The concept of special academic deference has evolved into a rule-like application of a nearly-insurmount-

_____

[2] The University's rules do not state such a thing. The decision is based on defined standards for each department that are officially approved by the University. (Br. Aplt., at 2, 23; R. Vol. 1, at 56-58.)

– 12 –

able level of deference to university administrators in employment decisions (see *infra*, at 27), and because of its frequent use, it needed no further explanation. The Respondent cited similar federal case law in its Response to my Supplemental Brief (Apee Rspnse to Supp. Br. at 14-16), but at that time the Kansas Supreme Court rules did not permit me to submit a Reply to that brief. I did, however, address this issue in my Motion for Modification or Rehearing (at 21).

The special academic deference is derived from the much more noble concept of academic freedom and is rooted in the First Amendment of the U. S. Constitution. See *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Keyishian v. Board of Regents of Univ. of State of NY*, 385 U.S. 589, 603 (1967). This constitutional link is the reason for a very high level of deference that is much greater than the typical deference for expertise. Academic deference is therefore federal case law. The Kansas Supreme Court did not cite *Michigan v. Long*, 463 U.S. 1032, 1041 (1983) to claim that federal case law served as merely guidance that did not compel its decision for this case, and its handling of the case (disregarding the statutory rules that explicitly constrain the review standards that applied to this case; see *infra*, at 14-23) further indicates that federal case law, rather than the applicable Kansas law, led to the court's decision in this case.

The district court and the Kansas Court of Appeals did not explicitly indicate that a special academic deference influenced their decisions. However,

– 13 –

I preemptively addressed the issue, and insisted on equal protection under the law, in my brief to the Court of Appeals because the district court seriously mishandled my case, and I suspected that this was due to the fact that I challenged an academic employment decision:

> Academics can make errors and are prone to the same biases and human failings as is anyone else, including jealousy and territorial instincts, which often impact tenure evaluations. The Petitioner argues that a fair judicial review of the University's tenure decision will help to ensure that academic agency decisions are made with the same care and accuracy as are the decisions of other state agencies.
>
> (Br. Aplt., at 42, 49-50).

The district court did not address the factually inaccurate reasoning that explained the University's decision, and it based its ruling in favor of the Respondent on the false notion that the decision on promotion and tenure is a financial one "in this time of governmental and institutional financial crisis," (Br. Aplt., at 46; R. Vol. 1, at 123-124), rather than a decision that was to be based solely on established rules and formally approved review criteria for evaluating teaching, scholarship and service (Br. Aplt., at 2; R. Vol. 1, 54-58). The Respondent had not explicitly claimed that the tenure decision was a financial or "business" decision.

– 14 –

### D. The Kansas Supreme Court applied federal law in this case and denied the right to Kansas judicial review

The scope of review under the KJRA, <u>K.S.A. § 77-621</u> *et seq.* (Appendix D), was modeled after the judicial review standards under the federal Administrative Procedure Act (APA), so it will be familiar to this Court.[3] The court below applied an old interpretation of the "substantial competent evidence" review standard that predates the APA (and KJRA) and had been explicitly invalidated by the Kansas legislature in 2009 amendments to the KJRA. The amendments make clear a requirement that courts consider both "detracting" and "supporting" evidence (<u>K.S.A. § 77-621(c)(d)</u>, Appendix D, at 2d-3d), correcting an earlier interpretation of the KJRA that held that courts "must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the factfinder and must disregard any conflicting evidence or other inferences...." *Jones v. Kansas Sate University*, <u>106 P.3d 10, 20</u> (Kan. 2005) (Br. Aplt., at 37). As I argued in my briefs, the new interpretation of the law applies to my case (Br. Aplt., at 37-38; Supp. Br. Aplt., at 7-17; Mot. Rehear. Modif. Kan. Sup. Ct., at 2-12).

The Kansas Supreme Court summarized the significance of the 2009 amendments in a subsequent opinion, which is binding precedent for my case. Importantly, the new case law, which I cited in my

_____

[3] For history of the KJRA, see Ryan, *The New Kansas Administrative Procedure and Judicial Review Acts*, 54 J.K.B.A. 53, 64 (1985).

– 15 –

briefs, made clear that the law now "requires review of the agency's explanation as to why the evidence supports its findings." *Redd v. Kansas Truck Center*, 239 P. 3d 66, 72 (Kan. 2010) (Br. Aplt., at 37-38). Yet, the court largely followed *Jones* in my case, although it did not cite this invalidated case law. The district court did cite *Jones*, making clear its use of incorrect law (Br. Aplt. at 37-38). I point this out because the same error, made by the same district court judge, had been helpfully addressed by the Kansas Court of Appeals in *Romkes*—the only Kansas appellate court opinion that I am aware of (besides mine) in which a tenure-review case had been decided based on merits rather than a deadline or similar technical issue:

> [Dr. Romkes] contends the district court used an incorrect standard of review in reviewing the University's decision. The University concedes that the district court used a standard of review which had been modified in 2009. But on appeal to our court we treat the issues for which Dr. Romkes sought judicial review in the district court as though they had been initially directed to us. See *Powell*, 290 Kan. 564, Syl. ¶ 1, 232 P.3d 856. We are capable of reviewing the evidence before the district court using the appropriate standard of review, which is found in K.S.A. 2012 Supp. 77-621.
>
> *Romkes v. University of Kansas*, 317 P.3d 124, 135 (Kan. App. Ct. 2014).

– 16 –

I pointed out the district court's error in my brief (Br. Aplt., at 37-38), but the error and its correction is not mentioned in court opinions for my case.

The 2009 amendments to the KJRA have a second, related, significance. Prior to the amendments, the addition of the words "record as a whole" to the "substantial competent evidence" standard under K.S.A. § 77-621(c)(7) was misinterpreted to mean that courts are to scour the whole record for any evidence which, when viewed in isolation, supported the agency decision. This was inconsistent with the intent of the law, and it was inappropriate also because the task of explaining an agency decision has been delegated to the agencies, not to the courts (or to agency attorneys, in *post hoc* explanations in court filings years after the agency decision was made; Supp. Br. Aplt., at 3-4). Citing the evidence that led to a decision is a critical component of explaining the reasons for a decision, and it is the agency's explanation *in the agency record* that the courts are to review. K.S.A. § 77-621(a)(2) (Appendix D, at 1d) states that "the validity of agency action shall be determined in accordance with the standards of judicial review provided in [K.S.A. § 77-621 *et seq.*] as applied to the agency action *at the time it was taken*." (Emphasis added.) This is consistent with the long history of American judicial review: "[A]gencies are reviewed only on the basis of their actual reasoning at the time they made their decisions, and they must offer rational explanations for their actions." Meazell, *Deference and Dialogue in Administrative Law*, 111 Colum. L. Rev. 1722 (2011) (citing the landmark cases *SEC v. Chenery Corp.*, 318 US 80

– 17 –

(1943); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 US 402 (1971)). See also Ryan, *Judicial Review of Administrative Action—Kansas Perspectives*, 19 Washburn L. J. 423, 431 (1980) (Sup. Br. Aplt. at 9).

Most critically for my case, K.S.A. § 77-621(d) (Appendix D, at 2d-3d) now also clarifies that findings of an intermediate-level of review are to be considered. This is especially important when those findings and decisions detract from the final agency decision, and when the earlier step of review has more appropriate expertise and was in a position to make in-person observations. See *Hudson v. Bd. of Directors of the Kansas Pub. Employees Ret. Sys.*, 388 P.3d 597, 603-05 (Kan. App. Ct. 2016). This interpretation of "substantial competent evidence" and "whole record" review is also stated in a report by the Kansas Judicial Council that advised the legislature for amending the KJRA.[4] Thus, the 2009 amendments clarify that "whole record review" has the same meaning in the KJRA as it does in the federal APA, as it was helpfully explained by Justice Frankfurter in *Universal Camera v. NLRB*, 340 US 474 (1951).

The above explanation of the "substantial competent evidence" standard is the only logical interpreta-

---

[4] Report of the Judicial Council Administrative Procedure Advisory Committee, 2008. The *Report* states that the purpose of the amendments was "to make judicial review more available and meaningful as a check on the fairness of agency decisions...," and it stresses that consideration of a contradictory intermediate-level decision makes it more important for agencies to carefully explain their decisions (*Report,* at 5, 6).

– 18 –

tion of the 2009 amendment to the KJRA, which instructs courts to consider both supporting and detracting evidence, and yet "not reweigh the evidence or engage in de novo review" (K.S.A. § 77-621(d), Appendix D, at 3d). In order to not reweigh the evidence in determining which decision-maker was correct, the court below needed to assess only the accuracy and quality of the explanations that decision-makers have provided in the record. If the court instead considers only evidence that supports the College- or University-level of review, including evidence not presented in decision letters, and if the court disregards the strong detracting evidence from the department's expert review, then its review is no different at all from the old "substantial evidence" review standard that has been explicitly invalidated.

In my situation, the "detracting," "intermediate" decision was explained in decision letters from the Department's tenure-review committee and from the Department Chair. The Departmental findings and explanations deserve much deference not only because of the level of detail and care and accuracy of the review that was documented in the record, but also because the department had appropriate knowledge and expertise that all subsequent reviewers lacked.

Rather than following the corrected interpretation of "whole record review," the court below applied the old, invalid, meaning, and scoured the record (with assistance form the Respondent's briefs) in search of evidence against granting tenure, in order to make up for the complete lack of factually correct

– 19 –

evidence cited in the University- and College-level decision letters that explained why I should not be granted tenure. Even worse, the court below misrepresented my tenure review, and thus harmfully misrepresented me, in its *published* Opinion that is now readily available to the world on the internet. The court did not acknowledge the existence of strong evidence that supported me and contradicted the court's "new findings," and it made numerous misleading and inaccurate statements. I will list some of these misleading or inaccurate statements. My key point is not any particular fact or statement, but the consistency and extent of misrepresentation.

The court's Opinion described the inaccuracies at the College-level of review as being just a "single inaccuracy" that was "one feature of one criterion in the three-criterion evaluation process" (Kan. Sup. Ct. Opin., Appendix A at 21a). This incorrectly implies that there were additional criticisms of my performance, but there were not. Only "quantity" was an issue, and the "quantity assessed" was inaccurate. My teaching and service were praised and there is no evidence that they contributed to the decision to deny tenure (Br. Aplt., at 4-5). And the third criterion, research, has two "features": quantity and quality. The quality of my research was praised by both external reviewers and by my department (Br. Aplt., at 21-22). And it is untrue that there was just a "single inaccuracy." One of my papers and three of my research grants were not acknowledged to exist in two decision letters. The court misleadingly implied that the status of my third paper was "rejected" at the time when my Chair updated the College com-

– 20 –

mittee, and it incorrectly stated that the college evaluators were correct on my paper counts (Kan. Sup. Ct. Opin., App. A, at 6a,8a). I clarified the status of this paper in my briefs (Br. Aplt., at 10-11; Reply Br. Aplt., at 3-5). The Respondent never explained why my third paper was not "counted" and never countered my explanations. By the time of the College review, the third paper had been favorably reviewed by a second journal that *never rejected it* and eventually published it during my review year (Br. Aplt, at 11; R. Vol. 2, at 163). All three of my papers were to "count" according to University rules, and College-level reviewers had copies of all three papers (Br. Aplt., at 11-12).

The court below also misrepresented the assessments of the external reviewers by citing only their outdated assessment of "quantity," when most reviewers focused their evaluations on the quality and importance of my work.[5] A Professor of Biology at Vanderbilt University stated: "In my view, Dr. Harsay's contributions are highly significant and offset concerns about productivity." (Br. Aplt, at 21; R. Vol. 2 at 367-368.) The Chair of the Department of Biology at Johns Hopkins University (now Dean) stated: "While the quantity of Dr. Harsay's work is not great, its quality is very high." (Br. Aplt. at 22; R. Vol. 2, at 371.) A Group Leader at the MRC Laboratory of Molecular Biology in Cambridge, England,

––––––––––––––––––

[5] As I explained in my briefs (Br. Aplt., at 11), and as mentioned in the Department's evaluation letters (R. Vol. 181-182), the external reviewers did not have a copy of my third manuscript because I was required to send them my materials in the summer before my review year.

– 21 –

stated: "I would like to give support to Edina's pro-
motion as I consider her to be a high quality scientist
working on an important and interesting problem."
(Br. Aplt., at 22; R. Vol. 2,, at 364.) The George
Palade Endowed Chair in the Department of Cellular
and Molecular Medicine at the University of Califor-
nia, San Diego, started his letter by stating, "It is a
pleasure to write in strong support of Dr. Edina Har-
say's promotion to a tenured position." He described
my research accomplishments and their significance
in great detail, and stated, "Her work is both very
careful and very creative... and [she] will continue to
produce important and novel contributions to the
field of membrane traffic." (Br. Aplt., at 22; R. Vol. 2,
at 373-374.)

Furthermore, the court below is misleading in
counting up the number of external reviewers who
explicitly made a statement on granting of tenure. As
the Respondent's brief to the district court had
stated, and as I explained in my Supplemental Brief
to the court (Sup. Br. Aplt., at 5-6), external review-
ers were intentionally not asked to state a recom-
mendation on tenure, but simply to evaluate my re-
search, and thus not all reviewers made an explicit
statement on tenure. They were not "voters" in this
process. This is because criteria for tenure are very
different at different institutions. In Europe, where
two of my external reviewers worked, tenure is
granted at a much more senior stage of one's career,
as was mentioned by the Departmental committee in
its evaluation documents, to explain why one Euro-
pean external reviewer may have stated that he did
not favor tenure (R. Vol. 2, at 277).

– 22 –

Another clear example of failure to consider "detracting" evidence is the court's citing of an external reviewer's pessimistic comment concerning my prospects for future funding (Kan. Sup. Ct. Opin., App. A, at 5a). This quote was mentioned for the very first time only in a brief to the court below (Apee Rspnse to Supp. Br., at 11), in response to my argument that the likelihood of funding in the "foreseeable" future, rather than non-stop funding, is the formal and allowed tenure-review standard in my department, because most faculty members in my department experience gaps in external funding[6] (Br. Aplt., at 24; Supp. Br. Aplt., at 13; R. Vol. 2, at 167). The court failed to acknowledge in any way the existence of significant evidence that detracted from its statement, including a contradicting comment from another external reviewer who stated that he was "bullish on [Dr. Harsay's] potential for future funding," even though this comment was quoted in the departmental committee's decision letter and in my briefs (Br. Aplt., at 25; Sup. Br. Aplt., at 13; R. Vol. 2, at 183). This optimistic conclusion concerning future funding was consistent with other findings and ex-

_____

[6] The level of funding is not an indicator of faculty quality. Obtaining funding has been "hyper-competitive" for over 16 years. Early-career (assistant professor) investigators frequently struggle to obtain funding. See Daniels, *A generation at risk: Young investigators and the future of the biomedical workforce*, 112 Proc. Natl. Acad. Sci. U. S. A. 313-318 (2015) (Despite efforts to help early-career investigators, "the trajectory of our science funding away from young scientists has only continued," in part because "the NIH open review process is a 'networked system' that favors insiders and the familiar and disfavors the unknown and the innovative [citations omitted].").

– 23 –

planations made by department-level reviewers (Br. Aplt., at 24-25). Thus, the court below misrepresented the evaluation of my funding prospects.

There are additional examples of misleading statements in the court's Opinion, but I wish to clarify just one more—that I complained about not getting proper credit for my work (Kan. Sup. Ct. Opin., App. A, at 7a). Stating the context of my comments is important, because otherwise it appears as if I am blaming my former mentors for taking credit for my work. In fact the opposite was true. Because of a letter from my former mentor, which the Departmental committee cited in its decision letter (Br. Aplt. App. A; R. Vol. 1 at 182), my department gave me more credit for my independence than did at least some external reviewers. The Chair of my department also explained this in his decision letter in support of tenure, which quoted from my mentor's letter and which I cited for the court below (Sup. Br. Aplt. at 6; R. Vol. 1 at 179): "I can assure you and your colleagues at Kansas that this paper and the approach that led to it were entirely Edina's inspiration and labor." My comment was a reference to grant proposal reviewers, who improperly credited my former mentors for my very independent research. This issue is important because it is one of the numerous ways in which my department had the most information and expertise to evaluate me fairly, and it shows why the Department's "detracting" review needed to be addressed in the Opinion below, as required by the KJRA (K.S.A. § 77-621(d)).

– 24 –

REASONS FOR GRANTING THE PETITION

*A. Limits on state court power serves the public good*

This Court most often will defer to a state court's judgment on whether or not due process in a state court case was sufficient and whether or not state law was properly construed and applied. The Constitution does not impel this Court to "train a skeptical eye on a state court's portrayal of state law." *Bush v. Gore*, 531 U.S. 98, 140 (2000) (Ginsburg, J., dissenting). But there are limits to state court power even in what is (or should be) a thoroughly state matter. "The Due Process Clause, in both its substantive and procedural aspects, is a central limitation upon the exercise of judicial power." *Stop the Beach Ren. v. Fla. Dept. of Env. Prot.*, 130 S.Ct. 2592, 2614, 560 U.S. 702 (2010). (Kennedy, J., concurring in part and in the judgment). The manner in which my case was handled below—regardless of whether state law or federal law was most critical for the judgment—should qualify my case as a federal matter.

Clearly, I was not outright denied a "process" of some form. But "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And a hearing "must be a real one, not a sham or a pretense." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (citing *Moore v. Dempsey*, 261 U.S. 86 (1923); *Mooney v. Holohan*, 294 U.S. 103 (1935)). The "opportunity to be heard" in my case surely ought to mean more than

– 25 –

just an opportunity to file briefs and motions and (presumably) have them read by all judges who participated in my case. (There was no oral argument at any stage in this case, and so my briefs were my "voice" that should have been "heard.") In my case, a "real" and "meaningful" hearing ought to have meant having my side of the issues fairly considered and fairly represented when there is a published court opinion. This did not happen, and because of that, I was harmed by more than just the judgment.

Not every inaccuracy, omission, or unnecessary violation of privacy in a published court opinion will qualify as a "liberty infringement." But in my case the court's published opinion did reach that level, because it misrepresents my case, it severely harms my reputation, and it obviously harms my career and employment prospects. It was not merely harmful; it was unjust. "[T]he individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being— a concept at the root of any decent system of ordered liberty.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (concurring opinion)). And the court's reliance on invalidated rather than current law—with no response to my objections that it was doing so—is not "within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Hurtado v. California*, 110 U.S. 516, 535 (1884). The court's treatment of my case was thus a violation of my substantive due process rights.

– 26 –

While I am claiming a violation of substantive due process rights, the nature of that violation in this case clearly overlaps with a denial of procedural due process. There is a possibility for procedural remedy in this case. The substantive aspects of my due process claim, as well as my claim that the court below improperly relied on federal law, should justify the need to scrutinize whether or not the court below applied the proper standard of review and procedural due process. There is in addition a "historical context" for this case, as well as "recalcitrance" by state courts, that justifies scrutiny in my case. Cf. *Bush v. Gore*, 531 U.S. at 140-52 (Ginsburg, J., and Breyer, J., dissenting opinions).

We live at a time in which people of ordinary means are increasingly denied access to our courts, especially when they wish to challenge employer abuses. See, *e.g.*, *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018). Even when court rulings do not explicitly preclude access to our courts, it is rare for an employee to prevail in a legal challenge to an employment decision. I am not aware of any KJRA case in which an employment decision was successfully challenged. The refusal to abide by the legislated amendments to the KJRA—amendments that are typically required for making judicial review effective—may be a systematic problem, as this was an issue in *Romkes* as well (see *supra*, at 15-16). The Kansas legislature intended for the KJRA to provide a remedy and accountability in university employment disputes. The ineffectiveness of judicial review in employment disputes is a wrongful denial of justice and only serves to funnel these types of cases to

– 27 –

civil actions in federal courts, thereby increasing the time, effort, and cost of resolving the cases.

I had clear legal rights in this case, and the courts had a duty to protect my rights. The failure to do so was especially likely to happen in my case, because I was a *pro se* litigant. There is a systematic problem of courts failing to meet the needs of litigants who cannot afford an attorney:

> "Many of the lower courts… can be lawless. When lawyers are present on both sides of cases, courts act more like courts, following the rules they have made to guide their own activities….. Courts, already paid for by public taxpayer dollars and empowered to act by the public they are supposed to serve, have the responsibility to solve this problem." Sandefur, *Access to What?* Daedalus (Winter 2019).
> https://www.amacad.org/publication/access-what

### B. Case law prescribing the rule-like application of the special "academic deference" is controversial and lacks rational basis

Courts frequently invoke a special "academic deference" standard to justify differential treatment of discrimination claims in which an employment dispute involves an academic decision, such as denial of tenure. See Moss, *Reluctant Judicial Factfinding: When Minimalism and Judicial Modesty Go Too Far*, 32 Seattle U.L. Rev. 549, 555 (2009). The notion that academic judgment deserves its own special deferen-

– 28 –

tial standard is not universally held. It has been criticized for its harmful effects:

> [T]he penchant of many courts to dismiss employment discrimination claims based on 'academic deference' is misguided in a host of ways. It threatens to leave academia an island of civil rights lawlessness, essentially exempt from Title VII — a dangerous outcome for a society in which there is such gender inequity in academia.
> Scott A. Moss, *Against Academic Deference: How Recent Developments in Employment Discrimination Law Undercut an Already Dubious Doctrine*, 27 Berkeley J. Emp. & Lab. L. 1, 5 (2006).

And it has been criticized for having no logical basis:

> [W]e do not understand why university affairs are more deserving of judicial deference than the affairs of any other business or profession. Arguably, there might be matters unique to education on which courts are relatively ill equipped to pass judgment. However, this is true in many areas of the law, including, for example, technical, scientific and medical issues. Yet, this lack of expertise does not compel courts to defer to the view of one of the parties in such cases.
> *McConnell v. Howard University*, 818 F.2d 58, 69 (D.C. Cir. 1987).

The special treatment of academic decisions especially when they involve tenure is also controversial:

– 29 –

I do not see a qualitative distinction be-
tween a tenure decision and any other em-
ployment decision. The subjective esteem of
colleagues and supervisors is often the key
to any employment decision. … Indeed,
subjective esteem is more important in cer-
tain blue-collar contexts, where, for exam-
ple, lives may depend on the employee's
performance and good judgment. [Citations
omitted.]
*Namenwirth v. Board of Regents of Univ. of
Wisconsin*, 769 F.2d 1235, 1244 (7th
Cir.1985). (Swygert, J., dissenting.)

Tenure is not a highly unusual employment
situation and it does not mean a "guaranteed job for
life." It does not protect incompetence or sloth. It pro-
tects academic freedom and it protects due process
rights. Tenured faculty members undergo annual
performance evaluations, and termination of a ten-
ured faculty appointment due to performance or
other issues can and does occur in Kansas and else-
where. Tenure at the University of Kansas, accord-
ing to its *Faculty Code of Rights, Responsibilities,
and Conduct* (Supp. Br. Aplt. at 22) means the fol-
lowing:

Tenured faculty may be removed only for
cause, in cases of program discontinuation,
or in cases of bona fide financial exigency
consistent with Faculty Senate Rules and
Regulations (FSRR) 6.1.2. The University
will follow the University Senate Code,
Faculty Senate Rules and Regulations,

– 30 –

and University Senate Rules and Regula-
tions as applicable in such cases.
(Faculty Code, Article III, Section 15.)

Furthermore, University's rules do not indicate
that tenure is a special honor bestowed on a select
few who go through the review process. Some univer-
sities do follow such policy (most notably Harvard).
But the standard practice in Kansas public universi-
ties is that tenure-track professors who meet the
guidelines for tenure are granted tenure. I was not
demanding special treatment by pursuing this case; I
was asserting that the tenure decision for me should
have been made according to the same rules and ex-
pectations that were applied to other faculty mem-
bers in my department.

Not being granted tenure means the loss of a job
and often the loss of a career and work that had been
the center of one's life for many years, sometimes
decades. It can mean the loss projects and reagents
that took many years, and much public expense, to
develop, and which were an investment intended to
last for many years or future work. In my case, I had
hundreds of strains and cell lines and reagents that I
created or collected since I was a graduate student in
the nineties (Aplt. Mot. Rehear. Modif. Kan Ct. Ap-
peals, at 7), and I had long-term ongoing projects
that I developed as a graduate student and post doc
and brought with me to Kansas. Those projects and
reagents did not belong to the University; they be-
longed to the public. The University was merely a
caretaker, and it owed the public, and it owed me, far

– 31 –

more care in safeguarding years of work by conduct-ing a proper and careful tenure review.

Judicial review under the KJRA was intended as a mechanism to hold state agency decision-makers, including public university administrators, account-able, and thus to promote careful decision-making. Being that this is the goal of the law, there is no ra-tional basis whatsoever for why an important uni-versity administrative decision ought not to get a normal, proper judicial review—a proper review that takes a few months, not years; a proper review that considers the facts and legal arguments presented by both sides, and which presents the facts fairly and accurately; a proper review that uses the current standards of review, as intended by the legislature, rather than a misguided and outdated standard that had been explicitly corrected by the legislature. There is no rational basis for why my status as an academic employee should deprive me of my right to due process and equal protection under the KJRA.

## C. Accountability of public university decision-makers serves the public good

Public universities in the United States are in-creasingly straying from a mission of serving the public good, and instead are prioritizing private good, including status and prestige (rankings of all sorts; promoting the university "brand"), money (at-tracting wealthy non-resident students by providing expensive amenities and supporting a party cul-

– 32 –

ture),[7] and pursuit of short-term goals that advance the careers of academics, even when this has harmful long-term consequences (a focus on paper count and grant count rather than on the long-term contributions of research; short terms in "stepping-stone" leadership positions).[8] This shift in mission is in part caused by a decrease in state funding and the resulting privatization of public universities. But decreases in public funding often follow, rather than precede, tuition hikes, and further funding cuts are then provoked by the willingness of university leaders to raise tuition and by their failure to put up a fight for a mission to serve public rather than private interests. This situation has been described as a "self-reinforcing devolutionary cycle," or a decline cycle.[9] The result is a decline in the quality of public education and research, while tuition and other costs keep increasing for students and their families.[10] This leads to decreased access to quality higher education, to an increasingly stratified society, and to our nation's intellectual decline. The decline of public universities, for which university leadership is partly to

_____

[7] Armstrong and Hamilton, *Paying for the Party: How College Maintains Inequality,* 2013.

[8] Tuchman, *Wannabe U: Inside the Corporate University*, 2009, Chapter 4; Derek Bok, *Higher Education in America*, 2013, Kindle Ed., pp. 34-38, 43-50, 74, 330, 336.

[9] Newfield, *The Great Mistake: How We Wrecked Public Universities and How We Can Fix Them*, 2016). Kindle ed., loc. 171, 381, 845.

[10] *Ibid.*, loc. 301, 528, 553, 713. Also, Brownstein, *American Higher Education Hits a Dangerous Milestone,* theatlantic.com, May 3, 2018.

– 33 –

blame, is a serious threat to our democracy. It is thus critically important to hold public universities accountable for decisions that are harmful, unjust, and not in accordance with formal university rules and policies that were designed to promote the public good. The discriminatory special "academic deference," and failure of courts to follow standard procedures and the law in cases involving challenges to university decisions, harmfully—and unlawfully—excludes university administrators from accountability.

*D. The quality of publicly-funded research would improve if university decision-makers were held accountable when they fail to adhere to formal rules and standards for evaluating faculty scholarship*

The University's rules and departmental standards for tenure and promotion do not state that "quantity" of scholarship is more prized than "quality." They do not state, or even hint, that the University's financial interests are to be considered in tenure decisions (Br. Aplt., at 2; R. Vol. 1, at 54-58). They do not specify a paper count or grant count or dollar count. They don't, and won't, specify such things because it would be shameful to do so. And if it is shameful to put a policy in writing, then it is shameful to follow it in practice. The pressure for high paper counts and grants is intense in academia, with well-known harmful consequences especially in the sciences. Numerous articles and books have been published in the past few years documenting the

– 34 –

high rate of irreproducible published results.[11] There is a danger that the intense pressure on academic scientists is selecting for and normalizing unethical behavior and lower quality research.[12] This is harmful for science, wasteful of public funds, and a betrayal of the public that supports academic research.

The University's rules and regulations for tenure review, and my department's official standards for tenure and promotion, support the University's stated mission to promote high-quality research (Br. Aplt., at 2; R. Vol. 1, at 54-58). I had a right, and also a responsibility, to put up a fight against a decision that was not made according to those rules and standards. The legal system, and the KJRA, was my sole permissible mechanism for doing so. The court below should not be allowed to apply a special "academic deference" to deprive me of the right to a normal judicial review, according to current law, as intended by the legislature.

---

[11] Yong, *The Inevitable Evolution of Bad Science: A simulation shows how the incentives of modern academia naturally select for weaker and less reliable results.* The Atlantic, Sept. 21, 2016; Richard Harris, *Rigor Mortis: How Sloppy Science Creates Worthless Cures, Crushes Hope, and Wastes Billions* (New York: Basic Books, Hachette Book Group, 2017).

[12] Edwards and Roy, *Academic Research in the 21st Century: Maintaining Scientific Integrity in a Climate of Perverse Incentives and Hypercompetition.* 34 Environ Eng Sci. 51 (2017).

– 35 –

CONCLUSION

For the foregoing reasons, I request that this
Court grant the Petition for Certiorari. I further re-
quest that this case be remanded to the Kansas Su-
preme Court with instructions to review the case ac-
cording to the current standards of review pursuant
to the KJRA, or for the Kansas Supreme Court to in-
stead remand the case to the Kansas Court of Ap-
peals, for a review either by a new panel or the same
as the previous one.

Dated: August 1, 2019

Respectfully submitted,

Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: 785-856-3924
email: eharsay@gmail.com
Petitioner, pro se

APPENDIX A
OPINION OF THE KANSAS SUPREME COURT


APPENDIX B
OPINION OF THE KANSAS COURT OF APPEALS


APPENDIX C
ORDER OF DENIAL OF REHEARING AND MODIFICATION


APPENDIX D
CONSTITUTIONAL AND STATUTORY PROVISIONS IN-
VOLVED

– 1a –

**430 P.3d 30** (2018)

## Edina HARSAY, Appellant,
v.
## UNIVERSITY OF KANSAS, Appellee.

No. 114,292.

### Supreme Court of Kansas.

Opinion filed November 21, 2018.

Review of the judgment of the Court of Appeals in an unpublished opinion filed July 29, 2016. Appeal from Douglas District Court; ROBERT W. FAIRCHILD, judge. Opinion filed November 21, 2018. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

Edina Harsay, appellant, was on the briefs pro se.

Sara L. Trower, associate general counsel and special assistant attorney general, and Michael C. Leitch, associate general counsel and special assistant attorney general, Lawrence, were on the briefs for appellee.

*Syllabus by the Court*

1. K.S.A. 60-518 is applicable to save a Kansas Judicial Review Act action challenging a university

Appendix A

– 2a –

promotion and tenure denial, if the action is refiled within six months of dismissal for lack of prosecution.

2. On the record in this case, a university's decision to deny promotion and tenure was supported by evidence "based on a determination of fact, made or implied by the agency" that was "supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole," as required by K.S.A. 2017 Supp. 77-621(c)(7).

The opinion of the court was delivered by

BEIER, J.:  After being denied promotion and tenure at the University of Kansas, Edina Harsay brought this action under the Kansas Judicial Review Act. The district judge dismissed the action for lack of prosecution. Harsay then refiled within six months, relying on K.S.A. 60-518, the savings statute, to make her action timely.

A panel of our Court of Appeals reversed the dismissal, ordering remand to the University to begin the promotion and tenure consideration process anew. The University has successfully petitioned for our review of whether K.S.A. 60-518 should have been applied, and, if so, whether the University's decision to deny Harsay promotion and tenure should be upheld because it was supported by substantial evidence.

We hold K.S.A. 60-518 applied to make Harsay's refiled KJRA action timely; but, because the University's decision was supported by substantial evidence

Appendix A

– 3a –

under <u>K.S.A. 2017</u> Supp. 77-621(c)(7), that decision must stand.

## FACTUAL AND PROCEDURAL BACKGROUND

Harsay was hired for a tenure-track position on the faculty of the University in January 2004.

### *The University's Promotion and Tenure Process*

The University's multilayered review process for tenure culminates in the granting or the denial of promotion and tenure. Denial leads to termination of employment. Each level of review is independent of the others; no reviewing level is bound by the decision of any other; and each level must base its decision on the applicant's scholarship, teaching, and service to the University.

The process ends with the chancellor's decision. According to the University's rules, the chancellor must consider the entire record before him or her in making the decision. The chancellor's decision is a final agency action under Kansas law.

According to the University, scholarship is an essential aspect of the applicant's record and the tenure review process. Applicants seeking tenure must demonstrate "accomplishment reflecting a sustainable program of scholarly activity," and review of this area must be done "in light of the expectations of the discipline." Scholarship review covers both the quan-

Appendix A

– 4a –

tity and quality of the applicant's work. It also includes evaluation of the work by peers in the applicant's field from outside the University, as well as evaluation of the applicant's reputation in his or her field. An applicant's "teaching (or professional performance), scholarship, and service are characterized as `excellent,' `very good,' `good,' `marginal,' or `poor.'" An applicant for tenure must receive at least a rating of "`good'" in all three categories "[a]bsent exceptional circumstances."

### *Harsay's Dossier*

Harsay's tenure review began in 2009 in her Department of Molecular Biosciences, to which Harsay submitted a promotion and tenure "dossier." The dossier included information about her pertinent scholarship and grants as well as external reviews from peers in her field.

Harsay reported her scholarship as one published article in a scientific journal in 2007; one paper accepted and being prepared for publication, which was published later in 2009; and one manuscript being considered for acceptance for publication.

As for grants, Harsay reported four grants from the National Institutes of Health (NIH) and one grant from the American Heart Association, totaling slightly more than $600,000. Harsay also included one pending grant from the NIH, one pending grant from the National Science Foundation (NSF), and one pending grant from the Department of Defense, totaling nearly $3.6 million. Harsay included propos-

Appendix A

– 5a –

als for eight more grants submitted to various or-
ganizations but not funded at the time of her appli-
cation for tenure.

The peers in Harsay's field whose remarks were
included in the dossier varied in their opinions re-
garding her promotion and tenure. Three reviewers
recommended Harsay for tenure; three recommended
tenure but expressed serious reservations; one re-
fused to endorse her. All reviewers mentioned insuf-
ficiency of scholarship. At least one reviewer com-
mented that a low publication rate like Harsay's
could make it difficult to maintain funding for her
work.

### Department Level

The review at the department level of the Univer-
sity resulted in a recommendation for Harsay to re-
ceive promotion to associate professor and tenure.
The vote was 11 to 6.

In its recommendation letter to the College of
Liberal Arts and Sciences committee that would con-
duct the next level of review, the department review
committee noted Harsay's relatively low number of
published papers and said that "[t]he question of
quantity versus quality was also at the center of the
department's discussion." A review by the full de-
partment noted that the external reviewers "ex-
pressed concerns about her level of productivity." But
Harsay "had moderate to good success at obtaining
extramural support for her research" and had grants
pending or received.

Appendix A

– 6a –

The department's recommendation was forwarded to the College Committee on Appointments, Promotions, and Tenure (the College Committee).

### College of Liberal Arts and Sciences Level

The College Committee initially concluded that Harsay did not qualify for promotion and tenure and notified the chair of Harsay's department, Robert S. Cohen, by letter. The College Committee made "this decision ... largely based on research productivity." It requested additional information on Harsay's scholarship and research proposals so that it could make a final recommendation to the body responsible for the next level of review, the University Committee on Promotion and Tenure (the University Committee). The College Committee's letter to Cohen stated that Harsay was to be provided a copy of the letter and an opportunity to respond to its preliminary conclusion.

Cohen responded to the College Committee's request for more information. He told the College Committee that since Harsay submitted the dossier she had successfully published another paper (bringing her total to two) and the third paper mentioned in the dossier, i.e., the "submitted manuscript," had been rejected by a publisher. Cohen also informed the College Committee that two of the three grants listed as pending in the dossier had not been funded and that a decision on the third pending grant was expected within a month.

Harsay also responded to the College Committee's preliminary conclusion. In her letter, she explained

Appendix A

– 7a –

why she believed she had not been given proper credit for her scholarship, the hardships that may have affected her ability to publish more research papers, and the impact of her work. Harsay admitted difficulty in obtaining funding, speculating that it was due to receiving less than the proper amount of credit for some of her scholarship.

Victoria Corbin, the College Committee chair, informed Harsay that, after reviewing her record, the committee finally voted to reject the application for promotion and tenure. Although the committee believed that Harsay met the criteria for teaching and service, it "determined that [Harsay's] level of research accomplishment [was] insufficient and did not meet the criteria for promotion to Associate Professor." The College Committee then told Harsay that her information would be forwarded to the University Committee.

A letter from the College Committee to the University Committee, signed by Corbin, said the College Committee's final vote was 7 to 0, with two abstentions. In its evaluation summary, the College Committee rated Harsay's teaching and professional performance as "Very Good"/"Good," her overall service as "Good," and her research and scholarship as "Marginal"/"Poor." The College Committee letter also incorrectly stated that Harsay had received only two grants from the National Institutes of Health and connected Harsay's lack of publications with a lack of funding: "Lacking sufficient, long[-]term extramural funding in molecular biosciences means fewer scholarly publications can be produced[,] which in turn

Appendix A

– 8a –

negatively affects the ability of [Harsay] to remain competitive for future funding."

The College's interim dean, Gregory B. Simpson, wrote to the University Committee to state his agreement with the College Committee's decision. According to Simpson, Harsay's lack of scholarly articles and inability to acquire sufficient extramural funding outweighed the potential benefits of granting her tenure. In his letter, Simpson repeated the incorrect statement that Harsay had secured only "two smaller grants" instead of the five that she had reported in the dossier. However, he correctly stated that Harsay had two articles "while at KU." After noting that all of the external reviewers had commented on Harsay's low research output, Simpson suggested Harsay not be granted tenure "[b]ased on her relatively weak research record at this point in her career."

### *University Level*

The University Committee conducted a preliminary vote on Harsay's application and rejected it, pointing to Harsay's lack of "research productivity" as the reason for her application's failure.

Per University rules, the University Committee informed Simpson by letter that it had initially voted to deny Harsay tenure and requested additional information to help it reach a final decision. It asked why the department committee had rated "Professor Harsay's research as very good in light of her low productivity and the evaluation of her external re-

Appendix A

– 9a –

viewers." It requested "[a]n assessment of the sustainability of Professor Harsay's research program in the absence of external funding." And it sought "[a] report on the status of the NSF application under review." The University Committee letter to Simpson also stated that Harsay should be notified of the committee's initial decision and afforded an opportunity to defend herself.

Cohen supplied information to Simpson in response to the University Committee's request, saying that the NSF grant was still pending but that "the likelihood for funding is probably quite low as most of the awards from this cycle have already been made." He also defended the department's evaluation of Harsay's research productivity and positively commented on her funding sustainability.

Harsay also responded to the University Committee's initial decision. She acknowledged its concern with the "sustainability of [her] research program" and noted the potential impact of her research. She asserted that funding should not be a problem for her but recognized "my funding situation is currently a hardship for my lab."

The same day, Simpson sent Interim Provost Danny J. Anderson materials the College Committee had collected when the University Committee requested more information.

The University Committee ultimately rejected Harsay's application for promotion and tenure on a 9 to 0 vote, with one abstention.

Appendix A

– 10a –

Anderson sent a letter to Harsay, informing her of the University Committee's decision and stating he agreed with it. He also forwarded the recommendation to the chancellor for her final decision. Anderson's letter to Harsay did not explain in detail why he accepted the University Committee's recommendation, but it did state "the [committee] has recommended that you not be awarded tenure or promotion to Associate Professor... based upon your record of research productivity."

### *Faculty Rights Board Appeal*

Harsay appealed the decisions of the College Committee and the University Committee to the Faculty Rights Board, claiming that her right to academic freedom had been violated.

The board rejected Harsay's claim, saying in a short letter to Harsay, the chancellor, the associate general counsel for the University, the interim provost, and the vice provost that it found no substantive violation of Harsay's rights as a faculty member, as those rights were defined by the University's rules and regulations. The board recommended that Harsay's case be finally decided by the chancellor.

### *Chancellor's Decision*

On April 23, 2010, Anderson sent a letter to Harsay to inform her of the chancellor's decision. The letter did not elaborate on rationale, stating simply: "Chancellor [Bernadette] Gray-Little has decided to accept the recommendation of the University Com-

Appendix A

– 11a –

mittee on Promotion and Tenure not to award you tenure or promotion to Associate Professor." The letter also stated that, as a result, Harsay's employment by the University would terminate. The letter itself was "intended to serve as a notice of final agency action."

### District Court Action

Harsay filed a timely petition for judicial review of the University's promotion and tenure decision in the Douglas County District Court. She alleged that the decision was not supported by substantial evidence and was unreasonable, arbitrary, or capricious. See K.S.A. 2017 Supp. 77-621(c)(7), (8) (two of eight grounds for reversal of agency decision under the KJRA).

On June 21, 2012, Harsay's district court action was dismissed for failure to prosecute. Nearly six months later, on December 4, 2012, Harsay refiled the case under the savings statute, K.S.A. 60-518, which provides: "If any action be commenced within due time, and the plaintiff fail in such action otherwise than upon the merits, and the time limited for the same shall have expired, the plaintiff ... may commence a new action within six (6) months after such failure."

The district court ruled against Harsay on the merits of her challenge to the University's decision, holding that the University's denial of promotion and tenure was supported by substantial evidence and was not unreasonable, arbitrary, or capricious.

Appendix A

– 12a –

### *Court of Appeals Decision*

Harsay appealed, and a panel of our Court of Appeals reversed the district court's decision. *Harsay v. University of Kansas,* No. 114292, 2016 WL 4069604, at *8-9 (Kan. App. 2016) (unpublished opinion).

The panel cited the Administrative Procedure Act, specifically the requirement in K.S.A. 77-526(c) that a final order shall include

> "separately stated, findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion, for all aspects of the order, including the remedy prescribed and, if applicable, the action taken on a petition for stay of effectiveness. Findings of fact, if set forth in language that is no more than mere repetition or paraphrase of the relevant provision of law, shall be accompanied by a concise and explicit statement of the underlying facts of record to support the findings."

The panel ruled that meaningful appellate review of the University's decision was impossible because its factual findings and legal conclusions in the April 23, 2010, letter were "inadequate to disclose the controlling facts or the basis of the agency's findings." 2016 WL 4069604, at *8.

The panel accurately pointed out that the College Committee had incorrectly reported to the University Committee that Harsay had only "`two small external grants' from the NIH. This report of Dr. Harsay's grant funding was materially in error," because she had been awarded a total of five grants from two

Appendix A

— 13a —

sources at the time of her tenure application. 2016 WL 4069604, at *8. The panel noted that the University Committee cited no basis for its recommendation that tenure be denied other than Harsay's "record of research productivity," and the chancellor accepted the University Committee's recommendation. 2016 WL 4069604, at *5.

The panel then continued:

"If the chancellor had before her the correct information on Dr. Harsay's scholarly works and funded research grants over her years at the University, would the chancellor have made the same decision? The chancellor very well may have arrived at the same conclusion that Dr. Harsay should be denied tenure because of an inadequate record of research productivity... [b]ut it is not for us to speculate on whether the chancellor's decision would have been different if she had before her a recommendation from the University Committee based on accurate information." 2016 WL 4069604, at *9.

The panel thus reversed the district court judgment and remanded the case to the University to restart Harsay's promotion and tenure review process. 2016 WL 4069604, at *10.

## DISCUSSION

Before reaching the dispositive K.S.A. 60-518 and substantial evidence issues on petition for review, we pause to discuss three preliminary matters briefly.

Appendix A

– 14a –

First, shortly before the docket to which Harsay's case was assigned was set to begin, Harsay moved to "immediately" file a conditional cross-petition for review. Conditional cross-petitions were allowed for the first time when we amended Supreme Court Rule 8.03, effective July 1, 2018. See Supreme Court Rule 8.03(a)(1). Harsay sought to address two issues — the applicability of K.S.A. 60-518 and the appropriate remedy for her tenure denial. Because these two issues have already been exhaustively covered in both parties' voluminous filings, including supplemental briefs to this court, we deny Harsay's motion. This ruling on the merits of the motion eliminates any necessity to address whether the motion was untimely or otherwise procedurally deficient.

Second, we agree with the University that the KJRA provides the bulk of the statutory infrastructure supporting an action such as Harsay's, which was filed in the district court to challenge a final agency action with which she disagreed. Indeed, Harsay invoked the KJRA's grounds for reversal in her petition, asserting that the University's tenure decision was not supported by substantial evidence, see K.S.A. 2017 Supp. 77-621(c)(7), and was otherwise unreasonable, arbitrary, or capricious, see K.S.A. 2017 Supp. 77-621(c)(8). The panel's citation and quotation of the Administrative Procedure Act demonstrated no contrary understanding of the governing law in a judicial review action. It merely supported the panel's observations of the bare-bones nature of the University's notice of the decisions made at two levels of Harsay's tenure review. These observations and inaccuracy in the count of Harsay's

Appendix A

— 15a —

grants when the College Committee reported its outcome to the University Committee combined to make the panel lose confidence in its ability to perform its mandatory role under the KJRA. See K.S.A. 77-606 (KJRA "exclusive means of judicial review of agency action"). This is not the same thing as disregarding or misunderstanding that role, as the University contends.

Third, we must address preservation of the K.S.A. 60-518 issue. Ordinarily we would not permit a party to raise an issue for the first time in a petition for review. However, an absence of subject matter jurisdiction can be raised at any time — by a party or by the court sua sponte, see *Stechschulte v. Jennings,* 297 Kan. 2, 29, 298 P.3d 1083 (2013) (citing *Mid-Continent Specialists, Inc. v. Capital Homes,* 279 Kan. 178, 185, 106 P.3d 483 [2005]); *Ternes v. Galichia,* 297 Kan. 918, 921, 305 P.3d 617 (2013) (citing *Vorhees v. Baltazar,* 283 Kan. 389, 397, 153 P.3d 1227 [2007]) — and compliance with any applicable time limit for challenging an agency action is required to endow a reviewing court with subject matter jurisdiction. See, e.g., *Pieren-Abbott v. Kansas Dep't of Revenue,* 279 Kan. 83, 99, 106 P.3d 492 (2005) ("`The rule is well established that the time for taking an administrative appeal, as prescribed by statute, is jurisdictional and delay beyond the statutory time is fatal.'"); *W.S. Dickey Clay Mfg. Co. v. State Corp. Comm'n of State,* 241 Kan. 744, 749, 740 P.2d 585 (1987) (time limitation for administrative appeal jurisdictional, failure to appeal within statutory limit fatal); *Lakeview Village, Inc. v. Board of Johnson County Comm'rs,* 232 Kan. 711, Syl. ¶ 5,

Appendix A

– 16a –

659 P.2d 187 (1983) (same); *Vaughn v. Martell,* 226 Kan. 658, 661, 603 P.2d 191 (1979) (same). We thus permit the University to raise and argue its position that K.S.A. 60-518 should have been unavailable to make Harsay's refiled KJRA action timely. We see no unfairness in this approach, as Harsay has had ample opportunity to rebut the University on this point.

### *K.S.A. 60-518*

Having disposed of the three preliminary matters, we turn next to the merits of whether K.S.A. 60-518 applied to save Harsay's case and preserve subject matter jurisdiction. Because this issue requires interpretation or construction of K.S.A. 60-518 and the KJRA, we exercise unlimited review. *Neighbor v. Westar Energy, Inc.,* 301 Kan. 916, 918, 349 P.3d 469 (2015) (statutory interpretation, construction raise questions of law reviewable de novo). And

> "'[t]he fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. When language is plain and unambiguous, there is no need to resort to statutory construction. An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there.'" *In re Estate of Strader,* 301 Kan. 50, 55, 339 P.3d 769 (2014).

Under the KJRA, "[a] petition for judicial review of a final order shall be filed within 30 days after service of the order." K.S.A. 2017 Supp. 77-613. The

Appendix A

– 17a –

parties do not dispute that Harsay initially complied with this deadline by filing her district court petition for judicial review within 30 days of receiving notice of the chancellor's decision. While the action was pending, the 30-day jurisdictional time limit expired.

Again, nearly two years later, Harsay's action was dismissed for failure to prosecute. Within six months of that dismissal, Harsay refiled her KJRA action, relying on K.S.A. 60-518 to make it timely despite the expiration of the 30 days.

K.S.A. 60-518 is not a part of the KJRA but of the Code of Civil Procedure. The University therefore argues that it cannot apply in this case. But, in *Pieren-Abbott v. Kansas Dept. of Revenue,* we held that provisions of the Code of Civil Procedure can apply to appeals taken under the KJRA "if the provision is a logical necessity that is not addressed within the KJRA." 279 Kan. at 97, 106 P.3d 492. In that case, we observed that the procedural rights created by the KJRA are "`in addition to those created and imposed by other statutes.'" 279 Kan. at 96, 106 P.3d 492. And we relied upon summons and service of summons provisions in K.S.A. 8-1020(o) and in the Code of Civil Procedure, specifically K.S.A. 2003 Supp. 60-303, to allow review under the KJRA "to come into being." 279 Kan. at 97, 106 P.3d 492. The KJRA lacked the provisions borrowed from K.S.A. 8-1020(o) and K.S.A. 2003 Supp. 60-303; importing them qualified as a "logical necessity." 279 Kan. at 97, 106 P.3d 492.

Although *Pieren-Abbott* could support application of K.S.A. 60-518 in this case because the KJRA lacks

Appendix A

– 18a –

a savings provision, we need not go so far as to say that any savings provision is a "logical necessity" for the KJRA to perform its function. Rather, we can look to the plain language of K.S.A. 60-518 itself, which states unequivocally that it applies to "*any* action" that is commenced within "due time" and that fails "otherwise than upon the merits" when "the time limit for the same shall have expired." (Emphasis added.) This broad language encompasses a suit such as Harsay's, and this straightforward reading of it is "`the best and only safe rule for ascertaining the intention of lawmakers.'" *Neighbor,* 301 Kan. at 919, 349 P.3d 469. Thus we hold that K.S.A. 60-518 was correctly employed by the district court to allow Harsay's refiled action to proceed.


### *Substantial Evidence*

With the subject matter jurisdiction question answered, we turn to the merits of the University's decision: Was the denial of promotion and tenure to Harsay, as required by K.S.A. 2017 Supp. 77-621(c)(7), "based on a determination of fact, made or implied by the agency" that was "supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole"?

We have frequently defined "substantial competent evidence" as "that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." See, e.g., *State v. Sharp,* 289 Kan. 72, 88, 210 P.3d 590 (2009). "Substantial competent

Appendix A

– 19a –

evidence," as that phrase is used in myriad cases, is essentially equivalent to "evidence that is substantial" under K.S.A. 2017 Supp. 77-621(c)(7). See *Atkins v. Webcon*, 308 Kan. 92, 96, 419 P.3d 1 (2018) (equating "substantial competent evidence" to "evidence `that is substantial'").

In addition, the KJRA elaborates on the phrase, "in light of the record as a whole," in K.S.A. 2017 Supp. 77-621(d):

> "For purposes of this section, `in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record ... cited by any party that supports such finding.... In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

The choices involved in the decision to recommend or deny tenure are inherently subjective, involve a series of discretionary decisions made by various groups of people, and are based in part on the business judgment of the University. See *Romkes v. Univ. of Kansas*, 49 Kan.App. 2d 871, 889-91, 317 P.3d 124 (2014) (discussing cases in the context of employment discrimination and tenure). In this case, the Court of Appeals was rightfully concerned with the lack of detail informing Harsay of the chancellor's final call.

Appendix A

– 20a –

But we do not agree with the panel's assertion that meaningful judicial review was precluded. While the notice of the chancellor's decision was short on details, it did say that the chancellor was accepting the recommendation of the University Committee. And the University Committee stated it initially rejected Harsay's application because it was concerned with her research productivity. This concern was reiterated when it had taken its final vote. Furthermore, Harsay explicitly recognized herself that her research record was somewhat thin — a primary concern for the University. The bottom line is that the existence of this concern and the reasons for it are supported at multiple points in the record of the multilayered tenure review process, including in the expressed misgivings of outside peer reviewers.

Harsay is correct when she states that the number of her funded grants was misstated in the College Committee letter signed by Corbin and in the letter from Simpson, and both misstatements are parts of the KJRA "record as a whole." But there is ample other material in the record correctly stating the number of grants, and the University's rules provide clearly that each level of tenure review makes its own evaluation separately from each other level. Harsay directs our attention to no evidence, substantial or otherwise, that demonstrates that the University Committee or the chancellor deviated from their responsibilities to review *all* materials and arrive at *independent* conclusions.

In sum, "in light of the record as a whole," we see plenty of "evidence that is substantial" under K.S.A.

Appendix A

– 21a –

2017 Supp. 77-621(c)(7) to support the University's decision to deny Harsay promotion and tenure. The single inaccuracy twice mentioned on a subject that was but one feature of one criterion in the three-criterion evaluation process did not fatally pollute that process or necessarily detract from or destroy the many accurate elements the decision makers had before them. Harsay's identification of that inaccuracy is not enough to meet her burden to show a lack of the required evidence under K.S.A. 2017 Supp. 77-621(c)(7). Indeed, if we treated this identification otherwise, we would be derelict in our duty to consider the case "in light of the record as a whole."

Finally, we note that Harsay also attempted in the district court and before the Court of Appeals to challenge the University's decision as "otherwise unreasonable, arbitrary or capricious" under K.S.A. 2017 Supp. 77-621(c)(8). She also added an argument before the Court of Appeals that the University incorrectly applied the law under K.S.A. 2017 Supp. 77-621(c)(4), because it relied on finances as well as her scholarship, teaching, and service in denying her promotion and tenure.

As with the question of whether the record as a whole contained substantial evidence to support the University's decision, the Court of Appeals did not reach the merits of these two distinct challenges by Harsay. Nor did it address any potential preservation problem with the K.S.A. 2017 Supp. 77-621(c)(4) argument advanced for the first time on appeal.

We do not reach the merits of these challenges today because we consider them abandoned. Harsay

Appendix A

– 22a –

opposed granting the University's petition for review, did not file a cross-petition for review, and did not attempt to raise either of these two challenges through her eventual motion to file a conditional cross-petition for review. See *State v. Funk,* 301 Kan. 925, 932-33, 349 P.3d 1230 (2015) (issues not fairly included in petition or adequately briefed deemed abandoned). The only petition for review this court granted was filed by the University, and its merits arguments focused only on K.S.A. 2017 Supp. 77-621(c)(7). That issue has been addressed and resolved in the University's favor.

## CONCLUSION

For the reasons set forth above, the Court of Appeals decision is reversed and the judgment of the district court is affirmed.

STEGALL, J., not participating.

JEFFREY E. GOERING, District Judge, assigned.[1]

GOERING, J., concurring:

I agree with the majority that there is substantial evidence in the administrative record as a whole to support the University's decision to deny Edina Harsay promotion and tenure. I write separately because I respectfully disagree with the majority that K.S.A. 60-518 can be applied to actions arising under the Kansas Judicial Review Act (KJRA).

"In construing statutes and determining legislative intent, several provisions of an act, *in pari materia,* must be construed together with a view of recon-

Appendix A

– 23a –

ciling and bringing them into workable harmony if possible. [Citation omitted.]" *State v. Brown,* 272 Kan. 843, 847, 35 P.3d 910 (2001). Accordingly, while the language of K.S.A. 60-518 is broad, that language cannot be considered in a vacuum. K.S.A. 60-518 must be construed with the rest of Article 5 in order to determine the scope of its application. K.S.A. 60-501 plainly limits the application of K.S.A. 60-518 to civil actions: "The provisions of this article govern the limitation of time for commencing *civil actions,* except where a different limitation is specifically provided by statute." (Emphasis added.)

It is well established that administrative appeals to the district court are not "civil actions." *In re Gantz,* 10 Kan.App. 2d 299, 302, 698 P.2d 385 (1985); see also *Kansas Turnpike Authority v. Jones,* 7 Kan.App. 2d 599, Syl. ¶ 1, 645 P.2d 377 (1982) (an appeal to the district court from an administrative decision is not the commencement of a civil action). Rather, administrative appeals are "in the nature of `judicial review'" of agency decisions. *Flanigan v. City of Leavenworth,* 232 Kan. 522, 528, 657 P.2d 555 (1983); see also *Nurge v. University of Kansas Med. Center,* 234 Kan. 309, 316, 674 P.2d 459 (1983) (the district court in an administrative appeal is a court of error and review). As such, the Legislature never intended K.S.A. 60-518 to be applied to administrative appeals taken under the KJRA.

In *Pieren-Abbott v. Kansas Dept. of Revenue,* 279 Kan. 83, 106 P.3d 492 (2005*),* this court held that provisions of the Code of Civil Procedure can be applied to appeals taken under the KJRA "if the provision is a logical necessity that is not addressed under

Appendix A

– 24a –

the KJRA." 279 Kan. at 97, 106 P.3d 492. In *Pierren-Abbott,* this court addressed the service of a summons necessary to initiate judicial review of an administrative decision suspending driving privileges. This court held that because the service of a summons was required to effectuate judicial review, but the method of serving process was not mentioned in the KJRA, the use of the Code of Civil Procedure became a "logical necessity." 297 Kan. at 97, 298 P.3d 333.

The KJRA does not have a savings statute. Nevertheless, the savings statute in K.S.A. 60-518 is not necessary to carry out the functions of the KJRA. Thus, the application of K.S.A. 60-518 to the KJRA is not a "logical necessity" in order for judicial review of an agency action to take place. To the contrary, as the facts of this case demonstrate, the application of the savings statute to administrative appeals defeats the purpose of K.S.A. 77-613(d) which ensures the timely commencement of judicial review of an agency's final order by requiring that a petition for judicial review be filed within 30 days after the agency action.

For the foregoing reasons I would find that Harsay's appeal to the district court was not initiated within the time prescribed by K.S.A. 77-613(d) and would dismiss the appeal on that basis.

[1] REPORTER'S NOTE: District Judge Goering was appointed to hear case No. 114,292 vice Justice Stegall under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

Appendix A

– 1b –

NOT DESIGNATED FOR PUBLICATION

No. 114,292

IN THE COURT OF APPEALS OF
THE STATE OF KANSAS

EDINA HARSAY, Appellant,

v.

THE UNIVERSITY OF KANSAS,

Appellee.

MEMORANDUM OPINION

Appeal from Douglas District Court; ROBERT W.
FAIRCHILD, judge. Opinion filed July 29, 2016.
Reversed and remanded with directions.

Edina Harsay, of Lawrence, appellant pro se.

Sara L. Trower, associate general counsel and
special assistant attorney general, for appellee.

Before GREEN, P.J., MCANANY and ATCHESON,
JJ.

*Per Curiam*: Dr. Edina Harsay, a former assistant
professor in the Department of Molecular Biosciences
at the University of Kansas (University), appeals the
ruling of the district court finding no legal impropri-
ety in the University's decision to deny her promo-
tion to associate professor with tenure.

Dr. Harsay joined the University's faculty in
January 2004 as an assistant professor in the De-

Appendix B

– 2b –

partment of Molecular Biosciences on track for a possible tenured position. The University's tenure track is a 7-year up-or-out process. Under this process, Harsay was on probation for a period of 7 academic years. During 2009, the sixth year of her employment, the University conducted a review to determine her eligibility for tenure.

The University denied tenure, so Harsay was terminated from her position at the end of her seventh year, the 2010-2011 academic year.

### Tenure Review Process

At the time of Dr. Harsay's promotion and tenure review, the University's procedure involved a multi-level review process set forth in the University's Faculty Senate Rules and Regulations (FSRR), Article VI. In Dr. Harsay's case, the Department of Molecular Biosciences conducted the initial review of her application for promotion and tenure; the College of Liberal Arts and Science's College Committee on Appointments, Promotion, and Tenure (College Committee) conducted the intermediate level review; and the University Committee on Promotion and Tenure (University Committee) conducted the university level review. After the university level review, Dr. Harsay's complete promotion and tenure application, including the recommendations of each review committee, was forwarded to the University's chancellor for a final determination on tenure. The chancellor's decision was the final agency action, and no further administrative review was permitted following the chancellor's decision.

Appendix B

– 3b –

The FSRR required that Dr. Harsay's application receive an independent review at each review level:

"Each level of review, including the initial review, the intermediate review . . . , and the university level review, conducts an independent evaluation of a candidate's record of performance and makes independent recommendations to the Chancellor. Later stages of review neither affirm nor reverse earlier recommendations, which remain part of the record for consideration by the Chancellor. It is the responsibility of each person involved in the review process to exercise his or her own judgment to evaluate a faculty member's teaching (or professional performance), scholarship, and service based upon the entirety of the data and information in the record. No single source of information, such as peer review letters, shall be considered a conclusive indicator of quality."

The provost was required to provide "guidelines for compiling and evaluating a candidate's record." FSRR § 6.3.4. Under FSRR § 6.3.4.2, those guidelines were to include

"a summary evaluation section to be prepared by the committee at each level and shared with the candidate upon completion of the initial review and intermediate review, if one is conducted. The evaluation section shall include:

Appendix B

– 4b –

"(a) the recommendation of the committee, its
rating of the candidate in the areas of
teaching (or professional performance),
scholarship, and service, and a statement of
the reasons for those ratings."

The University's promotion and tenure standards
provide:

"6.2.3. Scholarship. Scholarship is an essential
component of the University's mission as a
center of learning, and the award of tenure
and/or promotion in rank must be based on a
record of accomplishment reflecting a sustain-
able program of scholarly activity. Evaluation
of scholarship must be undertaken in light of
the expectations of the discipline."

Under section 6.2.3.1, scholarship includes "tradi-
tional academic research and publication." Under
section 6.2.3.2, in considering a promotion to a ten-
ured position the reviewers consider the quality and
quantity of the candidate's publications, "external
reviews of the candidate's work by respected scholars
or practitioners in the field, the candidate's regional,
national, or international reputation, and other evi-
dence of an active and productive scholarly agenda."

The departmental review criteria further provide:

"A ranking of 'very good' in research requires
publication of original work in peered-
reviewed journals. It is essential that this
work includes research that was carried out at
[the University], or is otherwise distinguish-
able from studies conceived by the faculty

Appendix B

– 5b –

member's doctorate and post-doctorate advisors. The quality and quantity of the published work needs to be sufficiently high to establish the faculty member as an important contributor to his or her field. It is also essential that the faculty member has demonstrated success at obtaining extramural funding to support his/her research program and that there is a reasonable level of assurance that they will maintain a productive research program of high scholarship for the foreseeable future."

### Departmental Review

In 2009, consistent with the University's promotion and tenure procedures, Dr. Harsay submitted an application for promotion and tenure with supporting materials showing her record of achievement. In her application, Dr. Harsay stated that since her appointment at the University she had

- 1 published journal article

- 1 "paper in press"

- 1 submitted manuscript.

With respect to research grants, she reported the following five funded grants:

1. National Institutes of Health (NIH) R21 NS061754-01 ($138,934 total cost; $25,000 additional direct cost pending approval of second stage of project; 9/30/07—8/31/09 plus requested extension)

Appendix B

– 6b –

2.   American Heart Association, 0760054Z ($143,000 total cost; 1/1/2007—12/31/2008)

3.   NIH X01MH077628-01 (resource award, 5/10/2006—1/31/2007)

4.   NIHRO3NS050784 ($70,000 total cost; 9/30/2004—8/30/2006)

5.   NIH P20 RR15563 ($250,000 total cost; 8/1/2004—4/30/2007).

She reported three additional pending research grants:

1.   NIH1R01GM ($1,795,027 total cost; 04/01/2010—03/31/2015)

2.   National Science Foundation ($1,388,027 total cost; 01/01/2010—12/31/2014)

3.   Department of Defense ($404,329 total cost; 01/01/2010—12/31/2011).

She also had submitted eight grant proposals that had not been funded. These were to the American Cancer Society, the Prevent Cancer Foundation, the National Science Foundation, and five to the NIH.

Dr. Harsay also provided with her application the evaluations of seven external reviewers, who had commented on her application for promotion and tenure. The reviews were generally favorable to Dr. Harsay, though several reviewers were concerned her publication rate was low for a tenure candidate in her field. A reviewer also expressed that it may be

Appendix B

– 7b –

difficult for Dr. Harsay to maintain an externally funded research program with a low publication rate.

The six-member Departmental Committee voted five to one in favor of tenure. A majority of the committee members rated Dr. Harsay's teaching and research records as "Very Good," and the committee unanimously rated her service record as "Very Good."

In its recommendation letter to the College Committee, the Departmental Committee discussed Dr. Harsay's research record:

"Dr. Harsay currently has one paper published based on research she has performed at [the University].

....

"In addition, she has two manuscripts currently submitted for publication. A revised version of [one of the manuscripts] is currently undergoing review. The editor of the paper has written our department chair, Dr. Robert Cohen, explaining his great interest in publishing the manuscript, and his expectation that the current version will be accepted for publication. . . .

....

"A third manuscript has been submitted to [another academic journal]. This is also a substantial paper, with a total of 10 figures and tables. . . .

....

Appendix B

– 8b –

". . . Dr. Harsay has also been successful at obtaining significant grant support for her research. She has been funded by the Cancer Experimental Therapeutics COBRE as a project [primary investigator], and by the American Heart Association grant. Her high throughput screening and characterization of the compounds she identified has been funded by an NIH R03 award, an NIH X01 Resource Award, and is currently funded by an NIH R21. She currently has proposals under review at the NIH, the NSF, and the Department of Defense."

In its evaluation, the Departmental Committee concluded:

"Overall, Dr. Harsay's major publication record consists of 2 strong papers submitted for publication, (of which one seems very likely to be accepted) and one extremely strong published paper. Her outside review letters confirm that Dr. Harsay's contributions are of extremely high quality. At the same time, the outside reviews all mention that Dr. Harsay's productivity . . . could be higher. She has thus far been successful at obtaining sufficient grant support to maintain a laboratory with an active research program capable of generating data of extremely high quality, and that has had a significant impact on her field."

On October 14, 2009, the Departmental Committee gave its recommendation to the tenured faculty members of the Molecular Biosciences Department.

Appendix B

– 9b –

The faculty members voted 11 to 6 to recommend promotion to associate professor with tenure. Two of the favorable votes were cast as "exceeds expectations," and nine of the favorable votes were cast as "meets expectations."

When the Departmental Committee advised the College Committee of this action, the department's chair, Dr. Robert Cohen, provided to the College Committee an evaluation of Dr. Harsay's application and discussed her research record. Dr. Cohen commented: "The question of quantity versus quality was . . . at the center of the Department's discussion of Dr. Harsay's promotion and tenure dossier."

### *College of Liberal Arts and Sciences Review*

At the intermediate level of review, the nine-person College Committee performed an initial review of Dr. Harsay's application and determined she did not meet the criteria for promotion and tenure, noting its decision was "largely based on research productivity."

On December 9, 2009, before issuing a final recommendation, the College Committee contacted Dr. Cohen and requested updated information concerning Dr. Harsay's research papers, either submitted or accepted for publication, and the status of any pending research proposals.

On December 14, 2009, Dr. Cohen responded to the College Committee's inquiry. In the letter, he explained that Dr. Harsay had two published journal articles and a third article which had been rejected

Appendix B

– 10b –

despite generally favorable reviews. The publica-
tion's editor encouraged her to resubmit the paper
after addressing the reviewers' comments. Dr. Cohen
noted that Dr. Harsay planned to resubmit the third
article within the month. With regard to research
grants and proposals, Dr. Cohen provided an update
on Dr. Harsay's research grants:

> "Three grants, one each to the NIH, NSF, and
> Department of Defense (DOD), were listed as
> pending on Dr. Harsay's Blue Book

> "The NIH and DOD grants were not funded.

> "Dr. Harsay's NSF grant is still pending. My
> understanding is that she spoke to her pro-
> gram administrator yesterday and was told
> that a decision on the grant should be ren-
> dered within a month."

On December 15, 2009, Dr. Harsay also submit-
ted a written response, which further discussed her
research record and sought reconsideration of the
committee's initial determination.

The College Committee voted seven to zero, with
two abstentions, to recommend against a promotion
to associate professor with tenure. In making its rec-
ommendation, the committee rated Dr. Harsay's
teaching as "Very Good"/"Good," her service as
"Good," and her research scholarship as "Marginal"/
"Poor."

In his December 28, 2009, letter, Dr. Corbin in-
formed Dr. Harsay of the College Committee recom-
mendation and explained:

Appendix B

– 11b –

"The committee arrived at our assessment of your work after a careful consideration of your statements on the blue form, your record of teaching, research, and service, peer evaluations of your teaching, and outside reviews of your scholarship. We concluded that your record of teaching evaluations, teaching materials, and other assessments show work that exceeds departmental standards for promotion and tenure. Your record of service also met criteria for promotion and tenure. However, [the College Committee] determined that your level of research accomplishment is insufficient and did not meet the criteria for promotion to Associate Professor. For these reasons, the committee has not recommended you for promotion to associate professor with tenure."

On December 28, 2009, Interim Dean Gregory Simpson concurred with the College Committee's negative recommendation. In his letter to the University Committee but not to Dr. Harsay, he stated:

"Although Professor Harsay's teaching and service meet the criteria for promotion and tenure, her research does not. Her scholarly output has been low (two articles while at [the University]), and she has not been successful in securing significant extramural funding to support her research (although she has received two smaller grants). She works in an area in which such funding is necessary to sustain a productive research program, and the failure to obtain such resources further hurts her ability to publish her work at an ap-

Appendix B

– 12b –

propriate rate. Her external reviewers all noted that her research output was low."

Interim Dean Simpson concluded, based on her "relatively weak research record at this point in her career," Dr. Harsay did not qualify for promotion to associate professor with tenure.

Also on December 28, 2009, Dr. Victoria Corbin, the chair of the College Committee, advised the University Committee of the College Committee's recommendation, stating:

"[T]he [College Committee] agreed with outside evaluators in her discipline who commented on low research productivity (2 published paper) as an issue in her tenure application. In addition, [the College Committee] notes that she has been unable to successfully compete for significant extramural funding, although she did have two small external grants from the National Institutes of Health. The department expectations include '. . . the faculty member's ability to obtain the funding needed to support his or her research program in the long-term.' Lacking sufficient, long term extramural funding in molecular biosciences means fewer scholarly publications can be produced which in turn negatively affects the ability of the investigator to remain competitive for future funding. . . . [The College Committee] believes that this overall low level of scholarly accomplishment is insufficient and does not meet expectations for promotion to the rank of Associate Professor."

Appendix B

– 13b –

In reporting these results to Dr. Harsay, the College Committee only provided the conclusory statement that her research accomplishments were insufficient. On the other hand, the College Committee provided a more detailed explanation to the University Committee. The College Committee reported that Dr. Harsay had "been unable to successfully compete for significant extramural funding, although she did have two small external grants from the National Institutes of Health."

### *University Review*

At the university level of review, the University Committee, comprised of 10 voting members broadly representative of the faculty, reviewed Dr. Harsay's application for promotion to associate professor with tenure. After completing an initial review of the prior recommendations, the University Committee informed Dr. Harsay that it had voted that she did not meet the criteria for promotion and tenure based on her record of research productivity.

On February 11, 2010, in order to aid in reaching a final determination, the committee requested the following additional information: (1) a report on the status of Dr. Harsay's NSF application; (2) a basis for the department's evaluation of Dr. Harsay's research as "very good" considering her low research productivity and the evaluation of the external reviewers; and (3) an assessment of the sustainability of Dr. Harsay's research program in the absence of external funding.

Appendix B

– 14b –

On February 17, 2010, Dr. Cohen provided the University Committee with the requested additional information. Dr. Cohen, the acting chair of the Department of Molecular Biosciences, stated the NSF grant application was still pending but noted Dr. Harsay "should be able to finish two ongoing projects within the next year, each leading to the publication of a peer-reviewed research article." Dr. Cohen also noted that Dr. Harsay's research was gaining momentum in terms of excitement and had a good chance of being funded in the near future. With regard to the Departmental Committee's rating, he explained: "There is a persuasive sentiment in the department that Dr. Harsay is capable of hitting a homerun. She is totally dedicated to her science." He further explained that Dr. Harsay's research had produced seminal or near-seminal publications and her current research appeared likely to boost her career and greatly enhance her prospects for future funding.

In February 22, 2010, Interim Dean Simpson hand delivered to the interim provost the additional documents the College Committee had collected regarding Dr. Harsay.

The University Committee voted nine to zero to deny promotion to associate professor with tenure, with one committee member abstaining.

On March 4, 2010, Interim Provost and Executive Vice Chancellor Danny Anderson informed Dr. Harsay of the University Committee's negative recommendation. In the letter, he advised Dr. Harsay of her options to either provide the chancellor a written

Appendix B

– 15b –

response to the negative recommendation or file an appeal with the University's Faculty Rights Board. Anderson stated: "This recommendation has been forwarded to Chancellor Gray-Little for her review and final decision." The parties do not cite, and we do not find, any specific findings by the University Committee to support its recommendation other than a reference to Dr. Harsay's deficient "record of research productivity."

### *Faculty Rights Board Appeal*

On March 15, 2010, Dr. Harsay appealed the University Committee's decision to the Faculty Right's Board, claiming "the lack of fair representation by natural scientists [in the review process] ... resulted in the use of inappropriate review criteria ... in violation of [her] academic freedom rights." At this point, she was not aware of the mistake made by the College Committee in reporting to the University Committee her history of research grant funding.

The Board reviewed Dr. Harsay's appeal on April 2, 2010, and ultimately denied it, finding no substantive violations to faculty rights as defined in the University's rules and regulations.

### *Chancellor Review*

On April 23, 2010, Interim Provost Anderson informed Dr. Harsay of the chancellor's decision. The substantive portion of the letter is as follows:

Appendix B

– 16b –

"After careful review, Chancellor Gray-Little has decided to accept the recommendation of the University Committee on Promotion and Tenure not to award you tenure or promotion to Associate Professor at the University of Kansas.

"In accordance with the polices of the Kansas Board of Regents and the Rules and Regulations of the Faculty Senate, I am notifying you that your appointment for the 2010-2011 academic year will be a terminal appointment."

### *District Court Review*

Dr. Harsay filed a petition for judicial review in the Douglas County District Court. About 2 years later, on June 21, 2012, the case was dismissed without prejudice for failure to prosecute. Almost 6 months later, on December 4, 2012, Dr. Harsay re-filed her petition in the district court seeking judicial review of the University's action. The University filed its responsive pleading in mid-January 2013. A scheduling order was entered the next month, and Dr. Harsay filed her supporting brief on April 8, 2013. In her supporting brief, Dr. Harsay contended the University's decision to deny her promotion to associate professor with tenure was not supported by substantial evidence and was otherwise unreasonable, arbitrary, or capricious.

The University filed its brief in June 2013, and Dr. Harsay filed her reply brief the following month. The district court then took the matter under ad-

Appendix B

– 17b –

visement. Almost 2 years later, on June 24, 2015, the
district court issued a memorandum decision ruling
in favor of the University. The district court found
that the University's action was supported by sub-
stantial evidence and was not unreasonable, arbi-
trary, or capricious.

Dr. Harsay appeals. The appeal was perfected
and briefing was complete in March 2016. The mat-
ter was placed on the first available Court of Appeals
docket in May 2016. Thus, our first opportunity to
consider the issues raised by Dr. Harsay is 6 years
after the chancellor's decision.

### *Analysis*

On appeal, Dr. Harsay asserts: (1) the Univer-
sity's action was unreasonable, arbitrary, or capri-
cious; (2) the district court erred in ruling that sub-
stantial competent evidence supported the Univer-
sity's decision; and (3) the University misinterpreted
or misapplied the law in denying her promotion to
associate professor with tenure.

The Kansas Judicial Review Act (KJRA) governs
an appellate court's review of an agency decision.
K.S.A. 77-601 *et seq.*; *Herrera-Gallegos v. H & H De-
livery Service, Inc.*, 42 Kan. App. 2d 360, 361-62, 212
P.3d 239 (2009). An appellate court presumes the
agency action was valid; on appeal, the party claim-
ing an invalid action of the agency has the burden of
establishing such invalidity. K.S.A. 2015 Supp. 77-
621(a)(1); *Romkes v. University of Kansas*, 49 Kan.
App. 2d 871, 880, 317 P.3d 124 (2014). An appellate

Appendix B

– 18b –

court exercises the same statutorily limited review of an agency action as does a district court—as though the appeal had been made directly to the appellate court. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); *Romkes*, 49 Kan. App. 2d at 880.

Dr. Harsay argues that because the explanations that were given for recommending the denial of promotion and tenure were contradicted by the facts in the record, the University's decision to deny her promotion to associate professor with tenure was not supported by substantial evidence and was unreasonable, arbitrary, or capricious.

### The Agency's Findings

In advising Dr. Harsay of the chancellor's decision, the interim provost stated: "The University of Kansas is an agency of the State of Kansas, and this letter is intended to serve as a notice of a final agency action by the University of Kansas." K.S.A. 77- 526(c) requires:

> "A final order or initial order shall include, separately stated, findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion, for all aspects of the order, including the remedy prescribed and, if applicable, the action taken on a petition for stay of effectiveness. Findings of fact, if set forth in language that is no more than mere repetition or paraphrase of the relevant provision of law, shall be accom-

Appendix B

– 19b –

panied by a concise and explicit statement of the underlying facts of record to support the findings."

Meaningful appellate review is precluded when an administrative agency's factual findings and legal conclusions are inadequate to disclose the controlling facts or the basis of the agency's findings. *Jones v. Kansas State University*, 279 Kan. 128, 142, 106 P.3d 10 (2005).

Dr. Harsay disclosed in her application for a promotion and tenure that she had one published journal article, one revised manuscript that was currently undergoing review and was likely to be published, and one manuscript that had been submitted for publication. She also disclosed five funded research grants while working at the University plus three additional pending grant applications. In recommending a promotion and tenure, the Departmental Committee recognized these scholarly works and her grant-funded research projects.

The matter was then sent to the College Committee. The College Committee initially voted against tenure and requested that Dr. Cohen, acting chair of the Department of Molecular Biosciences, provide an update on Dr. Harsay's publications and research grants.

Dr. Cohen responded that Dr. Harsay now had two published articles; and although the third paper had been rejected for publication, Dr. Harsay was planning to resubmit it later that month after making revisions in line with the reviewers' comments.

Appendix B

– 20b –

With regard to pending research grant applications, Dr. Cohen reported that two had been turned down and the third was still pending and should be decided on within a month.

The College Committee then recommended to the University Committee that Dr. Harsay not be promoted, noting Dr. Harsay's two published papers and Dr. Harsay's inability "to successfully compete for significant extramural funding, although she did have two small external grants" from the NIH. This report of Dr. Harsay's grant funding was materially in error to Dr. Harsay's disadvantage on a point of substantial importance in the University's tenure decision.

The matter was then sent to the University Committee. The University Committee requested an update from Dr. Cohen on Dr. Harsay's pending NSF grant application. Dr. Cohen reported that the NSF grant application was still pending. The University Committee recommended to the chancellor that tenure be denied "based upon [Dr. Harsay's] record of research productivity." The University Committee made no other findings in support of its decision.

In the final agency action, the chancellor "decided to accept the recommendation of the University Committee." The chancellor did not specify the basis for the decision to deny tenure.

We could piece together the bases for the chancellor's decision from the analysis of the recommendation of the University Committee if the University Committee had made findings that were specific and

Appendix B

– 21b –

consistent with the record. Such was the case in *Romkes v. University of Kansas*, <u>49 Kan. App. 2d 871, 888</u>, <u>317 P.3d 124</u> (2014). But here, the sole expressed basis for the University Committee's recommendation was Dr. Harsay's "record of research productivity." That record apparently came from the College Committee's recommendation which was based on incorrect information.

We recognize that decisions on tenure involve a "large mix of factors, from the subjective qualities of the candidate to institutional priorities having nothing to do with the candidate." *Pyo v. Stockton State College*, <u>603 F. Supp. 1278, 1282</u> (D. N.J. 1985). "[P]ractical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level." *Blasdel v. Northwestern University*, <u>687 F.3d 813, 815</u> (7th Cir. 2012). As a result, courts are loath to interfere in tenure decisions.

If the chancellor had before her the correct information on Dr. Harsay's scholarly works and funded research grants over her years at the University, would the chancellor have made the same decision? The chancellor very well may have arrived at the same conclusion that Dr. Harsay should be denied tenure because of an inadequate record of research productivity. As stated in *Blasdel*, <u>687 F.3d at 816</u>, "In some academic fields . . . research requires costly laboratories financed by grants from the federal government or from foundations. Proficiency in obtaining grants is a highly valued capability in such fields; and scholars differ in their ability to obtain grants."

Appendix B

– 22b –

But it is not for us to speculate on whether the chancellor's decision would have been different if she had before her a recommendation from the University Committee based on accurate information. Such speculation would turn our court into a "Super-Tenure Review Committee." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980).

As a result, we see no alternative but to remand this case for further consideration by the University's various tenure committees, starting with the Departmental Committee, based on Dr. Harsay's correct history of research productivity and scholarly works. See *Jones*, 279 Kan. at 142 (citing *Gas Service Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 623, 626, 609 P.2d 1157, *rev. denied* 228 Kan. 806 [1980]) ("The appropriate remedy for inadequate findings in a final order of an administrative agency is to remand for additional findings of fact and conclusions of law.").

The timing of such an order is admittedly troublesome. This comes over 6 years after the chancellor's decision, and at least part of the delay can be attributed to Dr. Harsay's inaction. An award of tenure has significant ramifications for both the candidate and the educational institution, resulting in something of an academic marriage. The relationship is not a commitment to be entered into lightly or based on a courtship from bygone years. Thus, it would be improvident and unfair to both parties to suggest the decision should now be based simply on a review of the record compiled and considered in 2009 and 2010. Without some further consideration by the University, we would be forced to rely on our own

Appendix B

– 23b –

view of the current record and our sense of the significance of Dr. Harsay's actual research productivity. And this we cannot do. Indeed, it would be the worse available choice.

Rather, the tenure determination should be returned to the initial stage at the departmental level. Dr. Harsay should then supplement the existing materials with a detailed account of her relevant professional activities after leaving the University. Dr. Harsay's candidacy for tenure then may be evaluated through the customary process by academics and administrators regularly charged with that duty, using a base of correct information freshly assembled to facilitate the making of their decision.

Reversed and remanded for further proceedings.

Appendix B

– 1c –

Case 114292 CLERCK OF THE APPELLATE COURTS
Filed 2019 Feb 28 AM 11:03

12 CV 625

**IN THE SUPREME COURT OF
THE STATE OF KANSAS**

No. 114,292

Edina Harsay,
*Appellant,*

v.

University of Kansas,
*Appellee.*

## **ORDER**

The court has considered and denies Appellant's motion for rehearing or modification.

Appellee's response is noted.

BY ORDER OF THE COURT this 28th day of February 2019.

/s/ Lawton R. Nuss
_____

LAWTON R. NUSS,
Chief Justice

Stegall, J., recused.

Appendix C

– 1d –

## CONSTITUTIONAL AND STATUTORY PROVISIONS

### Fourteenth Amendment to the Constitution of the United States, Section 1:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### Standards of Review under the Kansas Judicial Review Act: Kan. Stat. Ann. § 77-621 *et seq*.

### 77-621. Scope of review.

(a) Except to the extent that this act or another statute provides otherwise:

(1) The burden of proving the invalidity of agency action is on the party asserting invalidity; and
(2) the validity of agency action shall be determined in accordance with the standards of judicial review provided in this section, as applied to the agency action at the time it was taken.

(b) The court shall make a separate and distinct ruling on each material issue on which the court's decision is based.

(c) The court shall grant relief only if it determines any one or more of the following:

Appendix D

– 2d –

(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

(3) the agency has not decided an issue requiring resolution;

(4) the agency has erroneously interpreted or applied the law;

(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

(8) the agency action is otherwise unreasonable, arbitrary or capricious.

(d) For purposes of this section, "in light of the record as a whole" means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any de-

Appendix D

– 3d –

terminations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review.

(e) In making the foregoing determinations, due account shall be taken by the court of the rule of harmless error.

Appendix D

Exhibit 2

# IN THE SUPREME COURT OF THE STATE OF KANSAS

EDINA HARSAY,             )
        Petitioner-Appellant,    )
                )     Case No.  15-114292-S
v.                   )
                )
THE UNIVERSITY OF KANSAS   )
        Respondent-Appellee.    )
_____)

## MOTION OF PETITIONER-APPELLANT, EDINA HARSAY

## FOR REHEARING OR MODIFICATION

### INTRODUCTION

In my Brief of Appellant and in my Supplemental Brief to this Court, I made legal arguments based on my understanding of the scope of judicial review and the standards of review as they are described in current caselaw and in statutes under the KJRA. The statutes are vague and the caselaw is confusing, inconsistent, and in some cases, probably incorrect, and so some of my arguments were likely mistaken. But I do not know for certain if, or how, I was incorrect, because the Court did not address any of my legal arguments in its Opinion. My case is an opportunity for this Court to provide much-needed clarifications for the standards of review under the KJRA.[1] More importantly, a rehearing or modification is needed because the Court applied an

_____

[1] "The law must be accessible and so far as possible intelligible, clear and predictable." Tom Bingham,. *The Rule of Law* (London: Penguin Books Ltd, 2010) p. 37.

incorrect standard of review for my case. The Court effectively used an old "substantial evidence" standard that largely overlaps an extremely deferential "arbitrary or capricious" standard and which was used in judicial review of state agency decisions prior the enactment of the KJRA in 1984. The old standard still applies to judicial review cases that the legislature chose to exclude from the KJRA,[2] but it should not have been applied to my case because the legislature chose to include state university decisions for review under the KJRA. The "substantial competent evidence" standard with "whole record" review under the KJRA was intended to allow a less deferential, and therefore more effective, judicial review than what was possible under the old standard, and the legislature clarified this difference in the 2009 amendments to the KJRA. But because the scope of review under the KJRA was incorrectly assumed to be essentially a codification of caselaw that defined the older standards of review,[3] most Kansas state judicial review cases since the enactment of the KJRA, and even since the 2009 amendments to the Act, largely follow the old standards of review. This causes discord between the purpose of the statutes enacted by the legislature, and some of the caselaw that courts use for guiding judicial review under the KJRA. Thus, while my arguments in my briefs for how the "substantial competent evidence" standard applies to the issues in my case were mostly correct, I could not easily support my arguments with Kansas caselaw. I request that this Court reconsider my arguments in light of additional authorities that I

---

[2] Judge Leben explains this in his dissent in *Denning v. Johnson Cty., Sheriff's Civil Serv. Bd.*, 46 Kan. App. 2d 688, 701, 266 P.3d 557, 568 (2011), *af'd sub nom. Denning v. Johnson Cty.*, 299 Kan. 1070, 329 P.3d 440 (2014)

[3] "In *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 497, 720 P.2d 1063 (1986), we held the Act codified earlier established principles of review." *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 474-75, 749 P.2d 21 (1988)

provide here. I have hope that a reconsideration or clarification of the law might lead to a different outcome in this case.

Lastly, the caselaw could be made more clear, and the review of my case would be more just, if all of my arguments for preserved issues were considered by the Court. In my situation, the Court has some discretion in determining which arguments may be preserved for consideration, because it has discretion to grant my motion to file the Conditional Cross-Petition that I submitted on September 7, 2018. The Court's Opinion is not correct as to the usefulness of the contents of the cross-petition.

## I. DEFINING THE STANDARDS OF REVIEW FOR THIS CASE

### A.  History and significance of "whole record" review

The most significant effect on the the scope of judicial review by the enactment of the KJRA was the broadening of the substantial evidence standard, for which review of the agency's factual findings must now be "viewed in light of the record as a whole." K.S.A. 77-621(c)(7). The same change, for the same reasons, occurred for the "substantial evidence" review standard for federal judicial review when the federal Administrative Procedure Act (APA) was enacted in 1946. The scope of review under the KJRA, K.S.A. 77-621 *et seq.*, was modeled after federal judicial review standards under the APA,[4] so caselaw of federal judicial review under the APA is useful guidance for judicial review under the KJRA. This is by design, as one purpose of the KJRA was to provide more consistency of judicial review standards among jurisdictions.

———————————

[4] For history of the KJRA, see Ryan, *The New Kansas Administrative Procedure and Judicial Review Acts*, 54 J.K.B.A. 53, 64 (1985).

The reason for the change in the "substantial evidence" review standard is explained well and in great detail by Justice Frankfurter in *Universal Camera v.NLRB*, 340 US 474, 71 S.Ct. 456 (1951). As in Kansas, federal judicial review under the "substantial evidence" standard was historically extremely deferential, such that it was essentially indistinguishable from an "arbitrary or capricious" test. Courts were "…said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate—unless indeed the stage of arbitrary decision is reached." *Universal Camera* 340 US 474, 481. Likewise, in Kansas, the "substantial evidence" test and "arbitrary or capricious" test was essentially the same, and the two tests were often used to describe or explain each other.[5] The nature of the substantial evidence test prior to the federal APA meant that even if the entire record needed to be "canvassed in order to determine whether the evidentiary foundation of a determination by [the agency] was 'substantial,' the phrasing of [the U.S. Supreme] Court's process of review readily lent itself to the notion that it was enough that the evidence supporting the Board's result was 'substantial' when considered by itself…..{This] led to the assumption that the requirements [for substantial evidence] were met when the reviewing court could find in the record evidence which, when viewed in isolation, substantiated the Board's findings." *Universal Camera* 340 US 474, 478-79. This "any evidence" review resulted in ineffective or controversial judicial review, and Congress was pressured to respond to "[p]rotests against shocking injustices and intimations of judicial abdication." *Universal Camera* 340 US 474, 479 (citations and internal quotation marks omitted). This led to the broadened scope of judicial review

_____

[5] "A decision may be held arbitrary or capricious where the action is not supported by substantial evidence." *Dallinga v. Center Township*, 19 Kan.App.2d 482, 484, 871 P.2d 1293, *rev. denied* 255 Kan. 1000 (1994).

under the federal APA, such that now, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in … statutes that courts consider the whole record." *Universal Camera* 340 US 474, 488.

The criticism of the old "substantial evidence" review standard prior to the enactment of the federal APA was especially intense when an initial decision, such as from a hearing officer, contradicted the final decision of the agency head. As in Kansas judicial review using the old "substantial evidence" standard, federal courts generally disregarded the hearing officer's findings and reasoning when those findings and reasoning contradicted the final agency decision, regardless of the soundness or accuracy of the contradictory explanations. Courts review the decision of the agency head, not the decision of an intermediate decision maker such as that of a hearing officer or administrative law judge, or in my case, a department chair or a college dean. But intermediate decision-makers serve an important advisory function, and when the agency head agrees with an intermediate decision-maker without adding further explanations to the record, it is assumed that the agency head has adopted the explanations of the intermediate decision-maker, and thus it is the explanations provided by the intermediate decision-maker that the courts review. The most serious problem with the old review standard is that the intermediate decision-maker's findings matter only when they are in agreement with the final agency decision.

Since the enactment of the federal APA and similar state acts, the newer "whole record" judicial review usually results in a more intense, less deferential review especially when the agency head disagrees with an intermediate decision, and yet the intermediate reviewer has knowledge from observations that the agency head does not

- 5 -

have. Such additional knowledge includes "credibility determinations," for example when the hearing officer could observe a witness in person, but the agency head could not, or when the intermediate reviewer can provide "a fair estimate of the worth of the testimony of witnesses or *its informed judgment on matters within its special competence* or both. [Emphasis added.] *Universal Camera* 340 US 474, 490. In such situations, the intermediate decision-makers' findings or reasoning may be accorded more deference than the contradictory explanations of an agency head who had less knowledge to accurately judge a situation. See *Hudson v. Bd. of Directors of the Kansas Pub. Employees Ret. Sys.*, ___ Kan. App. 2d ___, 388 P.3d 597, 603-05 (2016) (a disability benefits case in which the agency head improperly sided with an intermediate decision-maker who did not directly or extensively examine the patient, and rejected without convincing explanation the decisions of doctors who had more direct interactions with the patient as well as expertise to evaluate him).

For many years after the enactment of the KJRA, Kansas courts made little if any change in the intensity of judicial review under the "substantial competent evidence" standard. The addition of the words "record as a whole" to the "substantial competent evidence" standard under K.S.A. 77-621(c)(7) was misinterpreted to mean that courts are to be burdened with the task of scouring the whole record for some evidence to support the agency decision, even in addition to any evidence that the agency pointed to when it documented its explanations in the record of review. This was inconsistent with the intent of the law, and it was inappropriate also because the task of explaining an agency decision has been delegated to the agencies, not to the courts. Citing the facts that led to a decision is a critical component of explaining a decision, and this is a task for agencies, not for courts. *See* Ryan, *Judicial Review of Administrative Action − Kansas*

*Perspectives*, 19 Washburn L.J. 423 at 431 (1980). Furthermore, in addition to this type of "whole record" review to find evidence in support of the agency decision, Kansas courts disregarded any evidence that detracted from the agency's findings. *See* Leben, *Challenging and Defending Agency Actions in Kansas*, 64 J. Kan. B. Ass'n. 22, 27-28 (June/July 1995).

The Administrative Procedure Advisory Committee of the Kansas Judicial Council addressed the above problem by making recommendations that led to the 2009 amendments to the KJRA, and thus to the restoration of the original meaning of "whole record" review. As explained in a *Report* by the Committee,[6] the purpose of the amendments was "to make judicial review more available and meaningful as a check on the fairness of agency decisions without interfering with the agencies' expertise and legitimate policy making functions." (*Report* at 5). The *Report* also states that the changes were needed because the old standard of review "accords excessive deference to the agency and erects a nearly insurmountable barrier for parties challenging agency action. It is particularly problematic when the agency reverses the decision of a hearing officer, because it treats the hearing officer's decision as essentially irrelevant." *(Report* at 6.) Thus, as explained also in *Universal Camera*, the significance of "whole record" review under the KJRA is not only that contradicting as well as supporting evidence must be considered, but also that the findings and reasoning of intermediate decision-makers must be considered. Lastly, and critically important for my case, the *Report* also stressed that this change in the law makes it more important for agencies to carefully explain their decisions (*Report* at 6). The report makes clear that the "substantial competent

_____

[6] *Report of the Judicial Council Administrative Procedure Advisory Committee*, 2008; https://www.kansasjudicialcouncil.org/Documents/Studies%20and%20Reports/Recent%20Reports/AdminPro_Committee_Report_(KAPA).pdf

evidence" and "whole record" review refers to the findings of fact made by the agency to explain its decision: "KJRA should be amended to emphasize the obligation of courts reviewing an agency's factual findings to consider the whole record (including adverse evidence and a contrary hearing officer decision)." *Report* at 6.

### B. Applying "whole record" review to this case

The standard of review that this Court applied in my case effectively follows the old, incorrect, "substantial evidence" review standard. The best example to demonstrate this is the Court's citing of an external reviewer comment concerning my prospects for future funding (Opinion at 15). No University reviewer ever referred to this comment, at any level of review. It was mentioned for the very first time only by the Appellee's attorney (Apee Rspnse to Supp. Br. at 11), in response to my argument that the possibility of funding in the future, rather than non-stop funding, is the allowable tenure-review standard (Aplt. Supp. Br. at 13). Further, the Court disregarded a contradicting comment from another external reviewer who stated that he was "bullish on [Dr. Harsay's] potential for future funding," even though this comment was cited in a departmental evaluation letter (Aplt.Br. Appendix A; R. Vol. 2 at 183.), and it was consistent with other findings and explanations made by department-level reviewers, who were optimistic that I would obtain funding in the future (Sup. Br. of Appellant at 13). It was for University reviewers, not courts, to weigh the evidence concerning my ability to obtain funding in the future, and the courts need to judge only the explanations of that weighing, *as that explanation appears in the record,* since the courts are reviewing solely the record. The Court can make the required judgment in my case, because both the department-level and the contradicting college-level of review

decision letters stated the findings that they used to determine the outcome of my review.

Similarly, the Court refers to my comments in response to the College Committee's negative recommendation (Opinion at 5-6) but those citations occurred for the very first time in the Appellee's briefs (including quotes that appeared for the first time in Apee Rspnse to Supp. Br. at 10). Since I've not had opportunity to defend those comments in response to University decision letters during my tenure review year, it is fair for me to do so now. The context and purpose of my comments are important, most critically that they were intended for non-scientists. I struggled to understand why the outcome at the college-level, where there was no expertise in my scholarly field, was different from the department's evaluation, and so my comments were intended to highlight the differences in reasonable expectations regarding paper counts among widely differing scholarly fields. This is why I stressed the time and effort that is typically required to obtain funding and perform experiments, and also the greater effects of factors outside of my control. Furthermore, within my department, my research (using only cells) was much less expensive than that of colleagues who work with animal models. The comparison I intended was to other fields within the College, not other fields within my department.

Although the comments from external reviewers were important for the tenure review process, the comments I cited above did not deserve much attention from the Court. The reason given for the agency's final decision, as it is documented in the record by final decision letters from the College-level of review and from the Provost, was not any expression of doubt about my ability to obtain funds in the "foreseeable future," but rather my "level of research accomplishments" (R. Vol. II, at 176; Br. Aplt. Appendix

C) and "record of research productivity" (R. Vol. II, at 169; Br. Aplt. Appendix F) during my probational years — that is, the amount of funding and papers that I had *already* generated. Thus, the court followed the old interpretation of "whole record" review, and searched the record in support of the agency's final decision to deny tenure, rather than objectively assessing the accuracy of the findings and explanation that the agency had given in final decision letters. Those letters reflect the final weighing of the facts when committees and administrators stated their decisions.

Even if "productivity" is interpreted as an indirect indicator of the "reasonable likelihood" that I will obtain grant funds in the "foreseeable future,"[7] the record shows substantial competent evidence, which was cited by department-level reviewers, that I would be able to obtain funding in the future. The Court cited some of this evidence, including my five successful grant proposals and also my many grant proposal submissions that clearly demonstrated my very intense and continuous effort to obtain future funding (Opinion at 4). The Court should have concluded that the evidence in the record — that is, the listing of my numerous funding awards and ongoing proposal submissions — substantially supported the department's findings and reasoning that I would obtain funding also in the future. In contrast, the College Committee's assessment and the concurring Dean's assessment that my funding success consisted of only "two small grants" is not supported by *any* evidence in the record.

The Court did not need to make any subjective judgments or reweigh any evidence or search the record for facts (with help from the University's briefs). It simply needed to determine whether the evidence in the record supported, or detracted from,

---

[7] The wording is from the departmental standards for awarding tenure. The standard is cited and explained in Br. Aplt at 23, Appendix H, and R. Vol. 2 at 236.

the conflicting factual findings given by decision-makers at the three intermediate steps of review to explain their decisions. Furthermore, the Court was wrong to dismiss the inaccurate factual findings as mere "inaccuracies" that did not "pollute" the review process (Opinion at 16-17). There is no evidence in the record that explains why the college-level reviewers made the inaccurate assessments, and therefore the Court cannot know whether or not the inaccuracy was intentional or a "mistake." And intentional or not, the inaccurate assessments are a serious matter, because *they were stated as the reasons for why I should be denied tenure*. And thus those are the findings that are to be reviewed under the "substantial competent evidence" standard, which instructs courts to determine wether "*the agency action is based on a determination of fact*, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole.... [emphasis added]." K.S.A. 77-621(c)(7).

Judicial review under the "substantial competent evidence" standard, and even the more deferential "arbitrary or capricious" standard, must be a review of the agency's findings and explanations for its decision. This is so especially under a proper "whole record" review standard for a case in which the agency's final decision contradicts that of an initial decision-maker. In order not to reweigh the evidence in determining which decision-maker was correct, the courts need to assess only the accuracy and quality of the explanations that decision-makers have provided in the record. This is really the *only* way to interpret and apply the instruction to consider both supporting and detracting evidence, and yet not reweigh the evidence. If the Court defers only to the weighings expressed by the College or University-level of review, or only to weighings

from the Chancellor if she had weighted in, then its review is no different at all from the old "substantial evidence" review standard.

In my situation, the contradicted initial decision-maker was the department review committee and department chair. Their findings and explanations deserve much deference not only because of the level of detail and care and accuracy of their review that was documented in the record, but also because the department had knowledge and expertise that subsequent reviewers, including the Chancellor, lacked. This expertise was critical not only for assessing the sufficiency of my "research productivity" as judged by the quantity of papers and grants, but, especially, for assessing the quality and importance of my research. This is a very critical point, because the most important factor that would determine my future success, including obtaining funding, was the quality and importance of my research. This determination was made based on not only my papers but also on my unpublished, ongoing research, which I presented in a departmental research seminar in the fall of my review year (R. Vol. II at 163). Thus, department-level reviewers could make a "credibility determination" that subsequent reviewers could not. A similar argument could be made for evaluation of my teaching. Even though all three intermediate steps of review had proper expertise to evaluate teaching, only department-level reviewers observed me in person in the classroom. (Still, it was very improper that my teaching received little or no attention at the College and University-levels of review.) In *Hudson*, the Court of Appeals stated, "Personal observation is important because the statute specifically notes the value of actual observation of the witness when credibility determinations are made." *Hudson* 388 P.3d 597, 603. Because of the additional observations and expertise that only department-level reviewers had, the subsequent reviewers and administrators

would have needed to provide a strong, accurate, well-reasoned argument for why I should be denied tenure, including factual findings that were supported by substantial competent evidence in the record. They failed to do so.

Another important example of how the Court followed the old review standard is that it ignored the serious discrepancy between my claim that I produced three papers while at KU, and the University's claim, even in briefs, that I had only two. The inaccurate assessment of my papers is due to lack of care in conducting my tenure review, and this should not be ignored during judicial review of the University's decision. It is fair and just if the Court addressed this issue, because the carelessness in assessing my productivity helps to explain the outcome of the tenure review process. A key purpose of judicial review is to ensure that state agencies make decisions with care.[8]

I understand why the Court must disregard the letter from a journal editor documenting my third manuscript status, which I provided as an appendix to my Reply Brief of Appellant. Letters from editors are missing from the record of review because my departmental Chair failed to provide them when the Dean requested documentation of my manuscript status (Br. Apee. at 17; Reply Br. Aplt. at 3; R. Vol. 2 at 214). But the record of review contains sufficient evidence that my assertions concerning the third paper are accurate. The Chair's update letter to the College committee and Dean stating both a rejection of my third paper and also its approval and request for a revised submission is incongruous. Editors do not typically both reject and state an interest in publishing a paper, and the Chair's letter provides the result from two

---

[8] "[A] court reviewing agency action under the substantial evidence test should make sure that the agency has done a careful, workmanlike job of collecting and evaluating the available data — or, as Judge Leventhal put it, that the agency has taken a "hard look" at the important factual issues."Ronald Levin, Jeffrey Lubbers. *Administrative Law and Process in a Nutshell.* 6th ed.(West Academic, 2017) p. 99.

different editors, from subsequent submissions of my paper to two different journals, as I explained in my Reply Brief of Appellant at 3-5. In my Brief of Appellant, I had cited only the most up-to-date portion of the Chair's letter, because I did not know how to explain the update letter without proper documentation (Br. Aplt. at 11), and I did not know how to explain why the Chair did not take more care in providing the documentation (Reply Br. Aplt. at 9). But there is evidence in the record that the Chair's letter refers to correspondence from two editors, because the record shows that my third paper had been submitted initially to *ACS Chemical Biology* (R. Vol. 2 at 181), whereas in my letter to the Faculty Rights Board, I stated that my third paper had been accepted for publication by *ChemBioChem* (Br. Aplt. at 11, R. Vol. 2, at 163). The Dean's request for documentation of my manuscript status indicates that this was an important factor in his assessment. Thus, the College-level or University-level reviewers should have questioned the Chair's incongruous comment on my manuscript status, and they should have requested documentation and clarification, rather than assume, incorrectly, that the status of my paper was "rejected" and thus unlikely to be accepted for publication during my review year. And I should have been made aware of the inaccurate assessment, so that I could properly defend my record not now, many years later, but during the tenure-review process.

Regardless of the status of my third paper, it represented years of work, and it had been submitted to a journal by the time of the department-level of review, so it was completed work, not work-in-progress (Br. Aplt. at 29; R. Vol. 2 at. 217; R. Vol. 3, at. 487). If I had instead written three books and the third one was still under review by a publisher that had expressed interest in publishing the work, it would be misleading to state that my productivity while at KU consisted of just two books. But because

- 14 -

reviewers at the College and University-levels of review were not in my field or, with one exception, not natural scientists, all they could judge was volume of print. For these reasons, this Court should not have concluded that the Dean was correct in stating that my research activity while at KU had produced just two papers (Opinion at 5-6). The lack of mention of my third paper in the Dean's or College Committee's letters that were sent to the University Committee to advise them on my review was, at the very least, seriously misleading.

The inaccurate statements about my productivity from the College Committee and Dean were especially problematic during my review year, because the Provost and Chancellor were handling promotion and tenure files from over 50 faculty members, a very unusual number (Reply Br. Aplt. at 9; R. Vol. 2 at 156). In a newspaper article reporting on the promotions from that year, one review committee member stated, "I was just overwhelmed this year."[9] Thus, even though reviewers had the "entire record before them" at each step, the earlier steps, which handled fewer tenure cases and could more reasonably be expected to examine the whole record, needed to perform their reviews with great care, and then describe their assessments accurately to subsequent review steps. That simply did not happen in my case.

A final note on the harm from the Court's one-sided review, and the approach of using the older, outdated "substantial evidence" standard, is that it misrepresents my tenure review, and it misrepresents me, in a very public and harmful way. Anyone on Planet Earth who has internet connection can read the Court's Opinions. This may not be quite as unjust in typical appellate cases, because most often appeals follow a formal

---

[9] *KU grants tenure, promotions to more than 50 'excellent' faculty members* , Lawrence J.-World (April 20, 2010), http://www2.ljworld.com/news/2010/apr/20/ku-grants-tenure-promotions-more-50-excellent-prof/

trial in which there is ample opportunity to sort out all the facts, or at least present all the facts. This difference is why the amendments were needed to the KJRA — this is why there must not be the same high level of deference to agency decision-makers as there is to a trial court decision.[10] Even in most judicial review cases, an appellate court's review usually follows a more formal quasi-judicial process or hearing, so that courts have a fairly complete and accurate record before them. To some extent, the tenure review is a "quasi-judicial" process with multiple steps and extensive documentation, which is why I mistakenly thought that it was an attempt to roughly follow KAPA procedures. The key difference is that I have never had full opportunity to defend myself. Even now, the Court is not allowed to consider all of the relevant information about my case, including critical information about my third paper, or details about why that information was not conveyed with more care during my review.

For these reasons, it is unjust and misleading to imply that the updated status of my third paper during the College-level of review was "rejected," when that is not true. And it is misleading to state that external reviewers criticized the quantity of my work, when my record, and my briefs, show that because they received my review materials months before my review started at the department level, they did not have access to all of my papers. And it is misleading to state only the weakness of quantity of papers, but not their quality and importance, which external reviewers and my department enthusiastically praised. Perhaps most painful for me is a comment that must seem trivial to the Court -- that I complained about not getting proper credit for my work

_____

[10] "By definition, the informal proceeding provides fewer opportunities for thorough consideration of legal issues than would be possible in a formal proceeding. Moreover, participation of those affected will be less. Hence, informal proceedings will be less likely candidates for judicial deference." William Andersen, *Judicial Review of State Administrative Action - Designing the Statutory Framework*, 44 Admin. L. Rev. 523, 565 (1992).

- 16 -

(Opinion at 5). The context of that issue is important, because otherwise it appears as if I am blaming my former mentors for taking credit from me. In fact the opposite was true. Because of a letter from my former mentor, my department gave me more credit for my independence than did at least some external reviewers (Sup. Br. Aplt. at 6; R. Vol. 2 at 179). The issue is important because it is one of the numerous ways in which my department had the most information and expertise to evaluate me fairly.

## C. The "substantial competent evidence" standard is the only review standard that is appropriate for this case

Prior to the enactment of the KJRA, the "substantial evidence" standard and "arbitrary or capricious" standard were closely intertwined in judicial review cases. This is because Kansas statutes did not describe the standard of review for most types of judicial review, and so the standard described in caselaw was similar to that of an appellate court's review of a district court's decision.[11] In the federal APA and in the KJRA, the "substantial evidence" and "arbitrary or capricious" standards are more distinct because they were designed to provide different degrees of deference for different types of agency decisions and different types of records of review. They are thus best applied not concurrently but to different types of cases. This difference between the old and newer application of the standards has caused some confusion, including mine, in how the two standards differ from each other and when it is proper to apply them.

Recent caselaw from the Court of Appeals attempted to untangle the two standards, and I used this caselaw to guide my arguments in my Brief of Appellant and

---

[11] There was, and still is, disagreement on the scope of judicial review for cases not governed by the KJRA. *See Denning v. Johnson Cty., Sheriff's Civil Serv. Bd.*, 46 Kan. App. 2d 688, 266 P.3d 557 (2011), *af'd sub nom. Denning v. Johnson Cty.*, 299 Kan. 1070, 329 P.3d 440 (2014).

in my Supplemental Brief (Aplt. Br. at 34, *Wheatland* citing *State Farm*; Sup. Br. Aplt. at 8). But I do not think the caselaw, or at least how I applied it, is entirely correct. Thus, this Court is correct that I did not preserve any issue that would be most appropriate for review under the "otherwise unreasonable, arbitrary or capricious" standard of K.S.A. 77-621(c)(8) (Opinion at 17). All of the arguments that I classified as applicable to K.S.A. 77-621(c)(8) in my briefs more properly fall under K.S.A. 77-621(c)(7), as they all clearly relate to the issue of substantial competent evidence for the University's findings, rather than to any separate issue that made the University's decision *otherwise* unreasonable, arbitrary or capricious.[12] Therefore, the arguments that I misclassified as falling under K.S.A. 77-621(c)(8) still address the preserved issue of whether there was "substantial competent evidence" for the University's findings and explanations for its decision. This includes my arguments for following the American (not just federal, but also state) judicial review practice of taking a "hard look" at the agency's explanation for its decision, as it is provided in the record, which applies to both K.S.A. 77-621(c)(7) and K.S.A. 77-621(c)(8). The concept has always applied to the "substantial evidence" standard, since that standard is typically used in cases in which rules or laws required stating the findings of facts. The key significance of the famous federal cases like *Overton Park* (see Sup. Br. Aplt. at 9) is that "hard look" is now required even if statutes do not explicitly require careful documentation of the record.

Similarly, arguments under my "Issue III" from my Brief of Appellant also most properly fall under the "substantial competent evidence" standard, K.S.A. 77-621(c)(7), rather than under K.S.A. 77-621(c)(4), (erroneous interpretation or application of law).

---

[12] A recent article on the KJRA helpfully stresses the significance of "otherwise." *See* Michael Obermeier, *The Kansas Judicial Review Act: A Road Map*, 86 J. Kan. B. Ass'n 24, 44 (2017).

Other than my general "rule of law" arguments that must apply to every case considered by our courts, the arguments under "Issue III" most specifically addressed the requirement that the University base its tenure decision on the Department's (and therefore the University's) formal review standards for tenure (Br. Aplt. at 45-48). These arguments are essential for determining what is *relevant* evidence to consider under the "substantial competent evidence standard."

Thus, my arguments under the three "Issues" in my Brief of Appellant all fall under the preserved issue of whether there was "substantial competent evidence" for the University's findings and explanations for its decision. I therefore request that this Court consider fully the arguments that I made relating to the issue of substantial competent evidence, even if I incorrectly classified my arguments as falling under K.S.A. 77-621(c)(4) or K.S.A. 77-621(c)(8) rather than properly under K.S.A. 77-621(c)(7). This is especially a critical for "Issue III." At the time that I wrote my Brief of Appellant, I did not fully understand what "issue" meant in a judicial review case, so I wished to stress the errors made by the district court as is typical in an appeal, and also to choose the less-deferential standard under K.S.A. 77-621(c)(4). Furthermore, by law the University is required to adhere to its rules and standards for promotion and tenure. I also believed that the "rule of law" argument I made would best fit under K.S.A. 77-621(c)(4), when in fact that argument applies to any statute and any issue. I did not realize that the misclassification of arguments would seriously endanger their status as "preserved," since the arguments were so obviously fundamental to the key issue in this case. I believed, and still do, that my arguments should be considered, because "the consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights." *State v. Johnson*, 40 Kan. App. 2d 1059, 1073, 198 P.3d 769 (2008)

- 19 -

(citing *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 [2008]) (cited in Brief of Appellant at 44).

## II. My Conditional Cross-Petition preserves issues and arguments that will assist the fair and proper resolution of this case

I request that this Court reconsider its denial of my motion to file my Conditional Cross-Petition, and to consider also the arguments preserved in the cross-petition in its review of my case. Although the timing of my submission was beyond the date specified by court rules, it was impossible in my situation to conform to the rules, since they were not yet in effect at the appropriate time. This Court has discretion to allow submission of the cross-petition, because court rules, while strict, are not absolute, as this Court has also stated: "… failure to comply with our rules is not an absolute procedural bar to our reaching the issue because doing so serves the 'ends of justice.' [Citation omitted.]" *State v. Cheever*, 304 Kan. 866, 375 P.3d 979, 990 (2016).

The Conditional Cross-Petition is important for preserving issues and arguments in my case. The cross-petition was submitted at the same time as my motion requesting to file it, but most likely the Court had access just to the motion, which provided only a brief summary of the cross-petition. That summary failed to specify that the cross-petition addresses extensively some of the arguments under "Issue III" from my Brief of Appellant, in particular my argument that the tenure decision is not merely a subjective financial or business decision but is constrained by formal rules and standards, and thus it should be objectively reviewable pursuant to the KJRA. This Court explicitly ruled on this very issue by stating, incorrectly, that it was reviewing a subjective "business decision." In fact this seems to have been the guiding principle for the Court's review

(Opinion at 15). Thus, my Conditional Cross-Petition is probably essential for correcting a serious error in how my case was considered by the Court. Furthermore, the cross-petition explains the harmful consequences of according a special "academic deference"[13] to university administrative decisions. This "special deference" greatly exceeds the deference shown in reviews of other expert decisions or even typical "business decisions." The "special deference" is not based on statute but on misguided dicta, and it violates the fundamental legal principle of equality under the law. Thus a full consideration of this issue is important and broadly relevant to cases involving decisions by academic administrators.

Due to the page limitation for the cross-petition, I addressed these issue more succinctly than I had wished to, with just 3 pages on the issue that the tenure decision is not a "business" or financial decision, and ~6 pages on the issue of "academic deference" and the related issue that most tenure review cases that are civil rights cases, from which the concept of "academic deference" originates,[14] are not proper precedents for this case. If this Court grants my request for a rehearing, as well as my request to file the cross-petition, I would be happy to provide additional briefing on these issues, if the Court believes it would be helpful.

_____

[13] "In employment claims against colleges or universities, courts apply a 'deferential standard' in scrutinizing the challenged employer decision — especially as to denials of promotion to tenured status, but in other employment decisions as well. " Scott A. Moss, *Reluctant Judicial Factfinding: When Minimalism and Judicial Modesty Go Too Far*, 32 Seattle U. L. Rev. 549, 555 (2009).

[14] "[T]he penchant of many courts to dismiss employment discrimination claims based on 'academic deference' is misguided in a host of ways. It threatens to leave academia an island of civil rights lawlessness, essentially exempt from Title VII — a dangerous outcome for a society in which there is such gender inequity in academia." Scott A. Moss, *Against Academic Deference: How Recent Developments in Employment Discrimination Law Undercut an Already Dubious Doctrine*, 27 Berkeley J. Emp. & Lab. L. 1, 5 (2006).

- 21 -

A less critical, but still important, reason for this Court to grant my motion to file my Conditional Cross-Petition is that it would allow the Court to fully consider an issue relating to the filing deadline for my Petition for Judicial Review. Contrary to the Court's Opinion, my cross-petition does not discuss or even mention the applicability of the savings statute to the time limitation for filing a petition for judicial review. Rather, the cross-petition preserves for review the issue that the filing deadline should not be considered an issue of subject matter jurisdiction that either courts or litigants can raise "at any time," years after a petition had been filed. Because the Court did not acknowledge the existence of my arguments on this issue in its Opinion even though I argued the issue extensively in my Response to the University's Supplemental Brief, it seems that my cross-petition is needed to allow the Court to consider the issue.

The issue becomes essential for this case only if the Court chooses to address this issue rather than the related, but different, issue of applicability of the savings statute to the filing deadline, and thus this is no longer a critical issue for me. But the issue still matters in this case, for reasons in addition to those that I already argued in my Response to the University's Supplemental Brief. I was seriously harmed by the district court's intent to dismiss my case for a second time, on its own motion, when it delayed any indication of such intent until over two years after I had re-filed my petition (R. Vol. 1 at 2).[15] By that time, briefing had long been completed, so that I had already sacrificed much time and expense and suffered other harm from the lengthy wait for a decision on my case. No court should be able to do such a thing. Furthermore, it is unacceptable that the University could raise a filing deadline issue for the first time many years after

---

[15] I was not aware of the intent to dismiss until I obtained my court records and appealed my case, so I do not know the details of what happened. But I know that both parties corresponded with the district court at around that time, and requested that the court render a decision.

it was proper to do so, and only after two courts have rendered opinions for my case. It is extremely unlikely that the legislature ever had such an intent for any filing deadline. I have some responsibility, as does this Court, to help assure that in the future, neither district courts nor litigants can abuse an unfortunate and unnecessary legal tradition in this manner. I therefore request that this Court grant my motion to file my Conditional Cross-Petition, in which I formally raised the issue of "jurisdictional status" of the filing deadline. I further request that this Court render the issue on the savings statute as moot, and instead declare that the petition filing deadline, while a strict requirement, has nothing to do with "subject matter jurisdiction."

## Conclusion

The tenure-review year is a lengthy and stressful process for a faculty member under review, and it requires considerable time and effort especially from the faculty member and her department. The University needed to make the reasoning behind its decision clear during my review year, and this was an important responsibility with serious consequences. Given the high stakes and the potential for great harm when a review is not done properly during the review year, as is clearly evident in my case, the University should be held accountable. Reinstatement in my faculty position is the only just resolution in my case.

Dated: January 23, 2019

Respectfully submitted

Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: 785-813-1757
email: eharsay@gmail.com
*Appellant pro se*

## CERTIFICATE OF SERVICE

I certify that on the 23rd day of January, 2019, a true and correct copy of the above **Appellant's Motion for Rehearing or Modification** was served by email to the Respondent/Appellee, University of Kansas:

Michael C. Leitch, Kansas Sup. Ct. #19588
Associate General Counsel and
   Special Assistant Attorney General
245 Strong Hall, 1450 Jayhawk Blvd.
Lawrence, KS 66045
Phone: 785-864-3276
Fax:    785-864-4617
Email: mleitch@ku.edu
*Attorney for Respondent-Appellee*
   *University of Kansas*

Edina Harsay, Ph.D.

APPENDIX

NOVEMBER 21, 2018 SUPREME COURT OPINION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **EDINA HARSAY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case. No. 21-CV-4080-EFM-ADM** |
| ) | |
| **KANSAS SUPREME COURT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ───────────────────────────────) | |

## DEFENDANTS'
## MOTION TO DISMISS.

Defendants the Kansas Supreme Court, Marla J. Luckert, Chief Justice of the Kansas

Supreme Court, and Justices Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., Melissa Standridge,

and Eric S. Rosen, pursuant to FRCP 12(b)(1) and/or (12(b)(6), move to dismiss Plaintiff Edina

Harsay's Complaint. Plaintiff Edina Harsay has filed what is nearly identical to her recent

previous suit, *Harsay v. Luckert et al., #* 21-4017-KHV-ADM (*Harsay 1*), which was dismissed

for lack of subject matter jurisdiction, primarily Eleventh Amendment Immunity. This case must

be dismissed due to issue preclusion, and if not issue preclusion, like the prior case, Eleventh

Amendment Immunity, as well as other related reasons. Harsay also fails to state a claim since

she seems to disclaim 42 USC § 1983.

In support of this Motion, Defendants submit the accompanying Memorandum.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT


*/s/Stephen Phillips*
Stephen Phillips, KS No. 14130
Asst. A.G., Civil Litigation Div.,
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
TEL:   (785) 296-2215
FAX:   (785) 291-3767
steve.phillips@ag.ks.gov
*Attorney for Luckert, Biles, Wilson,*
*Wall, Standridge, Rosen and*
*Kansas Supreme Court*


## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2022 the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all those individuals currently electronically registered, and with a copy by U.S. mail to the following:

Edina Harsay
1100 Stone Meadows Drive
Lawrence, KS 66049

*/s/ Stephen Phillips*
Stephen Phillips
Assistant Attorney General

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **EDINA HARSAY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case. No. 21-CV-4080-EFM-ADM** |
| ) | |
| **KANSAS SUPREME COURT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants, the Kansas Supreme Court, Marla J. Luckert, Chief Justice of the Kansas Supreme Court, and Justices Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., Melissa Standridge, and Eric S. Rosen, submit this Memorandum in Support of their Motion to Dismiss. Plaintiff Edina Harsay has filed what is nearly identical to her recent previous suit, *Harsay v. Luckert et al.,* # 21-4017-KHV-ADM (*Harsay 1*), and this action must be dismissed for the same reasons.

## STATEMENT OF THE CASE

Harsay sues the Kansas Supreme Court and six current justices in their official capacities contending that they violated her constitutional rights when they allegedly got it wrong in an opinion affirming the dismissal of a case she brought against her former employer, the University of Kansas.[1] She alleges defendants made misleading or inaccurate statements and the opinion was factually incorrect and misleading. (Doc. 1, pp. 8-9). She alleges the opinion

---

[1] *Harsay v. Univ. of Kansas*, 308 Kan. 1371, 430 P.3d 30 (2018), *cert denied* 140 S.Ct. 201 (2019), *reh'g denied* 140 S.Ct. 568 (2019).

violates her rights under the Fourteenth Amendment. (Doc. 1, pp. 12-13.) As her sole remedy,
Harsay seeks an order compelling the Justices and Court to issue a "revised opinion." (Doc. 1, p.
16.)

As previously noted, Harsay brought a nearly identical suit against the six justices in
*Harsay 1*. Because Harsay proceeded IFP in *Harsay 1*, Magistrate Mitchell issued a Report and
Recommendation, recommending that it be dismissed. (*Harsay 1*, Doc. 4.)  Pursuant to FRCP
10(c), Defendants adopt and incorporate by reference the Report and Recommendation, both for
its factual statement, but also for the legal reasoning. A copy is attached hereto as Exhibit 1
pursuant to K. Kan. Rule 7.6(c).

The Report and Recommendation recommended dismissal: 1) due to 42 U.S.C. § 1983's
express prohibition on in injunctive relief against a "judicial officer;" 2) Eleventh Amendment
Immunity; and 3) that federal courts do not have mandamus type authority to direct state officials
in the performance of their duties. In EFC entry # 11, Judge Vratil accepted the Report and
Recommendation, saying:

> ORDER. The Objection of Edina Harsay, Plaintiff, to the Court's Report and
> Recommendation (Doc. # 10 ) filed May 10, 2021, is hereby OVERRULED. The
> Honorable Angel D. Mitchell correctly recommends that plaintiff's complaint is
> legally deficient on account of (1) failure to state a claim under Section 1983,
> Title 42, U.S.C.; (2) Eleventh Amendment sovereign immunity; and (3) the
> court's inability to grant plaintiff the relief requested. Plaintiff responds that these
> legal hurdles are not "insurmountable," and states that she is filing a motion to
> amend her complaint, in hopes to overcome at least the first legal hurdle. Id. at 2.
> Plaintiff has not filed such a motion, however, or attempted to comply with D.
> Kansas Rule 15.1 with regard to any proposed amendment. She has not otherwise
> shown good cause why her complaint should not be dismissed without prejudice,
> and it is so ordered. In the event that plaintiff re-files this suit, she should address
> the deficiencies which Judge Mitchell has identified, and perhaps try to obtain a
> hoped-for waiver of sovereign immunity. Signed by District Judge Kathryn H.
> Vratil on 6/28/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document
> associated with this entry.) (as) (Entered: 06/28/2021).

So after paying the $402.00 filing fee this time, Harsay has refiled essentially the same complaint, with minor changes. Mainly she seizes on Judge Vratil's suggestion and asks Defendants to waive their sovereign/Eleventh Amendment immunity. (Doc. 1, pp. 4-5.) Declining Harsay and Judge Vratil's invitation, Defendants—Justices of the Kansas Supreme Court and the Kansas Supreme Court—do not waive their sovereign/Eleventh Amendment immunity.

## ARGUMENT AND AUTHORITIES

### 1.  FRCP 12(b)(1) and 12(b)(6) Dismissal Standards.

Magistrate Mitchell's statement of dismissal standards in *Harsay 1* is equally applicable here:

> To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim for relief. *Id.* Dismissal of a pro se plaintiff's complaint for failure to state a claim is "proper only where it is obvious that the plaintiff cannot prevail on the facts . . . alleged and it would be futile to give [plaintiff] an opportunity to amend." *Curley v. Perry*, 246 F.3d 1278, 1281 (10th Cir. 2001). The court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

> Similarly, to determine whether a plaintiff has adequately alleged subject-matter jurisdiction, the court looks to the face of the complaint. *Penteco Corp. v. Union Gas Sys., Inc*., 929 F.2d 1519, 1521 (10th Cir. 1991). The court accepts "the well-pleaded factual allegations as true, . . . but ignor[es] conclusory allegations of jurisdiction." *Kucera v. CIA*, 347 F. Supp. 3d 653, 659 (D.N.M. 2018) (citing *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001), and *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971)), *aff'd*, 754 F. App'x 735 (10th Cir. 2018). "The party seeking the exercise of jurisdiction in his favor 'must allege in his pleading the facts essential to show jurisdiction.'" *Penteco*, 929 F.2d at 1521 (quoting *McNutt v. Gen. Motors Acceptance Corp*., 298 U.S. 178, 189 (1936)).

Because Harsay is proceeding pro se, the court construes her pleadings liberally and holds them "to a less stringent standard than those drafted by attorneys." *Johnson v. Johnson*, 466 F.3d 1213, 1214 (10th Cir. 2006). In doing so, the court does not "assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The plaintiff still bears "the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.*

*Harsay 1,* Doc. 4, pp.Doc. 4, pp. 3-4.

### 2.  Issue Preclusion Requires Dismissal.

It is a "sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991). Harsay has now twice asked the federal district court to overturn the state judicial decision. The first time, the district court applied the jurisdictional bar of Eleventh Amendment Immunity and related doctrines. Even though dismissed without prejudice, that ended the matter, as

> "[t]he doctrine of issue preclusion comes into play when an issue involved in a prior decision is the same issue involved in a subsequent action," *Scrivner v. Mashburn (In re Scrivner)*, 535 F.3d 1258, 1266 (10th Cir. 2008) (internal quotation marks omitted); *see also id.* (explaining that when a party fails to appeal a lower-court order, issue preclusion, not law of the case, governs subsequent appellate review). "[E]ven a dismissal without prejudice will have a preclusive effect on the [dispositive jurisdictional] issue in a future action." *Brereton v. Bountiful City Corp.,* 434 F.3d 1213, 1218-19 (10th Cir. 2006).

*Agrawal v. Ogden*, 753 F. App'x 644, 647, fn 2 (10th Cir. 2018).  See also 18A Charles Alan Wright & Arthur R. Miller, 18A Fed. Prac. & Proc. Juris. § 4436 (3d ed., Oct. 2020 update) ("Although a dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion, it does preclude relitigation of the issues determined in ruling on the jurisdiction question unless preclusion is denied for some other reason.");  *Ins. Corp. of Ir., Ltd. v.*

*Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n. 9 (1982) ("A party that has had an

opportunity to litigate the question of subject-matter jurisdiction may not ... reopen that question

in a collateral attack upon an adverse judgment. It has long been the rule that principles of res

judicata apply to jurisdictional determinations—both subject matter and personal.").

 **3. Harsay States No Cause of Action.**

 Harsay seems to disclaim that she is proceeding pursuant to 42 U.S.C. § 1983. (Doc. 1,

pp. 14-15.) There is no direct cause of action under the U.S. Constitution against state

government or officials, and she may not proceed absent a cause of action. Judge Crow has

explained:

> Plaintiffs may not bring a cause of action directly under the United States
> Constitution against defendants. *See Minneci v. Pollard*, 132 S.Ct. 617, 623
> (2012)(refusing to imply a Bivens-like cause of action against a private prison's
> employees for an Eighth Amendment violation because alternative remedies
> exist); *Foster v. Michigan*, 573 Fed.Appx. 377, 391 (6th Cir. 2014)(§ 1983 is
> exclusive remedy for constitutional violations in case involving race and gender
> discrimination claims); *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704,
> 705 (9th Cir. 1992) cert. denied, 506 U.S. 1081 (1993)(litigant complaining of a
> violation of the Constitution must proceed under § 1983.

*Shophar v. Johnson County, et al.,* No. 16-4138, Doc. 60 (11/16/16) [attached as Exhibit 2

pursuant to K. Kan. Rule 7.6(c)]. Other cases are in accord. *See e.g.*, *Liang v. Stockton Police*

*Dep't*, 2021 WL 4951726, at *2 (E.D. Cal. Oct. 25, 2021); *Moye v. Tri-Met*, 2021 WL 5368684,

at *1 (D. Or. Sept. 23, 2021), report and recommendation adopted sub nom. *Moye v. TriMet,*

2021 WL 5371548 (D. Or. Nov. 16, 2021) (A plaintiff does not have a cause of action directly

under the United States Constitution); *Velez v. Turco*, No. CV 20-10957-MBB, 2021 WL

3516446, at *1 (D. Mass. Aug. 10, 2021).

 Allowing a litigant to proceed directly under the Constitution would ignore the statutory

and case-law limits imposed by 42 U.S.C. § 1983 and quickly render § 1983 superfluous.

**4.   Eleventh Amendment Immunity Bars Harsay's Complaint.**

Defendants do not waive their Eleventh Amendment Immunity, so Magistrate Mitchell's

analysis of Eleventh Amendment Immunity in *Harsay 1* is equally applicable here:

> Harsay's claim is also barred by Eleventh Amendment immunity. The
> Eleventh Amendment grants sovereign immunity to the states and operates to
> divest the court of subject-matter jurisdiction. *See* U.S. CONST. amend. XI;
> *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) ("The Eleventh
> Amendment is a jurisdictional bar . . . ."). "The ultimate guarantee of the Eleventh
> Amendment is that nonconsenting States may not be sued by private individuals
> in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363
> (2001). Suits against state officials in their official capacity are "treated as suits
> against the State," thus these officials may be entitled to Eleventh Amendment
> immunity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[I]mmunities available to the
> defendant in an official-capacity action are those that the governmental entity
> possesses."). Eleventh Amendment immunity, however, "is not absolute" and
> does not apply in three situations:
>
> > First, a state may consent to suit in federal court. Second, Congress
> > may abrogate a state's sovereign immunity by appropriate
> > legislation when it acts under Section 5 of the Fourteenth
> > Amendment. Finally, under *Ex parte Young*, 209 U.S. 123, 28 S.Ct.
> > 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against
> > individual state officers acting in their official capacities if the
> > complaint alleges an ongoing violation of federal law and the
> > plaintiff seeks prospective relief. *Muscogee (Creek) Nation v.
> > Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citations omitted).
>
> Here, this lawsuit is treated as against the state of Kansas because Harsay
> named the Justices in their official capacities. Harsay's complaint does not contend
> that the state consented to her suit. And Congress did not abrogate the states'
> sovereign immunity when it enacted § 1983. *Quern v. Jordan*, 440 U.S. 332, 341
> (1979). Accordingly, Eleventh Amendment immunity bars Harsay's claim against
> the Justices unless the *Ex parte Young* exception applies. To determine that, "a
> court need only conduct a straightforward inquiry into whether [the] complaint
> alleges an ongoing violation of federal law and seeks relief properly characterized
> as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645
> (2002) (alteration in original) (quotation omitted). The *Ex parte Young* exception
> "is narrow: It applies only to prospective relief, [and it] does not permit judgments
> against state officers declaring that they violated federal law in the past." *Puerto
> Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).
>
> Harsay's complaint contends that the Justices violated her constitutional
> rights by allegedly failing to acknowledge her arguments and making misleading

or inaccurate statements in the Kansas Supreme Court's 2018 opinion in *Harsay v. University of Kansas*. (ECF 1, at 6.) These allegations relate to *past* conduct rather than any ongoing violations.5 *See Catanach*, 718 F. App'x at 598-99 (affirming dismissal on immunity grounds where the pro se plaintiff sought relief from the defendant judge's past rulings); *O'Rourke ex rel. B.G.O. v. Tulsa Cty.*, No. 19-CV-0076-JHPJFJ, 2019 WL 2388800, at *4 (N.D. Okla. June 6, 2019) (finding no allegation of an ongoing violation where the pro se plaintiff alleged the defendant judge violated his "constitutional rights in the past—specifically, in relation to rulings and hearings on his bond"); *cf. Moore v. Ideus*, No. 4:18CV3052, 2018 WL 5085709, at *3 (D. Neb. Oct. 18, 2018) (finding a pro se plaintiff seeking a declaration that the defendant judge injured his reputation and violated the Nebraska Constitution and his equal protection rights was really seeking "a declaration of past liability" that was barred by sovereign immunity). And although Harsay contends that she has suffered "lasting, continuous[] harm" because the 2018 opinion is easily available to the public via the internet (*see* ECF 1, at 5, 7-8), this does not amount to an allegation that the Justices are committing ongoing constitutional violations. *Cf. Goodson v. Maggi*, No. CIV. A. 08-44, 2009 WL 2960386, at *7 n.6 (W.D. Pa. Sept. 14, 2009) (no ongoing violation where the plaintiff argued a continuing due process violation "because the state court decisions [had] not been vacated or reversed").

Harsay is asking this court to review the state court case and order the Justices to vacate the 2018 opinion. (ECF 1, at 7 ("The remedy I seek from the Defendants is a revised opinion.").) This remedy is not prospective. *See Aron v. Becker*, 48 F. Supp. 3d 347, 368 (N.D.N.Y. 2014) (finding a request for an injunction "non-prospective" to the extent that the pro se plaintiff claimed the defendant judge improperly applied procedures and was seeking the court's review of her state case); *Bowling v. Evans*, No. 4:18-CV-610-ALM-CAN, 2019 WL 5395564, at *5 (E.D. Tex. Mar. 8, 2019) (finding the injunctive relief sought was "retroactive in nature" where the pro se plaintiff requested the court "vacate and/or reverse Justice Evans's prior orders and/or rulings in the state court case entered at the appellate level"); *Goodson*, 2009 WL 2960386, at *7 (finding requested injunctive and declaratory relief was "not prospective at all" when it was really an attempt to have the court "review the prior decisions of the state court judges"). Harsay's complaint does not allege any ongoing violation of federal law or seek relief that would be properly characterized as prospective. Thus, *Ex parte Young* does not apply. The court therefore recommends that Harsay's claim also be dismissed because the Justices are entitled to Eleventh Amendment immunity.

---

5 Some claims based on past harms may fall under *Ex parte Young*, such as situations where a plaintiff seeks to remedy continued exclusion from a university, continued denial of employment, or continued refusal to provide a hearing. *Columbian Fin. Corp. v. Stork*, 702 F. App'x 717, 721 (10th Cir. 2017). But Harsay does not make allegations of this nature here.

*Harsay 1*, Doc. 4, pp. 8-10.

The Kansas Supreme Court was not a defendant to *Harsay 1* so it is not directly addressed by Magistrate Mitchell's order. *Ex parte Young* only applies to state officials sued in their official capacity. The Kansas Supreme Court is entitled to Eleventh Amendment Immunity because it is part of the State of Kansas and not a government official.

In her Complaint, while confusing, Harsay seems to argue that her case fits within *Ex parte Young* prospective relief exception because the Kansas Supreme Court would likely deny a motion for rehearing or modification—that it would be reluctant to change its mind. (Doc. 1, p. 15.)[2]  This is not seeking prospective relief. She still just wants this Court to reverse the Kansas Supreme Court's decision. That the Kansas Supreme Court justices will not changes their minds cannot be grounds for finding a relief request prospective or any past action would qualify and all requests for retrospective relief would suddenly be "prospective," just because the decision-maker refused to do something different.

Moreover, the U.S. Supreme Court recently address suits against judges:

> [A]s *Ex parte Young* explained, this traditional exception does not normally permit federal courts to issue injunctions against state-court judges or clerks. . . . If a state court errs in its rulings, too, the traditional remedy has been some form of appeal, including to this Court, not the entry of an *ex ante* injunction preventing the state court from hearing cases. As *Ex parte Young* put it, "an injunction against a state court" or its "machinery" "would be a violation of the whole scheme of our Government." *Id.*, at 163, 28 S.Ct. 441.

*Whole Woman's Health v. Jackson*, ___ U.S. ___, 142 S. Ct. 522, 532 (2021). Harsay has already petitioned the U.S. Supreme Court for review of the Kanas Supreme Court's decision, and review was denied. She asked the U.S. Supreme Court for rehearing of that denial, and the rehearing was denied. For this Court to now direct Defendants in this matter to alter their decision would be a violation of the whole scheme of our government.

---

[2] Most courts are that way.

### 5.   The Rooker-Feldman Doctrine Bars this Suit.

The Rooker-Feldman doctrine provides that lower federal courts do not have subject matter jurisdiction to review final judgments from state court. *See Rooker v. Fid. Tr. Co*., 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). Appeals from state courts of last resort go only to the Supreme Court of the United States.[3]  *See Rooker,* 263 U.S. at 416. Further, "lower federal courts possess no power whatsoever to sit in direct review of state court decisions." *Feldman*, 460 U.S. at 482 n.16. In *Deloge v. Davis*, No. 21-8025, 2021 WL 6143719, at *2 (10th Cir. Dec. 30, 2021), the Tenth Circuit held the doctrine required dismissal for lack of subject matter jurisdiction of a declaratory judgment and injunction against the Chief Justice of the Wyoming Supreme Court.

### 6.   Injunctive Relief Against the Justices Is Unavailable Under § 1983.

To the extent the Harsay attempts to state a cause of action under 42 U.S.C. § 1983 (which she actually seems to disclaim), Magistrate Mitchell's analysis in *Harsay 1* is again equally applicable here:

> Section 1983 creates a federal cause of action against any person who, acting "under color of" state law, deprives an individual of federal rights. But the statute states that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. Thus, judicial officers are generally "explicitly immunized not only against damages but also against suits for injunctive relief under 42 U.S.C. § 1983." *Ysais v. New Mexico*, 373 F. App'x 863, 866 (10th Cir. 2010).

> Here, Harsay's claim is made against judicial officers for acts and omissions they took in their official capacities as Justices of the Kansas Supreme Court. She seeks injunctive relief—namely, an order directing the Justices to issue a revised opinion in *Harsay v. University of Kansas. See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222 (10th Cir. 2009) ("[T]his court defines injunctive relief as all equitable decrees compelling obedience under the threat of contempt."

---

[3] Federal statute provides that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari." 28 U.S.C. § 1257(a).

(quotation omitted)). But Harsay does not allege that any declaratory decree was violated or that declaratory relief is unavailable. Harsay's claim for injunctive relief against the Justices under § 1983 is therefore barred by the statute's plain language and should be dismissed. *See Knox v. Bland*, 632 F.3d 1290, 1292 (10th Cir. 2011) (affirming dismissal of § 1983 case in favor of state court judges where plaintiff failed to show the conditions for injunctive relief set forth in the statute were satisfied); *Rahimi v. Sweat*, 748 F. App'x 849, 850-53 (10th Cir. 2018) (affirming summary judgment in a § 1983 case where the pro se plaintiff sought an order requiring the defendant state court judge to take action after allegedly ignoring plaintiff's case and allowing trespass on plaintiff's property); *Catanach v. Thomson*, 718 F. App'x 595, 599-600 (10th Cir. 2017) (affirming dismissal of a § 1983 case where the pro se plaintiff did not allege that the defendant state court judge "violated a declaratory judgment or that declaratory relief was unavailable," thus the claim for injunctive relief was "barred by the statute itself"); *Hawver v. Nuss*, No. 5:14-CV-04084-DGK, 2015 WL 1470397, at *3 (D. Kan. Mar. 31, 2015) (dismissing plaintiff's § 1983 case for injunctive relief against the then-sitting Kansas Supreme Court Justices where the complaint did "not allege that a declaratory decree was violated or declaratory relief was unavailable").

*Harsay 1*, Doc. 4, pp. 6-8 [Footnote 4 omitted.]

Harsay's Complaint purports to address the qualifying phrase "unless a declaratory decree was violated or declaratory relief was unavailable," but her arguments are difficult to comprehend. (Doc. 1., p. 15.) She may be arguing that because she did not ask for declaratory relief, it is unavailable. There's an exception that would eat up the rule. She may be arguing that because she asked for rehearing or modification which was denied, declaratory relief is unavailable. Again, an exception that would eat the rule. There has been no declaratory relief so none has been violated, and we never get to the question of whether it is available or not, because declaratory relief is constitutionally precluded by Eleventh Amendment Immunity.

### 7. This Court Does Not Have Authority to Order the Justices or Kansas Supreme Court to Issue a Revised Opinion.

Magistrate Mitchell's analysis in *Harsay 1* of why this Court lacks mandamus type authority over Defendants is equally applicable here:

Harsay's claim should also be dismissed because the sole remedy she seeks is akin a writ of mandamus directing the Justices to take action in their

10

judicial capacities. This court has "no authority to issue such a writ to direct state courts or their judicial officers in the performance of their duties." *Knox*, <u>632 F.3d at 1292</u> (quotation omitted); *see also Smith v. U.S. Ct. of Appeals for the Tenth Cir.*, <u>484 F.3d 1281, 1287</u> (10th Cir. 2007) (affirming the district court's dismissal of a claim seeking a federal court order compelling a state trial judge to consider the plaintiff's constitutional claims). Accordingly, Harsay's claim should also be dismissed because the court cannot grant the relief she seeks.

*Harsay 1*, <u>Doc. 4</u>, p, 11.

## CONCLUSION

Not only has Harsay failed to state a claim, her suit must be dismissed for lack of subject matter jurisdiction for numerous related reasons.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

*/s/Stephen Phillips*
Stephen Phillips, KS No. 14130
Asst. A.G., Civil Litigation Div.,
<u>120 SW 10</u>th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
TEL:   (785) 296-2215
FAX:   (785) 291-3767
steve.phillips@ag.ks.gov
*Attorney for Luckert, Biles, Wilson, Wall, Standridge, Rosen and Kansas Supreme Court*

11

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on February 18, 2022 the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all those individuals currently electronically registered, and with a copy by U.S. mail to the following:

Edina Harsay
1100 Stone Meadows Drive
Lawrence, KS 66049

                                        */s/ Stephen Phillips*_____
                                        Stephen Phillips
                                        Assistant Attorney General

# IN THE UNITED STATES DISTRICT COURT
### FOR THE
## DISTRICT OF KANSAS

Edina Harsay,                          )
          *Plaintiff*,               )
                                         )        Case No. 21-cv-04080-EFM-ADM
vs.                                    )
                                         )
Kansas Supreme Court, et al.,          )
          *Defendants*.              )
_____)

## RESPONSE TO MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Plaintiff, Edina Harsay, submits this Response to Defendants' Memorandum in support of their Motion to dismiss this case.

**Introduction**

Defendants assert that I claim a violation of my constitutional rights because the Defendants "allegedly got it wrong in an opinion affirming the dismissal of a case …" (Memorandum, p. 1). This is somewhat misleading. Neither in this case nor in its prior filing do I seek reversal of, or remedy for, the judgment in the prior case, and I stated this in my Complaint: "I can no longer challenge the judgment of the Kansas Supreme Court in my case." (Complaint, p. 3.) As I explained in my Complaint and in the Exhibit 1 that I attached to it, my case was handled in a (presumably) highly unusual manner that violated my constitutional rights to due

process and equal protection of the laws under the Fourteenth Amendment. I seek remedy to stop ongoing harm that is very different from the harm caused by the judgment itself. The harm from the judgment can no longer be undone, even if that judgment were to be now reversed. But the misrepresentations of the factual and legal aspects of my case, likely made without the full awareness of all the justices involved in the case, can still be remedied. This action is my sole hope for such remedy.

I recognize that it would be unusual for a case such as this to succeed, since justices, especially in a state supreme court, have little accountability, and because a *pro se* litigant probably has little perceived credibility. But surely there is a limit to what judicial action is tolerable under the Constitution. I understand, and support, the concept of judicial immunity, and my goal is not to penalize the Defendants, but simply to change how a situation such as mine is handled and remedied, and thereby stop ongoing harm to me. My case will hopefully lead to policy changes that will prevent similar harm to others in the future.

**Arguments and Authorities**

*1. The Rooker-Feldman Doctrine Does Not Bar this Suit.*

Defendants claim that the Rooker-Feldman doctrine bars this suit (Memorandum, p. 9). The U.S. Supreme Court explained that "under the *Rooker-Feldman* doctrine, federal district courts lack jurisdiction over 'cases brought by state-court losers complaining of injuries caused by state-court *judgments* rendered before the district court proceedings commenced and inviting district court review

– 2 –

and rejection of those judgments.'" *Agrawal v. Ogden*, No. 18-6054, at *6-7 (10th Cir. Nov. 28, 2018), citing *Exxon Mobil Corp. v. Saudi BasicIndus. Corp.*, 544 U.S. 280, 284 (2005) ( emphasis added). As stated in the *Introduction*, I do not seek to overturn the state court judgment in my case, nor do I seek remedy for the harm caused by that judgment.

Were the relief I seek granted, it would not in any way undo the judgment of the state court, nor alleviate any effects of that judgment. "[T]he doctrine does not bar claims where "the *relief sought* in the federal action would not reverse or undo the *relief granted* by the state court." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006). If the relief I seek were to be granted, it would almost certainly indicate that the Defendants' judgment was incorrect and unjust, but even a likelihood of such a situation would not bar this case under the doctrine: "[T]he *Rooker–Feldman* doctrine does not bar an action just because it seeks relief inconsistent with, or even ameliorative of, a state-court judgment." *Campbell v. City of Spencer*, 682 F.3d 1278, 1282 (10th Cir. 2012).

Lastly, my claim must not be "'inextricably intertwined' with a state court judgment." *Pittsburg Cty Rural Water Dist. v. McAlester*, 358 F.3d 694, 707 (10th Cir. 2004) (citing *Dist. of Columbia Ct. of App. v. Feldman,* 460 U.S. 462, 482 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). In *Pittsbugh*, the 10th Circuit applied the following standard:

> To apply the "inextricably intertwined" standard, we ask "'whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment.'" *Kenmen,*314 F.3d at 476 (quoting *Garry v. Geils,*82 F.3d 1362, 1365 (7th Cir. 1996)). "In other words, we approach the question by asking whether the state-court judgment caused, actually and proximately, the injury for which the

– 3 –

federal-court plaintiff seeks redress." *Kenmen,* 314 F.3d at 476 (emphasis omitted). If it did, *Rooker-Feldman* deprives the federal court of jurisdiction; if it did not, *Rooker-Feldman* provides no bar.

*Pittsburg Cty Rural Water Dist. v. McAlester,* 358 F.3d 694, 707 (10th Cir. 2004)

Even if the Defendants had acknowledged and addressed my key legal arguments in their published Opinion, they still technically could have ruled against me, wether or not they believed my arguments to be correct. And they could have truthfully presented the facts in the case, and fairly presented both sides of the case, and yet they still could have chosen to rule against me, simply because they had the power to do so. Thus, the injury for which I seek remedy in the present case is not the result of the judgment, and therefore not "inextricably intertwined" with it. The Rooker-Feldman doctrine therefore does not bar this case.

### 2. The Complaint Did Not Fail to State a Cause of Action.

Defendants state that "[t]here is no direct cause of action under the U.S. Constitution against state government or officials," and therefore I may not proceed with this case. (Memorandum, p. 5.) Defendants cite primarily an unpublished 10th Circuit District Court decision from 2016 for this claim. But some federal appellate court decisions state that it is possible to bring a suit directly under the Constitution, including under the Fourteenth Amendment. The U.S. Supreme Court has stated that it has not decided whether or not a direct action can be brought under the Fourteenth Amendment. Citing one of several earlier decisions that allow direct actions under the Constitution against federal officials, the Court stated:

The question of whether the Board's arguments should prevail, or whether as respondent urged in oral argument, we should, by analogy to our decision in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), imply a cause of action directly from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this Court. Counsel for respondent at oral argument suggested that it is an extremely important question and one which should not be decided on this record. We agree with respondent.

*Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 278 (1977)

Although direct action under the Fourteenth Amendment is rare, numerous decisions have made the Takings Clause available for direct action under the Constitution, against either state or federal defendants. See, for example, *Lawyer v. Hilton Head Pub. Svc. Dist. 1*, 220 F.3d 298, 303 n.4 (4th Cir. 2000) ("We assume for purposes of this case that plaintiffs can bring direct claims under the Takings Clause," but citing also conflicting circuit court opinions). For additional authority supporting direct cause of action under the Constitution, see:

*Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1556 (Fed. Cir. 1991) (takings clause of U.S. Constitution is self-executing); *Civil Rights Cases*, 109 U.S. 3, 20 (1883) (Fourteenth Amendment "is undoubtedly self-executing without any ancillary legislation"); *Ex parte Young*, 209 U.S. 123 (1908) (approving issuance of injunctive relief claimed directly under Fourteenth Amendment); *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 n.21 (1969) ("Of course the private litigant could always bring suit under the Fifteenth Amendment.").

*California Sportfishing Protection Alliance v. United States Bureau of Reclamation*, 1:15-cv-00912 LJO BAM, at *17 n.7 (E.D. Cal. Oct. 20, 2015)

Typically, an action is brought under the Fourteenth Amendment rather than under §1983 when plaintiffs seek to avoid some restriction under §1983, such as a statute of limitations or a restriction on money awards. It makes sense that suits

– 5 –

involving a request for money damages should have more restrictions applied, as defined by Congress. Therefore, when money damages are sought directly under the Fourteenth Amendment, such claims are typically dismissed. A clear distinction has been made between cases that seek money damages and those that do not:

> The only relief sought by Plaintiffs in the complaint is compensatory and punitive damages. Plaintiffs' direct right of action under the Fourteenth Amendment will be dismissed because the Fourteenth Amendment does not provide Plaintiffs with a private right of action to seek damages against state or municipal officials; rather, it provides a right of action for those seeking injunctive relief. *See Farmer v. Ramsay,* 41 F.Supp.2d 587, 591 (D.Md.1999) ("The Fourth Circuit has explicitly rejected the argument that an implied cause of action for damages exists under the Fourteenth Amendment.") (*citing Cale v. Covington,* 586 F.2d 311 (4th Cir.1978)). Plaintiffs may seek monetary damages for violations of their Fourteenth Amendment rights through 42 U.S.C. § 1983, which they have pled as their third cause of action.

> *Hodge v. Coll. of S. Md.*, 121 F. Supp. 3d 486, 495-96 (D. Md. 2015)

I prefer the cause of action in my case to be brought directly under the Fourteenth Amendment because this would avoid the explicit requirement that a §1983 suit be brought against a *person* and thus avoid any convoluted argument concerning wether or not a justice is a state or a person. The Fourteenth Amendment explicitly applies to *states*, which would include state agencies and state officials. Furthermore, as I discuss below, Eleventh Amendment Immunity may be more flexible in a case brought directly under the Fourteenth Amendment.

Nevertheless, I recognize that I might not be permitted to bring this action directly under the Fourteenth Amendment, and instead, §1983 must apply. This would not end the case, however, since §1983 allows an action " brought against a judicial officer for an act or omission taken in such officer's judicial capacity" so long as the action does not seek money damages. A requirement §1983 is that injunctive

– 6 –

(and presumably declaratory) relief be prospective, and I argued how that is so in my case in the *Introduction* of this Response. Because a further restriction under §1983 is that "a declaratory decree was violated or declaratory relief was unavailable," I argued in my Complaint (admittedly, somewhat confusingly) that this was the case (pp. 14-15). I misunderstood the law because injunctive relief is stated as being in the future tense ("shall") and declaratory relief in the past tense ("was"), and so I thought declaratory relief must have been unavailable prior to filing my case in federal court. I shall seek leave to amend my Complaint to clarify this issue.

### 3. Issue Preclusion Does Not Apply To This Case

Defendants argue that issue preclusion bars this case (Memorandum, pp. 4-5). The judgment that was entered in this case states simply that my case is dismissed without prejudice (see Exhibit 1, attached). It does not give other reasons that would indicate that any issue had been finally and irreparably settled. It does not state that dismissal is due to lack of jurisdiction. Indeed, if any such issue had been considered as settled and closed, then Judge Vratil would not have given me advice on addressing deficiencies in my Complaint. She would not have addressed the possibility that I could rescue my case.

Furthermore, the issues that were addressed for the previous filing are not the same as what will be addressed this time. Judge Mitchell stated in her Report that "Although [Ms.] Harsay does not cite the statute, the court construes her complaint to allege a claim under 42 U.S.C. § 1983." (Report, p. 6.) She addressed

my Complaint accordingly. But my claim is directly under the Fourteenth Amendment. Even if it is required to be under § 1983, Judge Vratil recommended that I address the deficiencies identified by Judge Mitchell so that my case could be considered under that law, and I have now done so. In addition, the Kansas Supreme Court has been added as a Defendant to the case, and thus both the Fourteenth Amendment claim and immunity issues are not the same as in the previous filing.

Finally, under Rule 41(b) of the Federal Rules of Civil Procedure, the following conditions that are relevant to my case are not claim preclusive and are not considered an "adjudication on the merits": "a lack of jurisdiction" and "if the dismissal order does not state otherwise (i.e. a decision made 'without prejudice' would not be claim preclusive)."

### 4. Eleventh Amendment Immunity Does Not Bar this Claim

Defendants state that the Eleventh Amendment immunity bars this claim (Memorandum, p. 6-8.)  But it is not at all clear that it does so, in part because the concept of Eleventh Amendment immunity is not at all clear, and not absolute. This is especially so when a suit is brought directly under the Fourteenth Amendment, without the restrictions imposed under § 1983. In such cases, monetary damages are typically not involved (unless the Takings Clause is invoked) and thus the significance of "immunity" is different from the more common § 1983 cases that most often do involve damages. Regardless of whether my case is considered under the Fourteenth Amendment or under § 1983, my claims are permissible under the conditions cited by the 10th Circuit:

In *Ex parte Young*, the U.S. Supreme Court held that the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself.

*Hill v. Kemp*, 478 F.3d 1236, 1255-56 (10th Cir. 2007) (citing *Ex Parte Young* , 209 U.S. at 159–60, 28 S.Ct. 441 (1908)).

I did not name the State of Kansas as a defendant in this suit (which one would do only if one were seeking money damages). Yet, it is "state action" by state officials that I object to (as required for a suit under the Fourteenth Amendment). Thus, Defendants are indeed "the state" with respect to the Fourteenth Amendment, but they are people with respect to the Eleventh. My analysis is consistent with that provided by the 10th Circuit in *Hill*:

[The case] proceeds on the related assumption that the state employee is somehow engaging in something other than state action for purposes of the Eleventh Amendment yet is engaging in sufficient state action for purposes of the Fourteenth Amendment to provide us with jurisdiction; after all, we can enforce a constitutional right only as against state, not private, action. *See id.; Virginia v. Rives*, 100 U.S. 313, 318, 25 L.Ed. 667 (1879).

*Hill v. Kemp*, 478 F.3d 1236, 1256 (10th Cir. 2007)

Although the U.S. Supreme Court declined in *Ex parte Young* to view the Eleventh Amendment as modified by the Fourteenth, more recent cases suggest otherwise. Notes and case citations on a U.S. Congress website containing an annotated version of the Constitution suggests that it is possible that the Fourteenth Amendment abrogates the Eleventh, although this abrogation is likely restricted to cases that do not involve money damages.

The Court has reserved the question whether the Fourteenth Amendment itself, without congressional action, modifies the Eleventh Amendment to permit suits against states, *Milliken v. Bradley*, <u>433 U.S. 267, 290</u> n.23 (1977), but the result in *Milliken*, holding that the Governor could be enjoined to pay half the cost of providing compensatory education for certain schools, which would come from the state treasury, and in *Scheuer v. Rhodes*, <u>416 U.S. 232</u> (1974), permitting imposition of damages upon the governor, which would come from the state treasury, is suggestive. But see *Mauclet v. Nyquist*, <u>406 F. Supp. 1233</u> (W.D.N.Y. 1976) (refusing money damages under the Fourteenth Amendment), appeal dismissed sub nom. *Rabinovitch v. Nyquist*, <u>433 U.S. 901</u> (1977).

<u>https://constitution.congress.gov/browse/essay/amdt11_1_3_2_2/#essay-4</u>

A yet-more recent U.S. Supreme Court case further supports the notion that the Eleventh Amendment is not supreme over the amendments that protect the fundamental rights of the People. In *Stop the Beach Renourishment, Inc v Florida Department of Environmental Protection*, <u>130 S Ct 2592</u> (2010), a plurality of the U.S. Supreme Court seems to have opened the door to the possibility of judicial liability and the possibility that suits could be brought against state courts on constitutional grounds. Referring to that case in a University of Chicago Law Review article,[1] Bloom and Serkin state: "With only one brief exception [within the plurality], all of the justices view judicial takings–and thus suing courts–as a kind of constraint on state court decision making. As conceived by the Court, that is, suing courts is merely a new mechanism for achieving an old goal: correcting court-made errors."[2] Bloom and Serkin addressed the issue of judicial immunity: "[I]n certain limited contexts, judicial immunity should yield. … [J]udicial immunity may, and should, leave space for precisely the kind of suits we envision. Four

---

[1] Frederic Bloom and Christopher Serkin, *Suing Courts*, 79 U. Chi. L. Rev. 553 (2012).

[2] *Ibid.*, at 571.

justices recently implied, in *Stop the Beach*, that perhaps it would."[3] That is, absolute immunity is not truly "absolute."

Bloom and Serkin recognized that in addition to judicial immunity, Eleventh Amendment immunity is a hurdle in suits against courts. But they argue that at least in the case of judicial takings claims, the Fifth Amendment (Takings Clause) trumps Eleventh Amendment immunity. In addition to *Stop the Beach*, they cite an earlier case for this argument, *First English Evangelical Lutheran Church of Glendale v County of Los Angeles*, <u>482 U.S. 304, 316</u> n9 (1987).[4] If rights and protections granted by the Fifth Amendment can trump Eleventh Amendment immunity, then so can the rights and protections granted by the Fourteenth Amendment.

The primary objection to the concept of suits against courts seems to be the issue of "opening the floodgates" to these types of cases. Bloom and Serkin concede that this is a reasonable concern but argue that modern pleading standards already serve as sufficient hurdle to "floodgates." Plaintiffs cannot depend on "loose or emotional stories about how a judge somehow wronged them, but [must depend on] 'sufficient factual matter' showing a plausible entitlement to judicial relief."[5] My Complaint and this Response rely on such factual matter. Furthermore, suits against courts are likely to "...involve very little discovery, demand very little evidence, and ask fairly straightforward questions of law."[6] My case meets these

---

[3] *Ibid.*, at 597.

[4] *Ibid.*, at 598.

[5] *Ibid.*, at 585-586.

[6] *Ibid.*, at 586.

features as well. And since these types of cases are likely very difficult to win, for that reason as well, they would not encourage a "floodgate" of similar cases.[7]

Lastly, Bloom and Serkin argue that courts could (and I argue that they should) preempt these types of suits with new court-made rules or other administrative mechanisms.[8] The court rules, traditions, and routine practices that may have been acceptable and not likely to cause great harm in the past may need to be revised for modern times.

### 5. Relief Sought

Points 6 and 7 in Defendants' Memorandum (p. 9-11) object to the relief that I seek. I acknowledge that this Court cannot force a state court to re-write an opinion, and so declaratory relief would be more appropriate in this case. I shall request leave to amend my Complaint accordingly.

### Conclusions

It would not cause serous harm to anyone if this case were allowed to proceed, so that it could be judged on the merits. I recognize that judicial resources are limited, but the case is more simple than it might seem, because the University's briefs (Respondent in the old case at issue) support my factual statements. Those prior briefs can be judicially noticed, even at this early stage of the case. Because Kansas appellate courts hear a case under the KJRA (K.S.A. § 77-601 et seq.) as though the case had been brought directly to the appellate court (*Kansas Dept. of*

---

[7] *Ibid.*, at 587.

[8] *Ibid.*, at 587.

*Revenue v. Powell*, <u>290 Kan. 564, 567</u>, <u>232 P.3d 856</u> (2010)), it is not necessary to consider any other stage of the case.

Another consideration with respect to judicial resources is the benefit to others, not just me, if the merits of the case were addressed. It would lead to a recognition of the enormous, ongoing, harm that results from misrepresentations in judicial opinions, especially in the modern world, when such harmful misinformation is published on the World Wide Web and readily displayed to anyone on Planet Earth who has an internet connection. Courts must adopt their procedures to modern times, because they now have the power to cause tremendous, permanent harm, and thus tremendous injustice.

Lastly, I hope to demonstrate that accountability of University officials is critical, and petitioners should not be penalized for daring to pursue such accountability in a straight-forward judicial review case. Accountability is especially important in public universities, and regardless of how "public" a university truly is, all research universities receive enormous amounts of public funds for publicly-funded research. The loss of that research is a loss of public investment. University administrators are frequently short-term, and frequently come from out-of-state, and often end up leaving the state, so it should not be presumed that their attention is fully focused on what is best for the university. The KJRA should be applied properly in case such as mine.

For the above stated reasons, I request that this Court deny Defendants' motion to dismiss this case.

Dated: April 22, 2022

Respectfully submitted,

  s/ Edina Harsay
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
e-mail: eharsay@icloud.com
*Plaintiff, pro se*

CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

  s/ Edina Harsay
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **EDINA HARSAY,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **No. 21-cv-4017-KHV** |
| ) | |
| **MARLA J. LUCKERT,** ) | |
| **ERIC S. ROSEN,** ) | |
| **DAN BILES,** ) | |
| **EVELYN Z. WILSON,** ) | |
| **KEYNEN WALL, JR. and** ) | |
| **MELISSA TAYLOR STANDRIDGE** ) | |
| ) | |
| **Defendants.** ) | |

## JUDGMENT IN A CIVIL CASE

**( )    JURY VERDICT.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**( X )    DECISION BY THE COURT.**  This action came to decision by the Court.  The issues have been considered and a decision has been rendered.

        **IT IS ORDERED AND ADJUDGED** that pursuant to the Court's Order (Doc. #11) filed June 28, 2021 in which plaintiff's complaint was dismissed without prejudice, this case is hereby **dismissed without prejudice**.

Dated: 6/28/2021                                TIMOTHY M. O'BRIEN, CLERK

                                                                   s/ Andrea Schreyer
                                                                   Deputy Clerk

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **EDINA HARSAY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 21-CV-4080-EFM-ADM** |
| | ) | |
| **KANSAS SUPREME COURT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>DEFENDANTS' REPLY IN SUPPORT OF<br>MOTION TO DISMISS</u>

Defendants, the Kansas Supreme Court, Marla J. Luckert, Chief Justice of the Kansas Supreme Court, and Justices Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., Melissa Standridge, and Eric S. Rosen, submit this Reply in support of their Motion to Dismiss (Docs. 5, 6 ) and in opposition to Plaintiff Edina Harsay's Response (<u>Doc. 15</u>).

Harsay begins her Response by denying that her Complaint asks for the relief that it asks for.  She quotes in her Response from her Complaint: "'I no longer challenge the judgment of the Kansas Supreme Court in my case.'"  (Response, <u>Doc. 15</u>. p. 1, *quoting* Complaint, <u>Doc. 1, p. 3</u>.) Yet her Complaint states: "The remedy I seek from the Defendants is a revised opinion."  (<u>Doc. 1, p. 7</u>, § IV Relief.)  She goes on in her Complaint to make clear that she realizes this Court has no power to order the relief she seeks: "I am well aware that I am all but powerless in this situation, and I cannot demand that Defendants craft a more just, and less harmful opinion, regardless of the outcome of the present case before this Court.  But I can ask they do so . . .." (<u>Doc. 1, p. 7</u>.)

1.  **The *Rooker-Feldman¹* Doctrine Bars Harsay's Complaint.**

Harsay first addresses the *Rooker-Feldman* doctrine by quoting out of context from *Campbell v. City of Spencer*, <u>682 F.3d 1278, 1282</u> (10th Cir. 2012): "[T]he *Rooker–Feldman* doctrine does not bar an action just because it seeks relief inconsistent with, or even ameliorative of, a state-court judgment." This sentence, however, occurs in a discussion by the Tenth Circuit of whether the plaintiff's federal claim is *inextricably intertwined* with a state court decision, in which case the federal court lacks jurisdiction. *Id.* (*citing D.C. Ct. of Appeals v. Feldman,* <u>460 U.S. 462, 483</u> (1983) ("If the constitutional claims presented to a United States district court are *inextricably intertwined* with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, then the district court is in essence being called upon to review the state-court decision. This the district court may not do.") The *Campbell* discussion is in the context of the preceding statement: "When the state-court judgment is not itself at issue, the [*Rooker–Feldman*] doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action." *Campbell* at 1282 (*quoting Bolden v. City of Topeka*, <u>441 F.3d 1129, 1139</u> (10th Cir.2006).)

Harsay then goes on to seemingly argue that the relief she seeks is not inextricably intertwined because the Kansas Supreme Court got the facts and law wrong. (<u>Doc. 01, p. 4</u>.) Protestations by Harsay aside, she clearly, unequivocally wants this Court to reverse the Kansas Supreme Court. The Kansas Supreme Court's decision is precisely the issue. There could be no request for federal relief more clearly barred by the *Rooker-Feldman* doctrine than what Harsay asks for.

**2.   Issue Preclusion Bars Suit.**

Harsay argues that this suit is not barred by issue preclusion because her first suit was dismissed without prejudice.  Defendants' Memorandum in support of dismissal directly addresses that issue preclusion applies to dismissals without prejudice.  (Doc. 6, p. 4.)  Harsay provides no caselaw to the contrary.

Harsay argues that because Judge Vratil gave her advice on addressing the deficiencies in her original case, issue preclusion should not apply.  Again, Harsay cites no caselaw.  She ignores the fact that Judge Vratil did not grant Harsay permission to amend, and in fact dismissed the case.  Judge Vratils advice was, at best, dicta.

Harsay argues because the Court framed some of the issues a little differently in #21-4017 from the present case, issue preclusion should not apply.  She argues that because Magistrate Mitchell implied a cause of action for her under 42 USC § 1983, the present case is different.  Harsay didn't plead 42 USC § 1983 in #21-4017, however.  In #21-4017, Harsay's Complaint pleads straight-up Fourteenth Amendment violations by the Kansas Supreme Court, just as her current one does, and #21-4017 was barred by the same Eleventh Amendment/*Rooker-Feldman* issues that would bar this one.  This suit is barred by issue preclusion.

**3.   Harsay States No Cause of Action.**

Harsay argues she may proceed directly under the Fourteenth Amendment, without relying on 42 U.S.C. § 1983.  For this, she cites no on-point case law.  She argues that because some circuits have allowed direct causes of action under the Takings Clause, she should be allowed to proceed under the Fourteenth Amendment.  The Takings Clause is in the Fifth Amendment.  There is no good analogy.  Moreover, other circuits have rejected direct suits under

the Takings Clause.  The Ninth Circuit broadly stated in rejecting a direct suit under the Takings

Clause:  "Plaintiff has no cause of action directly under the United States Constitution. We have

previously held that a litigant complaining of a violation of a constitutional right must utilize 42

U.S.C. § 1983."  *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992),

*cert. denied*, 506 U.S. 1081, (1993).  *See also* these District of Kansas cases relying on *Azul-

Pacifico* and holding there is no direct cause of action under the Constitution: *Moral v. Babcock*,

No. 09-1230-EFM, 2010 WL 3199634, at *5 (D. Kan. Aug. 12, 2010*), aff'd sub nom. Moral v.

Grant Cty. Sheriff*, 424 F. App'x 803 (10th Cir. 2011*), and *aff'd sub nom., Moral v. Grant Cty.

Sheriff,* 424 F. App'x 803 (10th Cir. 2011); *Myers v. Supreme Ct. of State of Kan*., No. 05-4077-

JAR, 2006 WL 276399 (D. Kan. Feb. 1, 2006); *U.S. ex rel. Price v. McFarland,* No. 04-4058-

RDR, 2004 WL 3171649, at *6 (D. Kan. Sept. 22, 2004).

        In *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973), the Supreme Court held that 28 U.S.C. §

2254 is the exclusive federal means to for a person in state custody to seek release, because to allow

a suit for release under 42 U.S.C. § 1983 would allow the prisoner to bypass the requirements of §

2254.  The same rational applies here.  To allow a litigant to proceed directly under the Fourteenth

Amendment, would ignore § 1983's requirements and the 150 years of caselaw interpreting it.

        Harsay argues that somehow requests for injunctive relief should be different.  The analogy

to *Preiser* applies true as to injunctions.  The express terms of 42 U.S.C. § 1983 mention injunctions

(precluding injunctive relief against a judicial officer), and Harsay seeks to have this Court avoid that

congressional limitation.

### 4.  The Eleventh Amendment Bars Suit.

        Harsay seems to argue that her suit is permitted under *Ex parte Young* because she seeks

only declaratory and injunctive relief.  (Doc. 15, p. 9.)  For this proposition she cites *Hill v.

Kemp,* 478 F.3d 1236, 1255-56 (10th Cir. 2007) (citing *Ex parte Young* , 209 U.S. at 159–60, 28

S.Ct. 441 (1908)).  She neglects to mention that *Ex parte Young* allows only requests for prospective relief.  *See e.g., Hill* at 1256.  *Ex parte Young* does not apply to cases seeking retrospective relief.  *Id.* at 1258.  She asks for retrospective relief.

Harsay then goes on to argue that the Fourteenth Amendment impliedly overrules the Eleventh Amendment.  She cites no direct caselaw for this astonishing and novel proposition, and it is well beyond this Court's authority to overturn substantial Eleventh Amendment jurisprudence.

### 5.  Harsay Should Not be Allowed to File an Amended Complaint.

Harsay concludes her Response by stating she acknowledges this Court cannot force the Kansas Supreme Court to rewrite its opinion, so instead she wants to seek declaratory relief, and accordingly, she asks permission to amend.  Such an amendment would be futile. A declaratory complaint seeking this Court's opinion the Kansas Supreme Court got it wrong would be barred by the Eleventh Amendment, because it would be seeking retrospective declaratory relief.  *See e.g. Meiners v. Univ. of Kan.,* 359 F.3d 1222, 1232 (10th Cir. 2004).  It would be further barred by issue preclusion.

A court may dismiss a pro se complaint if "it is obvious that the plaintiff cannot prevail on the facts [she] has alleged and it would be futile to give [her] an opportunity to amend." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999) (*citing Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997)).  Such would be an amended complaint by Harsay.

### CONCLUSION

Pursuant to 28 U.S.C.A. § 1257, only the United States Supreme Court has jurisdiction to review a state court judgment.  What Harsay seeks—federal district court review of a Kansas

Supreme Court decision—would be a profound intrusion into the United States Supreme Court's

appellate jurisdiction and into state-court sovereignty.

For these reasons, and reasons not challenged by Harsay but set forth in Defendants'

Motion to Dismiss and accompanying Memorandum, Harsay's Complaint must be dismissed.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

*/s/Stephen Phillips*
Stephen Phillips, KS No. 14130
Asst. A.G., Civil Litigation Div.,
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
TEL:   (785) 296-2215
FAX:   (785) 291-3767
steve.phillips@ag.ks.gov
*Attorney for Luckert, Biles, Wilson,*
*Wall, Standridge, Rosen and*
*Kansas Supreme Court*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to Plaintiff Harsay who electronically registered.

*/s/ Stephen Phillips*
Stephen Phillips
Assistant Attorney General

6

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF KANSAS

| | | |
|---|---|---|
| EDINA HARSAY, | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 21-cv-04080-EFM-ADM |
| vs. | ) | |
| | ) | |
| Kansas Supreme Court, et al., | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## PLAINTIFF'S MOTION FOR LEAVE TO FILE A
## FIRST AMENDED COMPLAINT

The Plaintiff, Edina Harsay, requests leave of the Court to file a First Amended Complaint, a draft of which is attached as Exhibit 1. In support of her request, the plaintiff states:

1. *Background:*  Plaintiff became aware of deficiencies in her original *Complaint* (Doc. 1) from arguments made in the Defendants' *Memorandum in Support of Defendants' Motion to Dismiss* (Doc. 6). These deficiencies might prevent the Court from considering the merits of this case, and thus Plaintiff stated in her *Response* (Doc. 15, pp. 7, 12) that she will request leave to file an amended complaint. The deficiencies were a need to state an appropriate statute under which this action is brought, and a need to articulate better the need for a remedy and the particular remedy sought.

2. *Authority*:  D. Kan. Rule 15.1 and Fed. R. Civ. P. 15(a)(2).

3. *Concise Statement of the amendment sought:*  The proposed amended

complaint is significantly changed in three ways:

a. Proper statutes under which this action may be brought are now cited in

the complaint. The basis for jurisdiction is stated thus:

> This case raises federal claims under the Equal Protection
> Clause and the Due Process Clause of Section 1 of the
> Fourteenth Amendment of the U. S. Constitution. Declaratory
> and injunctive relief sought under the Declaratory Judgment
> Act, U.S.C. §§ 2201, 2202, and either declaratory or injunctive
> relief is sought under the Civil Rights Act of 1871, as amended,
> 42 U.S.C. § 1983. This Court has jurisdiction to hear this case
> under 28 U.S.C. § 1331.
> (Exhibit 1, p.2).

Plaintiff still wishes that this case be considered as brought under the

Fourteenth Amendment, which she believes should eliminate the need for

the legal fiction of converting "state" to "person" in the case of defendants

who are state officials (such conversion would be required under § 1983,

due to its wording), and it would allow the Kansas Supreme Court (which

is actually the most proper defendant in this case, but which cannot be

converted to a "person") to remain as a defendant. This would be

appropriate especially if a declaratory relief were granted, because a

declaratory relief does not force a "person–state" to perform an action (and

the state would not be required to perform an action in any remedy where

no money or property award is sought). However, Plaintiff recognizes that

it might be necessary for this action to be considered under § 1983, which

explicitly allows equitable relief for an action that includes defendants who

are judges. Thus, § 1983 is cited as well.

b. A declaratory remedy, in addition to, or instead of, an injunctive relief is now sought (Exhibit 1, pp. 15-16). The confusing statements concerning declaratory relief, due to a misunderstanding of § 1983, have been deleted from the amended compaint. The inappropriate injunctive remedy of a revised opinion has also been deleted. A declaratory remedy would not be as effective as injunctive relief in preventing ongoing and future harm to the Plaintiff, but it would be nearly so, and it might also lead to a voluntary (rather than forced) remedy from the Defendants. Even without any action from the Defendants, a declaratory remedy would be enormously beneficial to Plaintiff. Although the declaratory relief would be sufficient, an injunctive relief is still sought, primarily to provide another option in case this Court deems declaratory relief on its own as insufficient to qualify for relief.

c. The amended complaint now better explains the ongoing nature of the harm from what is essentially the publication of a false employment record (a false record that was missing both from the University's briefs and from the *Record* that was on review by the Defendants). The previous filing of the complaint cited the harm from the *Report and Recommendation* written by Judge Mitchell, which quoted incorrect, misleading, harmful statements from the *Opinion* published by the Defendants. Because the *Report*, and the harmful statements in it, is readily available on the World Wide Web, it exacerbated the ongoing harm to Plaintiff. The amended complaint now in addition mentions that the Defendants' *Opinion* has been cited at least

– 3 –

nine other times since its publication, including by the Defendants, and thus it is not only possible, but very likely, that this will continue to occur in the future, and thus continue to harm the Plaintiff. (Exhibit 1, p. 14.)

Lastly, in addition to the above significant changes, minor changes have been made. The amended complaint omits some unnecessary factual information that was in the original filing. That information was not directly related to the actions of the Defendants, and it is information that Defendants could not have been made aware of, due to the impermissibility of adding facts to the record in a KJRA case. The information had been added to aid the Plaintiff's credibility, but most likely it was inappropriate. Additional minor trivial cuts and edits have been made.

Dated: May 5, 2022

Respectfully submitted,

  s/ Edina Harsay
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

– 4 –

CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597


    s/ Edina Harsay
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF KANSAS

Edina Harsay,                           )
      *Plaintiff,*                      )
                 )      Case No. 21-cv-04080-EFM-ADM
vs.                                     )
                 )
Kansas Supreme Court, et al.,           )
      *Defendants.*                    )
                 )

## FIRST AMENDED COMPLAINT

### I. Parties to this civil action

   A. The Plaintiff:

      Edina Harsay
      1100 Stone Meadows Dr.
      Lawrence, Douglas County
      Kansas, 66049
      Phone: (785) 813-1757
      email: eharsay@icloud.com

   B. The Defendants:

     1. Supreme Court of the State of Kansas

     2. Honorable Marla Luckert, in her Official Capacity
       Chief Justice of the Kansas Supreme Court
       Kansas Judicial Center
       301 SW 10th Ave.
       Topeka, KS 66612-1507

     3. Honorable Eric S. Rosen, in his Official Capacity
       Justice of the Kansas Supreme Court
       Kansas Judicial Center
       301 SW 10th Ave.
       Topeka, KS 66612-1507

4.   Honorable Dan Biles, in his Official Capacity
     Justice of the Kansas Supreme Court
     Kansas Judicial Center
     301 SW 10th Ave.
     Topeka, KS 66612-1507

5.   Honorable Evelyn Z. Wilson, in her Official Capacity
     Justice of the Kansas Supreme Court
     Kansas Judicial Center
     301 SW 10th Ave.
     Topeka, KS 66612-1507

6.   Honorable Keynen Wall Jr., in his Official Capacity
     Justice of the Kansas Supreme Court
     Kansas Judicial Center
     301 SW 10th Ave.
     Topeka, KS 66612-1507

7.   Honorable Melissa Taylor Standridge, in her Official Capacity
     Justice of the Kansas Supreme Court
     Kansas Judicial Center
     301 SW 10th Ave.
     Topeka, KS 66612-1507

## II.  Basis for Jurisdiction

This case raises federal claims under the Equal Protection Clause and the Due

Process Clause of Section 1 of the Fourteenth Amendment of the U. S. Constitution.

Declaratory and injunctive relief sought under the Declaratory Judgment Act,

U.S.C. §§ 2201, 2202, and either declaratory or injunctive relief is sought under the

Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983. This Court therefore has

jurisdiction to hear this case under 28 U.S.C. § 1331.

## III. Venue

Plaintiff and Defendants are all in the State of Kansas; therefore, venue is

proper before this Court under 28 U.S.C. § 1391(b).

– 2 –

### IV.  History of the Case

The Kansas Supreme Court filed an *Opinion* on Nov. 21, 2018, which concerned a petition for judicial review case that I brought against the University of Kansas ("University") (Exhibit 1, Appendix A). The Kansas Court of Appeals had ruled in my favor in the case (Exhibit 1, Appendix B), but the Kansas Supreme Court overturned that decision. I timely filed a *Motion for Rehearing or Modification* (Exhibit 2), and the Kansas Supreme Court denied my motion on Feb. 28, 2019, which was its final decision in my case (Exhibit 1, Appendix C). I subsequently brought a *Petition for Writ of Certiorari* to the Supreme Court of the United States, in which I sought to overturn the Feb. 28, 2019 decision. That case is necessarily different from the current one, since I can no longer challenge the judgment of the Kansas Supreme Court in my case. However, I include my *Writ of Certiorari* as Exhibit 1, because it contains concise summaries of the most critical aspects of this case, and because it gives careful and precise citations to the *Record* that was under review at all stages of the case. In addition, Exhibit 1 also gives precise citations to earlier court filings in Kansas state courts. Those filings, which may be judicially noticed, gave careful and precise citations to the *Record* for all factual statements. My factual statements were not refuted either by the courts or by the University in filings in Kansas state courts, but most of my statements are omitted from court opinions. Therefore, the documentation that I provide in Exhibit 1 is critical for a fair consideration of the legitimacy this case. Furthermore, because the present *Complaint* is not an appeal, it is not sufficient or appropriate to consider solely prior court opinions that are relevant to the *Complaint*. It is not possible to evaluate the facts in an Equal Protection and Due Process case by considering solely

– 3 –

the statements in the Kansas Supreme Court *Opinion* that is the focus of such a case.

On March 1, 2021, I timely filed a *Complaint* in the U.S. District Court for the State of Kansas, which is substantially the same as the current *Complaint*. That case, No. 5:21-cv-04017-KHV-ADM, was assigned to the Honorable Judges U.S. District Judge Kathryn H. Vratil and U.S. Magistrate Judge Angel D. Mitchell. On May 10, 2021, I timely filed an *Objection* to a *Report and Recommendation* for the case. Among my arguments, a key problem I cited with the *Report and Recommendation* is that it cited (in a publicly available document, readily viewed on the World Wide Web) only the misleading and inaccurate statements from the Defendants' *Opinion*, and not my factual statements that corrected those harmful inaccuracies. Thus, the *Report and Recommendation* exacerbated the harmful, factually inaccurate and/or misleading, and publicly-available, record for this case. Judge Vratil dismissed the case without prejudice on June 28, 2021. Among other deficiencies, Judge Vratil stated that I failed to comply with D. Kansas Rule 15.1 regarding a proposed amendment to my complaint. Judge Vratil further stated that "in the event that plaintiff re-files this suit, she should address the deficiencies which Judge Mitchell has identified, and perhaps try to obtain a hoped-for waiver of sovereign immunity." (The decision was stated in Document 11 for the case, which was "text entry only.") This case may be opened as an original proceeding pursuant to K.S.A. § 60.518.

## V.  Statement of Claim

I have listed as Defendants for this case the current justices of the Kansas Supreme Court, in their official capacities, with the exception of Justice Stegall, who had recused himself from the case that led to this *Complaint*. Three justices who had participated in that case, including the sole Justice who signed the

*Opinion*, are now retired (Justices Carol Beier, Lawton Nuss, and Lee Johnson), and thus I have listed their replacements, in their official capacities, as Defendants. The term "Defendants" in this Complaint refers to the Kansas Supreme Court and the "Justices of the Kansas Supreme Court" in a general sense, because it is the current Kansas Supreme Court that is capable of providing a remedy in this case. For this reason, the Kansas Supreme Court is also listed as a defendant.

Eleventh Amendment Immunity grants immunity to state agencies, including state courts, but such immunity can be waived if the Defendants consent to this suit. While I recognize the very long odds of defendants waiving immunity in any suit, I believe (and hope) that my case is highly unusual, and I believe that the Justices might want to allow a remedy in this case that would be just and that would prevent further harm to me. It is very unlikely that Kansas Supreme Court opinions routinely make misleading or incorrect statements that cause serious, ongoing personal and financial harm to litigants, and I do not believe that court opinions routinely fail to address, or even acknowledge the existence of, legal arguments that are critical for fairly deciding a case (but as detailed below, this is what happened in my case). Furthermore, state supreme court justices are generally highly ethical individuals who value accountability and who value honestly. And this case is about accountability and about honesty, in addition to being an attempt to seek relief that will minimize ongoing and future harm to me.

Accountability and honesty were also at the heart of my legal case against the University of Kansas, which is the case that eventually led to this *Complaint*. The present case does not directly involve the University, but a brief summary of my judicial review case against the University is helpful in explaining the present *Complaint*. The judicial review case is succinctly summarized and carefully documented, citing both the *Record* that was under review and the filings for the

– 5 –

case, in Exhibit 1, pp. 6-23. I also briefly summarize the case here. I brought my case against the University following my tenure-review year while I was an Assistant Professor in the Department of Molecular Biosciences. The *sole reasons* that the University gave for denying me tenure were factually incorrect: an intermediate-level of review incorrectly concluded that I had produced just two papers and "two small grants" when in fact I had generated three papers and five grants during my probationary period, and I was funded for almost my entire probationary period, thereby demonstrating my ability to secure funding. *No other reason was given, or even hinted, at any stage of the review process,* for the denial of tenure, and *no other reasons were claimed in filings by the University,* which did not counter the accuracy of my factual statements regarding either the quality or quantity of my research, or the strongly positive evaluation of my teaching. In fact, my impression was that the University was primarily interested in the clarification of the relevant laws in my case (and perhaps also interested in avoiding being forced to reinstate someone whose research career had been very severely damaged by the extremely long, very unusual delay before the district court generated an opinion for the case).

The factually correct assessment of my research productivity (papers and grants) was confirmed by an extensive, in-depth, lengthy, Department-level review which rated the overall research portion of my review as "Very Good" (Exhibit 1, p. 7); the majority of tenured (and thus voting-eligible) faculty in my department, as well as the department's Chair, voted for granting me tenure. The "quantity" of my research productivity (papers and grants) was *the sole negative issue in my tenure evaluation*; both the quality of my research and my teaching were strongly praised, a fact that is entirely, and very misleadingly, omitted from the Defendants' *Opinion*. The Defendant's *Opinion* did acknowledge that the number of my grants was mis-

– 6 –

stated at review steps subsequent to the Department-level of review. However, the *Opinion* made no mention at all of the fact that the number of my papers was also mis-stated in review steps subsequent to the Department, and in fact repeated the inaccurate assessment without correction or clarification (Exhibit 1, pp. 19-20) even though the University never argued that my assertions on paper count were inaccurate, and copies of all three papers were included in the *Record*.

Perhaps most harmful of all, the *Opinion* misleadingly states, and this Court's subsequent *Report and Recommendation* cites, that "the inaccuracy [in grant count] was just 'one feature of one criterion in the three-criterion evaluation process [and] did not fatally pollute that process or necessarily detract from or destroy the many accurate elements the decision makers had before them.' *Harsay*, 430 P.3d at 38." (*Report and Recommendation*, p. 5; Exhibit 1, p. 19). That this Court's *Report* would cite the misleading statement as justification for recommending the dismissal of my case (without also citing my arguments against that very same statement from the *Opinion*; Exhibit 1, p. 19) is proof of the powerful, harmful, effect of the statement, and it also demonstrates that the statement is assumed by nearly everyone reading it to be an accurate and just rationale for ruling against me.

The "three-criterion review process" in the above statement from the *Opinion* refers to the three components to which tenure review was constrained at the time of my review: 1) Research; 2) Teaching; 3) Service. My teaching and service were praised; there was no criticism or other negative "elements" before decision makers concerning these other two criteria, whatsoever, either in my tenure review records or in court filings. (Exhibit 1, p. 19.) Furthermore, the criterion of Research had just two "features": quality and quantity. The quality of my research was highly praised; there was no criticism or other negative "elements" before decision makers concerning the quality of my research, whatsoever, either in my tenure review

records or in court filings. (Exhibit 1, p. 19.) Thus, *quantity of research was the sole criticism, and the sole reason given, for denial of tenure*. To imply that there were additional criteria or "features" in my record that had been criticized (that is, teaching, service, and quality of research) was wrong. It falsely implied that I had other performance issues in addition to the mis-assessed "quantity" issue, or even worse, that I had personality issues that made me undesirable as a colleague and provoked the dishonesty during my review. This makes my legal case against a former employer appear foolish and unsupported by the facts and, as I detail below, also appear unsupported by legal arguments. And this has made it impossible for me to gain employment that is appropriate for my level of education, abilities, and experience[1]. If not corrected, the inaccurate and misleading statements in the *Opinion* will continue to severely harm me for the rest of my life. This is a threat to my long-term ability to survive. It is mostly the hope for eventual justice in this case, to the somewhat limited extent that justice is still possible, that has given me the strength to fight to survive.

Although the above examples are the most serious factual inaccuracies and misleading statements in the Defendants' *Opinion*, there are many additional examples, so the inaccuracies are a clear "pattern" in the *Opinion*. The *Opinion* misleadingly omits my arguments, also present in my Department's evaluation, that while external reviewers were qualified to assess the *quality* of my research (which they praised), they could not adequately address the *quantity* (which they did criticize), because, as allowed by University rules, I added to the quantity

---

[1] Prior to my legal case but subsequent to the tenure review, before my situation became widely known, I was awarded a Fulbright Scholar Visiting Professorship in the Natural Sciences in Graz, Austria. Therefore, my level of scholarly achievements at the time of my review made me competitive for appropriate positions. Because any new long-term position would have required selling my house and moving long-distance (very undesirable especially because I grew up mostly in the Kansas City area and my elderly mother lives in Topeka), I stayed put and put up a fight in what I felt was an easy-win legal case. I was severely harmed by my faith in the justice system.

subsequent to the early deadline for external reviewer feedback in what was a nearly year-long review process (Exhibit 1, pp. 20-21). It was also misleading for the Defendants to not cite additional critical information that my Departmental review committee, but not external reviewers, had concerning my productivity. As I explained in Exhibit 1 (p. 23), this information, as well as other expertise and knowledge that only Department-level reviewers had, was extremely important in light of the law under which the Defendants reviewed my case, and thus its omission was not insignificant. Most critically, my Department had a letter from my postdoctoral mentor that asserted my intellectual independence, which was an issue in my case because my mentor had funded an early stage of the work for one of my papers[2]. In that letter, my mentor stated: "I can assure you and your colleagues at Kansas that this paper and the approach that led to it were entirely Edina's inspiration and labor." (Exhibit 1, p. 23.)

The factually incorrect statements were repeated in subsequent decision letters and never corrected at any stage of the tenure review process, most likely because subsequent steps of review were unaware of the inaccuracy of the intermediate-level summary assessments.[3] Because I was unaware of the false statements until I filed my petition for judicial review and obtained my records, I was not able to properly defend myself in my responses to the negative decisions during the review process

---

[2] Although I mentioned in my filings that proper credit for me was an issue in my case because my mentor was very well known, I understated the situation because I worried that the Defendants, too, would assume I was undeserving of credit. But the *Opinion* seems to mock the situation (Exhibit 1, p. 23). What I had not mentioned in prior filings is that my postdoctoral mentor shared a Nobel Prize in Physiology or Medicine in 2013, and he had been "short-listed" for the prize for years prior to my tenure review. There is much jealousy among scientists in this type of situation, and sometimes it was assumed that I was a mere good pair of hands with others' brains behind my work. Thus, my department's unique knowledge in my case was extremely important.

[3] There were over 50 faculty members evaluated for tenure and promotion at the University during my review year (Exhibit 2, p. 15). The primary responsibility for documenting the review outcome rests with the the initial (Department) and intermediate (College) level of review, since it is not practical for University-level reviewers to study thousands of pages of faculty records. The top-level University leadership depends on an accurate, honest, review conducted at lower levels, much like courts depend on judicial clerks to perform their work with honesty and care.

(another fact that is completely omitted from the Defendants' *Opinion*, which instead misleadingly quoted my inadequate, uninformed, panicked defenses made during the review process after I learned of the results from the intermediate-level of review). The University never tried to defend the factually incorrect statements in its briefs and never explicitly stated that three papers and five grants were insufficient "productivity" in my department. Therefore, this should have been a straight-forward judicial review case in my favor under the Kansas Judicial Review Act (KJRA), K.S.A. § 77-601 *et seq.*

The KJRA was amended in 2009, and these amendments, which are critical for making the law effective, applied to my case (Exhibit 1, pp. 14-19). The law is modeled after the federal Administrative Procedure Act. Prior to the 2009 amendments, case law incorrectly directed courts to disregard facts that detracted from the state agency decision, thus rendering the new law nearly useless. The district court in my case followed out-dated case law that was invalidated by the 2009 amendments and subsequent case law (and this was a pattern, as it did the same thing in at least one prior case; Exhibit 1. pp. 14-15). The Defendants likewise followed the old law, at least in practice, although unlike the district court, the Defendants did not cite outdated case law. I argued my case using the new definition of the law at every step of the litigation (Exhibit 1, pp. 9, 14-19), but the Defendants did not acknowledge the existence of my key legal arguments (for an issue that they acknowledged as preserved) in their *Opinion*, much less address them in any way. In my *Motion for Rehearing or Modification* (Exhibit 2), I requested that the Defendants apply the correct standard of review as it is now restricted by rules under the KJRA, or explain why they refused to do so by addressing my arguments. I also requested that the Defendants correct the many misleading or inaccurate factual statements in their *Opinion*, because the *Opinion*

– 10 –

misrepresents my tenure review, misrepresents my legal case, and misrepresents me, and thus is severely harmful to my reputation (Exhibit 2, pp. 15-16). The Defendants denied my motion without any statement or explanation (Exhibit 1, Appendix C).

Most likely, the Defendants assumed that there were additional reasons for the University's decision, absent from the record, and thus believed that their decision was just. That is why they implied that reasons in addition to the quantity of my research resulted in the denial of tenure. It is true that there were additional reasons. Individuals do not misrepresent a faculty member's tenure review record for no reason. But the Defendants were incorrect to assume that any failings were mine. My judicial review case was restricted to evidence from the University's record of my review, so I could not supply additional information, and it would be inappropriate for me to do so now. But one readily-verifiable relevant detail is that my department had been formed by the combining of three separate departments, which created factions within the new department that competed for faculty positions and laboratory space. This type of situation is very common at universities, especially in the natural sciences, due to the very intense competition for resources. There are many reasons why a faculty member might be denied tenure that have nothing whatsoever to do with his or her performance, even if University rules require a decision that is based on performance. And if the issue truly were about my performance, then there would have been no reason to misrepresent my performance. It was thus wrong for the Defendants to assume that the University's decision was fair and just, even when the University failed to articulate accurate reasoning for its decision.

I realize that I cannot now contest the Defendant's judgment in favor of the University, and thus this case is of necessity not primarily about that judgment, nor

about any action of the University. However, it was not merely the judgment of the Defendant that harmed me, but also the misrepresentation of my case: both the legal aspects (the Defendant's refusal to acknowledge the existence of my key legal arguments, much less address them) and the factual aspects (by giving a misleading, inaccurate, one-sided presentation of the facts in the case). This was an injustice that is causing me lasting, continuous, harm. It is enormously distressing, and not a day goes by that I do not think of it.

A more practical matter, and even more serious than the emotional distress, is the harm to my reputation caused by the misleading presentation of my case (Exhibit 1, pp. 18-23). Because of the manner in which the Defendants presented my case, I have been rendered essentially unemployable in my field. I am now seeking a degree in a completely different field (not law), and falling into serious debt from which I might never recover. The loss to me is enormous and goes far beyond the very substantial financial loss. I had dedicated my life to my research, and I was intensely passionate about my work. It was my life. Like other professions that require many years of intense effort and specialized training, the creation of a scientist is the creation of a highly specialized mind and abilities. I cannot easily be someone else and not a scientist, especially since we are all on this Earth for a very limited time. Thus, the Defendants' actions resulted in a destruction, or "taking," of something of immense value. Because so much of my work, for many years, was an investment into my future research (the many years I spent creating hundreds strains, DNA constructs, and cell lines, as well as conducting unpublished experiments necessary to develop long-term research projects), the loss for me is not just the loss of my future, but also the loss of my past. I probably can no longer rescue my past. But I am filing this Complaint, and seeking a remedy, in order to rescue my reputation and therefore my future.

– 12 –

**Claim 1** in this case is that the Defendants violated my right to equal protection of the law under the KJRA, and thus my rights under the Equal Protection Clause of the Fourteenth Amendment of the U. S. Constitution. I sincerely believe that my arguments were not acknowledged because they were legally correct and difficult to dispute, and acknowledging that fact would have pressured the Defendants to rule in my favor, which they had chosen not to do. I believe that I have been denied the benefit of a law that I was entitled to, and by not acknowledging and addressing my key legal arguments, the Defendants gave me no reason to believe otherwise. In my *Writ of Certiorari*, I claimed that this denial of my rights was because I was an academic and challenging an academic administrative decision (Exhibit 1, pp. 11-13), but it is equally likely that my *pro se* status led to the Defendants' refusal to acknowledge and address my arguments and to properly apply the law. I was presumed to be defenseless against such abuse of power.

**Claim 2** in this case is that by misrepresenting "my side" of the case and making misleading or inaccurate statements (Exhibit 1, pp. 18-23), the Defendants violated my substantive due process rights under the Due Process Clause of the Fourteenth Amendment of the U. S. Constitution (Exhibit 1, pp. 24-27). Due process, and the rule of law, surely includes addressing, or at least acknowledging, my key legal arguments, and surely includes not misrepresenting, in a serious and harmful manner, the factual aspects of my case. Otherwise, the courts would be routinely ignoring key legal arguments and routinely mis-stating facts in their opinions in a manner that is devastating to litigants, in order to reach their desired outcome, and that seems extremely unlikely to be the case.

While the harm to me under Claim 2 is separate from the harm due to the judgment against me, these harms are clearly connected. The misleading, harmful

– 13 –

statements supported the legitimacy of ruling in favor of the University, because the KJRA requires courts to base their decisions on the reasonings provided by state agency decision makers (Exhibit 1, pp. 14-18). This requirement makes sense; courts do not have authority to evaluate university faculty for tenure, and they are not qualified to peruse my records in order to decide whether or not I deserved tenure. But the injustice of the Defendants' ruling cannot ever be corrected or remedied, not even retrospectively. For both practical and legal reasons, I can seek relief only for ongoing and future harm that is specifically due not to the judgment but to the misrepresentations in my case, and such relief is the aim of this action.

The violation I seek to remedy is "ongoing" in the same sense that an employment record held by an employer, or an academic record held by a school, are ongoing violations if those records were made in a manner that violated constitutional rights. The ongoing harm is even more clear when there are serious harmful inaccuracies in a court opinion, since such opinions are routinely cited, thereby refreshing the harm. Harmful employment records and harmful academic records do not get repeatedly cited on the World Wide Web. But my case has been cited at least nine times already in published opinions, including by the Defendants. As already mentioned, the case has also been cited in the *Report and Recommendation* in a very harmful manner. Thus, ongoing and future harm is not merely possibility but very likely.

I already explained in some detail my need for prospective relief, and I will now argue that such a need arose from the ongoing policy of the Defendants to grant a Motion for Rehearing or Modification only extremely rarely, so that violations of due process rights can remain uncorrected, as happened in my case. I received no explanation whatsoever for why my motion was not granted (Exhibit 1, Appendix C), and that lack of explanation suggests that denying this type of motion

– 14 –

is routine court practice due to a desire for efficiency, and perhaps also due to a reluctance to acknowledge errors. Most likely, if a court refuses to change the judgement, it also will refuse to make other changes, deeming such changes as insignificant. Such a tradition and routine practice may have been more acceptable in the past, when one had to have physical access to law libraries or courthouses to gain access to opinions. Opinions were read almost exclusively by legal professionals, journalists and litigants, and this limited the level of harm caused by inaccuracies. This is no longer the case. Opinions are now publicly posted forever for all on Planet Earth to see on the World Wide Web. Thus the personal and financial harm from misrepresentations and inaccuracies can be severe and permanent. Because of these modern concerns, courts need to adapt their practices to avoid situations such as mine and to create better mechanisms for making corrections or some other type of remedy (such as a succinct published statement that acknowledges the errors). This would have the added benefit of increasing public trust in the courts. Allowing my suit to proceed, and thus demonstrating that there is at least a small chance for accountability even for state supreme courts in state law decisions, would also encourage greater care and revisions when needed, and thus make suits like mine less likely. Courts could also routinely redact sensitive portions of published (or posted) opinions that could be misinterpreted out of full context and cause serious harm. Some federal courts already do this to some extent in employment and family law cases, so there appears to be at least some recognition of the harm caused by these types of opinions. I have not seen such redactions in Kansas state court cases.

## VI.  Relief

The remedy that I seek from this Court is a declaratory judgment that would detail how the Defendants' inaccurate, misleading factual statements, as well as the

– 15 –

the omission of uncontested facts in my favor, have caused, and continue to cause, severe harm to me, in violation of my constitutional rights. Furthermore, I request that the Court declare the existence of my key legal arguments, as I cited them from my two Exhibits, as surely they would have been acknowledged and addressed, had they been made by an attorney rather than by a *pro se* litigant. Although this would primarily help other plaintiffs in KJRA cases, it would help me as well. It would legitimize my pursuit of the judicial review case, rather than making it appear as very foolish career suicide. This harm, too, is now repeatedly exacerbated every time that my case is cited.

I recognize that injunctive relief that would force a revised opinion would be very inappropriate, regardless of whether or not it is legally possible. However, requesting that the Defendants publish a corrective statement, and/or cite a declaratory judgment from this case whenever my KJRA case is cited, seems reasonable and proper. Even if injunctive relief is not possible or deemed as not proper, I can ask that the Defendants take corrective action, regardless of the outcome of the present case, because it is the right thing to do. My request has relevance for more than just me. It is critical for courts to realize that in the internet age, when court opinions are permanently posted on the World Wide Web for all to see, they now have far more power to seriously and permanently injure litigants than they did in the past. Because of this much greater power to cause harm and destroy lives, courts now have greater responsibility to write opinions with care and to make reasonable and fair corrections when litigants make a request that they do so.

## VII.  Related Litigation

This cause, or a substantially equivalent complaint, was previously filed in this court as Case No 5:21-cv-04017-KHV-ADM and assigned to the Honorable Judge Kathryn H. Vratil and the Honorable Judge Angel Mitchell. The case was dismissed without prejudice on June 28, 2021.

## VIII.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: May 5, 2022

Respectfully submitted,

__s/ Edina Harsay____
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

– 17 –

CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

    s/ Edina Harsay
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| EDINA HARSAY,                    ) | |
|                          ) | |
|         Plaintiffs,        ) | |
|                          ) | |
| v.                          ) | Case. No. 21-CV-4080-EFM-ADM |
|                          ) | |
| KANSAS SUPREME COURT, et al.,    ) | |
|                          ) | |
|         Defendants.      ) | |
|                          ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION
## TO MOTION TO AMEND

Defendants, the Kansas Supreme Court, Marla J. Luckert, Chief Justice of the Kansas Supreme Court, and Justices Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., Melissa Standridge, and Eric S. Rosen, submit this Response in Opposition to Plaintiff Edina Harsay's Motion to Amend (Doc. 17.)

### STATEMENT OF THE CASE

In her original Complaint, Harsay sued the Kansas Supreme Court and six current justices in their official capacities contending that they violated her constitutional rights when they allegedly got it wrong in an opinion affirming the dismissal of a case she brought against her former employer, the University of Kansas.[1]  She alleged Defendants made misleading or inaccurate statements and the opinion was factually incorrect and misleading.  (Doc. 1, pp. 8-9). She alleged the opinion violates her rights under the Fourteenth Amendment. (Doc. 1, pp. 12-

---

[1] *Harsay v. Univ. of Kansas*, 308 Kan. 1371, 430 P.3d 30 (2018), *cert denied* 140 S.Ct. 201 (2019), *reh'g denied* 140 S.Ct. 568 (2019).

13.)  Harsay sought an order compelling the Justices and Court to issue a "revised opinion."

(Doc. 1, p. 16.)

       Harsay previously brought a nearly identical suit against the six justices in *Harsay v Luckert et al.*, # 21-4017-KHV-ADM (*Harsay 1*). Because Harsay proceeded *IFP* in *Harsay 1*, the Magistrate issued a Report and Recommendation, recommending that it be dismissed. (*Harsay 1*, Doc. 4.)  Pursuant to FRCP 10(c), Defendants adopt and incorporate by reference the Report and Recommendation, both for its factual statement, but also for the legal reasoning and recommendation.  A copy is attached hereto as Exhibit 1 pursuant to D. Kan. Rule 7.6(c).  The Report and Recommendation recommended dismissal: 1) due to 42 U.S.C. § 1983's express prohibition on in injunctive relief against a "judicial officer;" 2) Eleventh Amendment Immunity; and 3) that federal courts do not have mandamus type authority to direct state officials in the performance of their duties.

       In EFC entry # 11, Judge Vratil accepted the Report and Recommendation, saying:

    ORDER. The Objection of Edina Harsay, Plaintiff, to the Court's Report and Recommendation (Doc. # 10) filed May 10, 2021, is hereby OVERRULED. The Honorable Angel D. Mitchell correctly recommends that plaintiff's complaint is legally deficient on account of (1) failure to state a claim under Section 1983, Title 42, U.S.C.; (2) Eleventh Amendment sovereign immunity; and (3) the court's inability to grant plaintiff the relief requested. Plaintiff responds that these legal hurdles are not "insurmountable," and states that she is filing a motion to amend her complaint, in hopes to overcome at least the first legal hurdle. Id. at 2. Plaintiff has not filed such a motion, however, or attempted to comply with D. Kansas Rule 15.1 with regard to any proposed amendment. She has not otherwise shown good cause why her complaint should not be dismissed without prejudice, and it is so ordered. In the event that plaintiff re-files this suit, she should address the deficiencies which Judge Mitchell has identified, and perhaps try to obtain a hoped-for waiver of sovereign immunity. Signed by District Judge Kathryn H. Vratil on 6/28/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 06/28/2021).

       A copy of the docket for # 21-4017 is attached as Exhibit 2.

2

So after paying the $402.00 filing fee this time, Harsay refiled essentially the same complaint, with minor changes. Mainly she seized on Judge Vratil's suggestion and asked Defendants to waive their sovereign/Eleventh Amendment immunity. (Doc. 1, pp. 4-5.)

Defendants moved to dismiss (Docs. 5, 6.)  Defendants declined Harsay and Judge Vratil's invitation to waive their sovereign immunity.  Defendants argued that issue preclusion precluded this subsequent suit on the three grounds previously state: 1) 42 U.S.C. § 1983's express prohibition on in injunctive relief against a "judicial officer;" 2) Eleventh Amendment Immunity; and 3) that federal courts do not have mandamus type authority to direct state officials.  Defendants argued that Harsay failed to state a cause of action because she was attempting to proceed directly under the U.S. Constitution.  Defendants argued that Eleventh Amendment Immunity because the relief she seeks is retrospective in nature.[2]  And relatedly, Defendants argued that Harsay is barred by the *Rooker-Feldman* doctrine.

Harsay obtained extensions totaling 42 days to respond to Defendants' Motion to Dismiss.

Now after her Response and Defendants' Reply. Harsay seeks to amend.  While her original Complaint disclaimed 42 U.S.C. § 1983, she now seeks to proceed under § 1983 or directly under the U.S. Constitution, whichever the Court likes best.  She superficially tweaks the language of her original complaint a little, now stating she merely seeks a declaratory judgment by the Court that the Kansas Supreme Court erred, although she then goes to request that the Kansas Supreme Court be ordered to publish a corrective statement.

Harsay's proposed Amended Complaint is substantively the same as her original Complaint in this action and her Complaint in *Harsay I*.

---

[2] The Kansas Supreme Court itself is protected by Eleventh Amendment Immunity as to any requests for relief.

### ARGUMENTS AND AUTORITIES.

A court is justified in denying a motion to amend as futile if the proposed amendment could not withstand a motion to dismiss or otherwise fails to state a claim. *See e.g., Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir.1992); *see* also 6 Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 1487 at 642 (1990).

This futility rule holds true even for pro se litigants. Nothing requires a court to grant a pro se litigant permission to amend just because they are pro se. Indeed, the Magistrate in this action is the same magistrate who recommended dismissal of *Harsay I.* As happened in *Harsay I*, under 28 USC §1915(e)(2) courts routinely dismiss pro se *IFP* actions without opportunity to amend when it is obvious that plaintiff cannot prevail on the facts she has alleged and an opportunity to amend her complaint would be futile. *See e.g., Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014) ("even though pro se parties generally should be given leave to amend, it is appropriate to dismiss without allowing amendment where it is obvious that the plaintiff cannot prevail on the facts [s]he has alleged and it would be futile to give [her] an opportunity to amend." (internal quotation omitted)); *Phillips v. Layden*, 434 F. App'x 774, 775 (10th Cir. 2011).

Defendants request that this Court not just grant Harsay permission to amend because she is pro se. Defendants ask the Court to review the proposed Amended Complaint that Harsay attached to her Motion to Amend. Indeed, the "purpose of Rule 15.1 is to compel parties to provide the Court with the information it needs to determine whether a motion to amend is warranted. Without a copy of the proposed pleading, the Court cannot conclusively determine if allowing [a plaintiff] to amend his complaint would promote justice or be entirely futile." *Carter v. Spirit Aerosystems, Inc*., No. 16-1350-EFM-GEB, 2018 WL 5923487, at *3 (D. Kan. Nov. 13,

4

2018) (internal quotations omitted.)

Harsay's proposed Amended Complaint is straight-up futility.  Like her previous Complaint in this case, she is precluded by the doctrine of issue preclusion because the issues are the same.  Issue preclusion aside, in this case under either the original Complaint or her proposed Amended Complaint (just as in *Harsay I*), the Eleventh Amendment precludes the relief she seeks because it is retrospective in nature.  She is seeking to remedy what she views as a past wrong, which is precluded under *Ex parte Young*.  "Ex parte Young does not cover declarations that a state official's past conduct violated a plaintiff's rights."  *Est. of Schultz v. Brown*, 846 F. App'x 689, 692 (10th Cir. 2021).

That Harsay argues she suffers on-going consequences of the Kansas Supreme Court decision does not change the retrospective nature of her request.  As was noted in the Report and Recommendation in *Harsay I*,

> And although Harsay contends that she has suffered "lasting, continuous[] harm" because the 2018 opinion is easily available to the public via the internet (see ECF 1, at 5, 7-8), this does not amount to an allegation that the Justices are committing ongoing constitutional violations. Cf. Goodson v. Maggi, No. CIV. A. 08-44, 2009 WL 2960386, at *7 n.6 (W.D. Pa. Sept. 14, 2009) (no ongoing violation where the plaintiff argued a continuing due process violation "because the state court decisions [had] not been vacated or reversed").

Exhibit 1, p. 10.  *See also, Buchheit v. Green,* 705 F.3d 1157, 1159 (10th Cir. 2012).

Amendment may also be denied when it would constitute undue prejudice to the defendant.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc*., 3 F.3d 1357, 1365 (10th Cir. 1993).  Allowing such futile amendment and requiring Defendants to file another motion to dismiss would run counter to the policy behind Eleventh Amendment immunity.  Eleventh Amendment Immunity is immunity from suit.  As Judge Melgren recently explained

> Immunity from suit is a "broad protection" that grants government officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.' " Medina v. Cram, 252 F.3d 1124, 1127 (10th Cir. 2001) (quoting Behrens v. Pelletier, 516 U.S. 299, 308 (1996)) (discussing qualified immunity). A defendant is therefore generally entitled to have immunity questions resolved before being required to engage in discovery. Arnold, 2019 WL 2438677, at *2. Otherwise, a defendant who is entitled to immunity would be effectively deprived of its benefit. See Siegert v. Gilley, 500 U.S. 226, 232 (1991) (treating immunity as a threshold issue allows a court "to weed out suits ... without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits").

*Grissom v. Palm,* No. 19-3178-EFM-ADM, 2021 WL 147255, at *2 (D. Kan. Jan. 15, 2021).

Even if the Court's practice is to grant pro se litigants one amendment, no matter what, as already discussed Harsay previously filed *Harsay I.* While Judge Vratil dismissed it, Judge Vratil pointed out that Harsay could refile, which Harsay did— Harsay's original Complaint in this case is already Harsay's second time around.

The relief Harsay seeks would be an extraordinary violation of Kansas' courts' sovereignty in the federalist system. This case has been pending since November 10, 2021. Defendants filed a motion to dismiss and accompanying memorandum that fully addressed the legal issues in the original Complaint and which addresses the Amended Complaint because it covers the same ground. Harsay was given ample time to Respond. Given the futility of her Amended Complaint, allowing amendment simply because Harsay is pro se would be form over substance. Amendment would defeat the purposes of Eleventh Amendment immunity and would frustrate the just, speedy, and inexpensive determination of this action. *See* FRCP 1.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT


/s/Stephen Phillips
Stephen Phillips, KS No. 14130
Asst. A.G., Civil Litigation Div.,
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
TEL:   (785) 296-2215
FAX:   (785) 291-3767
steve.phillips@ag.ks.gov
*Attorney for Luckert, Biles, Wilson,
Wall, Standridge, Rosen and
Kansas Supreme Court*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2022 the above and foregoing was filed with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all those individuals currently electronically registered, and with a copy by U.S. mail to the following:

Edina Harsay
1100 Stone Meadows Drive
Lawrence, KS 66049

*/s/ Stephen Phillips*_____
Stephen Phillips
Assistant Attorney General

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDINA HARSAY,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )          Case No. 21-4017-KHV-ADM
                                       )
MARLA J. LUCKERT, et al.,              )
                                       )
                    Defendants.        )

## ORDER GRANTING MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS AND REPORT AND RECOMMENDATION

Pro se plaintiff Edina Harsay's ("Harsay") complaint names as defendants six current Kansas Supreme Court members in their official capacities: Chief Justice Marla J. Luckert and Justices Eric S. Rosen, Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., and Melissa Taylor Standridge (collectively, the "Justices"). (ECF 1.) Harsay contends that the Justices violated her constitutional rights when they allegedly ignored arguments she made in a case against her former employer, the University of Kansas (the "University"), and made misleading or inaccurate statements in a Kansas Supreme Court opinion issued on November 21, 2018. As a remedy, Harsay seeks an order compelling the Justices to issue a revised opinion. In conjunction with Harsay's complaint, she also filed a Motion to Proceed In Forma Pauperis. (ECF 3.)

As discussed in further detail below, the court grants Harsay leave to proceed in forma pauperis ("IFP") but recommends that the presiding district judge dismiss her complaint for several reasons. First, Harsay seeks injunctive relief for acts or omissions that the Justices took in their judicial capacity, which is unavailable under 42 U.S.C. § 1983. Second, the Justices are protected by Eleventh Amendment sovereign immunity. And, third, even if Harsay's claim was otherwise

allowable, this court does not have the authority to issue an order directing state judicial officers in the performance of their duties.[1]

## I.      HARSAY MAY PROCEED IFP.

Title 28 U.S.C. § 1915 allows courts to authorize commencing a civil action "without prepayment of fees or security therefor, by a person who submits an affidavit that . . . the person is unable to pay such fees or give security therefor."  Proceeding IFP "in a civil case is a privilege, not a right—fundamental or otherwise."  *White v. Colorado*, 157 F.3d 1226, 1233 (10th Cir. 1998). The decision to grant or deny IFP status under § 1915 lies within "the sound discretion of the district court."  *Engberg v. Wyoming*, 265 F.3d 1109, 1122 (10th Cir. 2001).  After carefully reviewing the information Harsay provided in the financial affidavit in support of her motion, the court waives the filing fee required for her to commence this civil action.  Harsay is granted leave to proceed IFP.

## II.      THE COURT RECOMMENDS DISMISSING HARSAY'S COMPLAINT.

When a plaintiff proceeds IFP, the court may screen the complaint under 28 U.S.C. § 1915(e)(2)(B).  The court may dismiss the complaint if it determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).  The purpose of § 1915(e)(2) is to "discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate."  *Buchheit v. Green*, 705 F.3d 1157, 1161 (10th Cir. 2012).

In addition, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).  "[F]ederal courts are courts of limited

---

[1] Because the court is recommending dismissal on these grounds, the court does not address any other deficiencies in the merits or substance of Harsay's constitutional claim.

2

subject-matter jurisdiction," and they "may only hear cases when empowered to do so by the Constitution and by act of Congress." *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1035 (10th Cir. 2015) (quotation omitted). The power to hear a case "can never be forfeited or waived," and therefore the court always has an independent obligation to determine whether subject-matter jurisdiction exists. *Id.* (quotation omitted); *see also Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) ("If the parties do not raise the question of lack of jurisdiction, it is the duty of the federal court to determine the matter sua sponte.").

A.    **Legal Standard**

Dismissal under § 1915(e)(2)(B)(ii) is governed by the same standard that applies to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim for relief. *Id.* Dismissal of a pro se plaintiff's complaint for failure to state a claim is "proper only where it is obvious that the plaintiff cannot prevail on the facts . . . alleged and it would be futile to give [plaintiff] an opportunity to amend." *Curley v. Perry*, 246 F.3d 1278, 1281 (10th Cir. 2001). The court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

3

Similarly, to determine whether a plaintiff has adequately alleged subject-matter jurisdiction, the court looks to the face of the complaint. *Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991). The court accepts "the well-pleaded factual allegations as true, . . . but ignor[es] conclusory allegations of jurisdiction." *Kucera v. CIA*, 347 F. Supp. 3d 653, 659 (D.N.M. 2018) (citing *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001), and *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971)), *aff'd*, 754 F. App'x 735 (10th Cir. 2018). "The party seeking the exercise of jurisdiction in his favor 'must allege in his pleading the facts essential to show jurisdiction.'" *Penteco*, 929 F.2d at 1521 (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

Because Harsay is proceeding pro se, the court construes her pleadings liberally and holds them "to a less stringent standard than those drafted by attorneys." *Johnson v. Johnson*, 466 F.3d 1213, 1214 (10th Cir. 2006). In doing so, the court does not "assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The plaintiff still bears "the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.*

**B.    Harsay's Claim Should Be Dismissed.**

Harsay's complaint alleges that she was employed by the University as an Assistant Professor in the Department of Molecular Biosciences. After the University denied her tenure and terminated her employment, she filed a petition for judicial review pursuant to the Kansas Judicial Review Act ("KJRA"), KAN. STAT. ANN. § 77-601 *et seq*. The Douglas County District Court found in favor of the University, "holding that the University's denial of promotion and tenure was supported by substantial evidence and was not unreasonable, arbitrary, or capricious." *Harsay v. Univ. of Kan.*, 430 P.3d 30, 35 (Kan. 2018).[2]

---

[2] The Kansas Supreme Court's opinion is included in Exhibit 1 to Harsay's Complaint. (*See* ECF 1-1, at 48-69.)

The Kansas Court of Appeals reversed.  That court's opinion discussed the letter setting forth the University's final decision as to Harsay, which stated merely that the University's chancellor accepted the University Committee on Promotion and Tenure's ("University Committee") recommendation to deny Harsay tenure.  *Harsay v. Univ. of Kan.*, 376 P.3d 98, 2016 WL 4069604, at *9 (Kan. Ct. App. July 29, 2016), *rev'd*, 430 P.3d 30 (Kan. 2018).[3]  The Kansas Court of Appeals determined that the University Committee had incorrect information regarding the number of grants awarded to Harsay when it made the recommendation to deny Harsay tenure.  The chancellor's letter did not contain specific findings, however, and the court refrained from "speculat[ing] on whether the chancellor's decision would have been different if she had before her a recommendation from the University Committee based on accurate information."  *Id.*  The Kansas Court of Appeals decided to remand the case for "further consideration by the University's various tenure committees . . . based on Dr. Harsay's correct history of research productivity and scholarly works."  *Id.*

The Kansas Supreme Court reversed the Court of Appeals and affirmed the District Court's judgment in favor of the University.  The Kansas Supreme Court acknowledged that the number of Harsay's funded grants was misstated twice in the tenure process record.  But that inaccuracy was just "one feature of one criterion in the three-criterion evaluation process [and] did not fatally pollute that process or necessarily detract from or destroy the many accurate elements the decision makers had before them."  *Harsay*, 430 P.3d at 38.  The court found the University's decision was supported by substantial evidence "in light of the record as a whole."  *Id.*

---

[3] The Kansas Court of Appeals' opinion is included in Exhibit 1 to Harsay's Complaint.  (*See* ECF 1-1, at 72-94.)

Harsay alleges that she filed a motion for rehearing or modification, arguing the Kansas Supreme Court applied a standard of review that was invalidated by 2009 amendments to the KJRA and incorrectly disregarded evidence in the tenure process record that detracted from the University's decision. (ECF 1, at 4.) She also asked the court to correct statements in the opinion regarding herself and her tenure review that she characterized as "misleading." (*Id.*) The Kansas Supreme Court denied Harsay's motion. (*Id.* at 5; ECF 1-1, at 95.) Harsay then petitioned the Supreme Court for review, which was denied. *Harsay v. Univ. of Kan.*, 140 S. Ct. 201, *reh'g denied*, 140 S. Ct. 568 (2019).

Harsay now claims the Justices deprived her of rights afforded under the Fourteenth Amendment to the United States Constitution. Although Harsay does not cite the statute, the court construes her complaint to allege a claim under 42 U.S.C. § 1983. Specifically, Harsay contends that the Justices violated her right to equal protection by denying her the benefit of the KJRA because of her status as an academic and a pro se litigant. (ECF 1, at 6.) Harsay also alleges that the Justices violated her right to substantive due process by "misrepresenting" her side of the case in their opinion and "making misleading or inaccurate statements." (*Id.*) She asks this court to order the Justices to issue a revised opinion that "honestly presents [her] side of the case and omits or clarifies statements that are misleading and harmful"; acknowledges and addresses her legal arguments; and reprimands the Douglas County District Court for how it handled her case. (*Id.* at 7.) She does not seek damages or declaratory relief. For the reasons discussed below, the court recommends that Harsay's complaint be dismissed.

### 1.     Injunctive Relief Against the Justices Is Unavailable Under § 1983.

Section 1983 creates a federal cause of action against any person who, acting "under color of" state law, deprives an individual of federal rights. But the statute states that "in any action

brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. Thus, judicial officers are generally "explicitly immunized not only against damages but also against suits for injunctive relief under 42 U.S.C. § 1983."[4] *Ysais v. New Mexico*, 373 F. App'x 863, 866 (10th Cir. 2010).

Here, Harsay's claim is made against judicial officers for acts and omissions they took in their official capacities as Justices of the Kansas Supreme Court. She seeks injunctive relief— namely, an order directing the Justices to issue a revised opinion in *Harsay v. University of Kansas*. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222 (10th Cir. 2009) ("[T]his court defines injunctive relief as all equitable decrees compelling obedience under the threat of contempt." (quotation omitted)). But Harsay does not allege that any declaratory decree was violated or that declaratory relief is unavailable. Harsay's claim for injunctive relief against the Justices under § 1983 is therefore barred by the statute's plain language and should be dismissed. *See Knox v. Bland*, 632 F.3d 1290, 1292 (10th Cir. 2011) (affirming dismissal of § 1983 case in favor of state court judges where plaintiff failed to show the conditions for injunctive relief set forth in the statute were satisfied); *Rahimi v. Sweat*, 748 F. App'x 849, 850-53 (10th Cir. 2018) (affirming summary judgment in a § 1983 case where the pro se plaintiff sought an order requiring the defendant state court judge to take action after allegedly ignoring plaintiff's case and allowing trespass on plaintiff's property); *Catanach v. Thomson*, 718 F. App'x 595, 599-600 (10th Cir. 2017) (affirming dismissal of a § 1983 case where the pro se plaintiff did not allege that the defendant state court

---

[4] Federal common law judicial immunity bars claims for damages against a judge unless the judge's actions were not taken in his or her judicial capacity or the judge was acting in the complete absence of jurisdiction. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Harsay does not seek damages in this case. Even if she did, immunity would apply because Harsay's claim arises out of the Justices' actions in their judicial capacity and presumably within their jurisdiction.

judge "violated a declaratory judgment or that declaratory relief was unavailable," thus the claim for injunctive relief was "barred by the statute itself"); *Hawver v. Nuss*, No. 5:14-CV-04084-DGK, 2015 WL 1470397, at *3 (D. Kan. Mar. 31, 2015) (dismissing plaintiff's § 1983 case for injunctive relief against the then-sitting Kansas Supreme Court Justices where the complaint did "not allege that a declaratory decree was violated or declaratory relief was unavailable").

### 2.    Eleventh Amendment Immunity Bars Harsay's Claim.

Harsay's claim is also barred by Eleventh Amendment immunity. The Eleventh Amendment grants sovereign immunity to the states and operates to divest the court of subject-matter jurisdiction. *See* U.S. CONST. amend. XI; *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) ("The Eleventh Amendment is a jurisdictional bar . . . ."). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). Suits against state officials in their official capacity are "treated as suits against the State," thus these officials may be entitled to Eleventh Amendment immunity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("[I]mmunities available to the defendant in an official-capacity action are those that the governmental entity possesses."). Eleventh Amendment immunity, however, "is not absolute" and does not apply in three situations:

> First, a state may consent to suit in federal court. Second, Congress may abrogate a state's sovereign immunity by appropriate legislation when it acts under Section 5 of the Fourteenth Amendment. Finally, under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.

*Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citations omitted).

8

Here, this lawsuit is treated as against the state of Kansas because Harsay named the Justices in their official capacities.  Harsay's complaint does not contend that the state consented to her suit.  And Congress did not abrogate the states' sovereign immunity when it enacted § 1983. *Quern v. Jordan*, 440 U.S. 332, 341 (1979).  Accordingly, Eleventh Amendment immunity bars Harsay's claim against the Justices unless the *Ex parte Young* exception applies.  To determine that, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quotation omitted).  The *Ex parte Young* exception "is narrow: It applies only to prospective relief, [and it] does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

Harsay's complaint contends that the Justices violated her constitutional rights by allegedly failing to acknowledge her arguments and making misleading or inaccurate statements in the Kansas Supreme Court's 2018 opinion in *Harsay v. University of Kansas*.  (ECF 1, at 6.)  These allegations relate to *past* conduct rather than any ongoing violations.[5]  *See Catanach*, 718 F. App'x at 598-99 (affirming dismissal on immunity grounds where the pro se plaintiff sought relief from the defendant judge's past rulings); *O'Rourke ex rel. B.G.O. v. Tulsa Cty.*, No. 19-CV-0076-JHP-JFJ, 2019 WL 2388800, at *4 (N.D. Okla. June 6, 2019) (finding no allegation of an ongoing violation where the pro se plaintiff alleged the defendant judge violated his "constitutional rights in the past—specifically, in relation to rulings and hearings on his bond"); *cf. Moore v. Ideus*, No.

---

[5] Some claims based on past harms may fall under *Ex parte Young*, such as situations where a plaintiff seeks to remedy continued exclusion from a university, continued denial of employment, or continued refusal to provide a hearing.  *Columbian Fin. Corp. v. Stork*, 702 F. App'x 717, 721 (10th Cir. 2017).  But Harsay does not make allegations of this nature here.

9

4:18CV3052, 2018 WL 5085709, at *3 (D. Neb. Oct. 18, 2018) (finding a pro se plaintiff seeking a declaration that the defendant judge injured his reputation and violated the Nebraska Constitution and his equal protection rights was really seeking "a declaration of past liability" that was barred by sovereign immunity). And although Harsay contends that she has suffered "lasting, continuous[] harm" because the 2018 opinion is easily available to the public via the internet (*see* ECF 1, at 5, 7-8), this does not amount to an allegation that the Justices are committing ongoing constitutional violations. *Cf. Goodson v. Maggi*, No. CIV. A. 08-44, 2009 WL 2960386, at *7 n.6 (W.D. Pa. Sept. 14, 2009) (no ongoing violation where the plaintiff argued a continuing due process violation "because the state court decisions [had] not been vacated or reversed").

Harsay is asking this court to review the state court case and order the Justices to vacate the 2018 opinion. (ECF 1, at 7 ("The remedy I seek from the Defendants is a revised opinion.").) This remedy is not prospective. *See Aron v. Becker*, 48 F. Supp. 3d 347, 368 (N.D.N.Y. 2014) (finding a request for an injunction "non-prospective" to the extent that the pro se plaintiff claimed the defendant judge improperly applied procedures and was seeking the court's review of her state case); *Bowling v. Evans*, No. 4:18-CV-610-ALM-CAN, 2019 WL 5395564, at *5 (E.D. Tex. Mar. 8, 2019) (finding the injunctive relief sought was "retroactive in nature" where the pro se plaintiff requested the court "vacate and/or reverse Justice Evans's prior orders and/or rulings in the state court case entered at the appellate level"); *Goodson*, 2009 WL 2960386, at *7 (finding requested injunctive and declaratory relief was "not prospective at all" when it was really an attempt to have the court "review the prior decisions of the state court judges"). Harsay's complaint does not allege any ongoing violation of federal law or seek relief that would be properly characterized as prospective. Thus, *Ex parte Young* does not apply. The court therefore recommends that Harsay's claim also be dismissed because the Justices are entitled to Eleventh Amendment immunity.

### 3.    This Court Does Not Have the Authority to Order the Justices to Issue a Revised Opinion.

Harsay's claim should also be dismissed because the sole remedy she seeks is akin a writ of mandamus directing the Justices to take action in their judicial capacities.  This court has "no authority to issue such a writ to direct state courts or their judicial officers in the performance of their duties." *Knox*, 632 F.3d at 1292 (quotation omitted); *see also Smith v. U.S. Ct. of Appeals for the Tenth Cir.*, 484 F.3d 1281, 1287 (10th Cir. 2007) (affirming the district court's dismissal of a claim seeking a federal court order compelling a state trial judge to consider the plaintiff's constitutional claims).  Accordingly, Harsay's claim should also be dismissed because the court cannot grant the relief she seeks.

## III.    CONCLUSION

Section 1983's plain language bars Harsay from obtaining the relief she seeks.  Further, this court lacks subject-matter jurisdiction over Harsay's claim because Eleventh Amendment sovereign immunity protects the Justices from suit.  Furthermore, this court is not empowered to issue an order directing the Justices in the performance of their duties as state judicial officers.  For these reasons, the court recommends that the presiding district judge dismiss Harsay's complaint.

\* \* \* \* \*

Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(2), and D. Kan. Rule 72.1.4(b), plaintiff may file written objections to this report and recommendation within fourteen days after being served with a copy.  If plaintiff fails to file objections within the fourteen-day time period, no appellate review of the factual and legal determinations in this report and recommendation will be allowed by any court.  *See In re Key Energy Res. Inc.*, 230 F.3d 1197, 1199-1200 (10th Cir. 2000).

**IT IS THEREFORE ORDERED** that plaintiff Edina Harsay's Motion to Proceed In Forma Pauperis (ECF 3) is granted.

**IT IS FURTHER RECOMMENDED** that Harsay's complaint be dismissed for the reasons set forth above.

**IT IS FURTHER ORDERED** that the clerk's office mail a copy of this Order and Report and Recommendation to Harsay via regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

Dated March 29, 2021, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

CLOSED,MJLC2

# U.S. District Court
## DISTRICT OF KANSAS (Topeka)
## CIVIL DOCKET FOR CASE #: 5:21-cv-04017-KHV-ADM

| | |
|---|---|
| Harsay v. Luckert et al | Date Filed: 03/01/2021 |
| Assigned to: District Judge Kathryn H. Vratil | Date Terminated: 06/28/2021 |
| Referred to: Magistrate Judge Angel D. Mitchell | Jury Demand: None |
| Cause: 42:1981 Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Edina Harsay**                    represented by    **Edina Harsay**
1100 Stone Meadows Drive
Lawrence, KS 66049
785-813-1757
Email: eharsay@icloud.com
PRO SE

V.

**Defendant**

**Marla J. Luckert**
*in her official capacity as Chief Justice of*
*Kansas Supreme Court*

**Defendant**

**Eric S. Rosen**
*in his official capacity as Justice of Kansas*
*Supreme Court*

**Defendant**

**Dan Biles**
*in his official capacity as Justice of Kansas*
*Supreme Court*

**Defendant**

**Evelyn Z. Wilson**
*in her official capacity as Justice of Kansas*
*Supreme Court*

**Defendant**

**Keynen Wall, Jr.**
*in his official capacity as Justice of Kansas*
*Supreme Court*

**Defendant**

**Melissa Taylor Standridge**
*in her official capacity as Justice of Kansas*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/01/2021 | 1 | COMPLAINT (No Summons Issued) with trial location of Topeka, filed by Edina Harsay. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (jsh) (Entered: 03/02/2021) |
| 03/01/2021 | 2 | CIVIL COVER SHEET re 1 Complaint by Plaintiff Edina Harsay. (jsh) (Entered: 03/02/2021) |
| 03/01/2021 | 3 | MOTION for Leave to Proceed in forma pauperis by Plaintiff Edina Harsay. NOTE - Access to document is restricted pursuant to the courts privacy policy. (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Affidavit) (jsh) (Entered: 03/02/2021) |
| 03/04/2021 | | DOCKET ANNOTATION: Plaintiff Edina Harsay is a registered pro se participant with E-Filing & ECF Notifications. (gw) (Entered: 03/04/2021) |
| 03/29/2021 | 4 | ORDER GRANTING MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS AND REPORT AND RECOMMENDATIONS re 1 Complaint filed by Edina Harsay. Objections to R&R due by 4/12/2021. Signed by Magistrate Judge Angel D. Mitchell on 3/29/2021. Mailed to pro se party Edina Harsay by regular mail and by certified mail; Certified Tracking Number: 7010 2780 0003 1928 1545. (jal) (Entered: 03/29/2021) |
| 03/29/2021 | 5 | ORDER granting 3 Motion for Leave to Proceed in forma pauperis. Signed by Magistrate Judge Angel D. Mitchell on 3/29/2021. Mailed to pro se party Edina Harsay by regular mail and by certified mail; Certified Tracking Number: 7010 2780 0003 1928 1545. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry. See Docket Entry 4 ORDER GRANTING MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS AND REPORT AND RECOMMENDATIONS for a copy of the order.) (jal) (Entered: 03/29/2021) |
| 04/08/2021 | 6 | MOTION for extension of time *to file Objection to R. & R.* by Plaintiff Edina Harsay (Harsay, Edina ) (Entered: 04/08/2021) |
| 04/08/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 6 MOTION for extension of time *to file Objection to R. & R.*. The motion will be resolved by the District Judge. (ks) (Entered: 04/08/2021)** |
| 04/09/2021 | 7 | ORDER sustaining 6 Motion for Extension of Time to File. On or before April 26, 2021, plaintiff may file objections to the Order Granting Motion For Leave To Proceed In Forma Pauperis And Report And Recommendations (Doc. #4). Signed by District Judge Kathryn H. Vratil on 4/9/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (heo) (Entered: 04/09/2021) |
| 04/22/2021 | 8 | Second MOTION for extension of time to file Objection to R. & R. by Plaintiff Edina Harsay. (Harsay, Edina) (Entered: 04/22/2021) |
| 04/23/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 8 Second MOTION for extension of time *to file Objection to R. & R.*. The motion will be resolved by the District Judge. (ks) (Entered: 04/23/2021)** |
| 04/27/2021 | 9 | ORDER **sustaining**, for substantially the reasons stated in the motion, 8 Motion For Extension Of Time to file Objection to Report and Recommendation. Objections to R&R due by 5/10/2021. Signed by District Judge Kathryn H. Vratil on 4/27/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (as) (Entered: 04/27/2021) |

5/9/22, 3:42 PM

District of Kansas

| 05/10/2021 | 10 | OBJECTION to 4 Report and Recommendations by Plaintiff Edina Harsay. (Harsay, Edina) Modified on 5/11/2021, originally linked to DE 9. (mam) (Entered: 05/10/2021) |
| --- | --- | --- |
| 06/28/2021 | 11 | ORDER. The Objection of Edina Harsay, Plaintiff, to the Court's Report and Recommendation (Doc. # 10 ) filed May 10, 2021, is hereby **OVERRULED**. The Honorable Angel D. Mitchell correctly recommends that plaintiff's complaint is legally deficient on account of (1) failure to state a claim under Section 1983, Title 42, U.S.C.; (2) Eleventh Amendment sovereign immunity; and (3) the court's inability to grant plaintiff the relief requested. Plaintiff responds that these legal hurdles are not "insurmountable," and states that she is filing a motion to amend her complaint, in hopes to overcome at least the first legal hurdle. Id. at 2. Plaintiff has not filed such a motion, however, or attempted to comply with D. Kansas Rule 15.1 with regard to any proposed amendment. She has not otherwise shown good cause why her complaint should not be dismissed without prejudice, and it is so ordered. In the event that plaintiff re-files this suit, she should address the deficiencies which Judge Mitchell has identified, and perhaps try to obtain a hoped-for waiver of sovereign immunity. Signed by District Judge Kathryn H. Vratil on 6/28/2021. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (as) (Entered: 06/28/2021) |
| 06/28/2021 | 12 | JUDGMENT. Signed by deputy clerk on 6/28/2021. (ca) (Entered: 06/28/2021) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 05/09/2022 15:42:32 | | | |
| **PACER Login:** | sphillips14130 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-04017-KHV-ADM |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF KANSAS

Edina Harsay,                    )
          *Plaintiff,*          )
                        )   Case No. 21-cv-04080-EFM-ADM

vs.                              )
                        )

Kansas Supreme Court, et al.,    )
          *Defendants.*        )
_____)

## PLAINTIFF'S REPLY TO RESPONSE IN OPPOSITION
## TO MOTION TO AMEND

Plaintiff, Edina Harsay, submits this Reply to Defendants' Response in Opposition to Motion to Amend Complaint.

### *Introduction*

Defendant's Response in Opposition to my Motion to Amend my Complaint mostly repeats the same arguments that Defendants made in their Memorandum in Support of Motion to Dismiss (Doc. 6), which was in response to my initial Complaint. I have already addressed those arguments in detail my Response to the Memorandum (Doc. 15), so here I only very briefly summarize a few of my prior arguments and instead focus on the issues that are relevant to the proposed Amended Complaint (Doc. 17, Exhibit 1). My Response the Memorandum is critical for a fair consideration of my Complaint/Amended Complaint, but I do not wish to copy-paste from it here and possibly waste the Court's time with duplicate material.

– 1 –

I hope that my arguments in my Response will still get careful consideration, in addition to this Reply. My Response addressed all of the legal arguments that Defendants repeat now in their Response in Opposition (without any acknowledgment of my arguments that had already addressed those legal issues).

Defendants attached to their Response in Opposition a Report and Recommendation that Judge Mitchell made for the *prior* filing of this case, and they state that they accept the factual and legal reasonings of the Report (Response in Opposition, p. 2). But I have addressed a serious and harmful factual error in that Report in my new Complaint/Amended Complaint (Doc. 17, Exhibit 1, p.7). (Unlike in my prior filing of this case, in which I simply cited page numbers from an attached exhibit for my factual statements, and which the Report and Recommendation thus missed, the current Complaint contains the key facts more explicitly.) And I have also already addressed the legal issues that were raised in the Report and Recommendation in my Response (Doc. 15). It is thus unhelpful for this Court to consult the old Report that was made for the *prior* filing of this case without first considering my re-filed Complaint, the few (but critical) changes in the proposed Amended Complaint, and my Response to the Defendants' Motion to Dismiss. The old Report is now simply out-dated.

I am no longer requesting that the Justices issue a revised opinion (Response in Opposition, p. 2), and I stated in the Amended Complaint that I recognize that such a request is inappropriate (Doc. 17, Exhibit 1, p. 16).  Furthermore, Defendants criticize the similarity of the present Complaint to the initial filing, and they misleadingly suggest that the key change is simply that I "seized on" Judge

– 2 –

Vratil's suggestion to request that Defendants waive Eleventh Amendment

Immunity, if I choose to re-file my case (Response in Opposition, p. 3). A key

component Judge Vratil's Order (reproduced in Response in Opposition, p. 2) that I

did "seize on" was that my case was dismissed *without prejudice*, which meant that

I would be permitted to re-file it. So, of course it is not an entirely new and different

case, despite the significant improvements and clarifications in the presentation.

The re-filing is permissible, because the case was not dismissed due to lack of

jurisdiction. Raising a federal question grants subject matter jurisdiction under 28

U.S.C. § 1331 (this jurisdiction was never challenged). And it was clear from the

remedy that I requested in the prior filing, and the remedy that I now request, that

my case should not be barred by another jurisdictional issue, Eleventh Amendment

immunity. This is because I do not seek, and never sought, monetary damages, and

I aimed to remedy ongoing and future harm due to violation of federal law. Thus, it

was always clear that the *Ex parte Young* exception to Eleventh Amendment

Immunity should be applicable to this case.[1] Furthermore, state court judges do not

have absolute judicial immunity with respect to prospective relief in federal courts

(*see Pulliam v. Allen*, 466 U.S. 522 (1984)), although a 1996 Congressional

amendment to § 1983 partially abrogated *Pulliam*. The rest of this Reply will focus

on the new arguments in the Defendants' Response in Opposition, focusing on

primarily on arguments pertaining to the proposed Amended Complaint.

---

[1] "'[O]fficial-capacity actions for prospective relief are not treated as actions against the State.'
*Kentucky* v. *Graham*, 473 U.S., at 167, n. 14; *Ex parte Young*, 209 U.S. 123, 159-160 (1908). This
distinction is 'commonplace in sovereign immunity doctrine,' L. Tribe, American Constitutional Law
§ 3-27, p. 190, n. 3 (2d ed. 1988)." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989)

### *Declaratory or injunctive relief is sought as remedy for ongoing violation of constitutional rights*

The Defendants' Memorandum in Support of Motion to Dismiss (Doc. 6) helped me to understand that I needed to explain the nature of the harm that I seek to remedy more clearly, thereby making it more obvious that I seek prospective relief for an ongoing violation. Furthermore, I also realized that that I needed to address the possibility of a declaratory remedy if my case must be considered as an action under 42 U.S.C. § 1983.[2] These two matters are important changes in the proposed Amended Complaint (Doc. 17, Exhibit 1, pp. 11, 12, 15, 16).

Although I explained better how the harm that I seek to remedy is ongoing and similar to other types of harm that have been deemed to fall under the *Ex parte Young* exception (Doc. , Exhibit 1, pp), Defendants still insist, incorrectly, that the remedy I seek is "retrospective in nature" (Response in Opposition, p. 3).  It is impossible to remedy the harm that I have already suffered in the past, and this would be true even if monetary award were available. Money or other retrospective relief cannot repair past harm to a reputation, and it cannot not give me back lost time and scientific productivity, nor return to me a lost research program or the loss of opportunities. Thus, retrospective remedy is impossible in my case. Only prospective relief is possible, and only prospective relief is sought. I have no other reason or need for bringing this suit, at significant financial and personal cost to me, other than to prevent serious future harm.

---

[2] The wording of § 1983 requires that I address the possibility of a declaratory remedy. But I have also proposed that my case could instead, or in addition, be considered under the Fourteenth Amendment and 28 U.S.C. §§ 2201-2202. See Amended Complaint, p 2. Defendants did not address this in their Response in Opposition, so I am also not further addressing this point in this Reply.

Additionally, the violation of my rights is ongoing, because the statements made in a published court opinion are "ongoing" until eternity unless overturned or otherwise negated by future laws or future court decisions.  Even if written in the past, they are currently valid, currently in use, currently cited, and currently repeatedly harming me. It is ongoing harm more so than other types of harm that have been deemed to fall under the *Ex parte Young* exception. A student seeking the injunctive relief of having a censure expunged from university records relates to a past violation, and yet such injunctions "are not limited merely to past violations: they serve the purpose of preventing present and future harm to Flint [the student]. Therefore, they cannot be characterized solely as retroactive injunctive relief and are not barred by the Eleventh Amendment." *Flint v. Dennison*, <u>488 F.3d 816, 825</u> (9th Cir. 2007). Academic records are generally not published on the World Wide Web and are not repeatedly cited, an yet they still clearly cause "present and future harm." How is the situation that I seek to remedy any less "present and future harm" than the situation in Flint?  Similarly, adverse employment records due to violation of constitutional rights is considered an ongoing violation that is subject to prospective relief. *See Cobb v. State*, CIVIL ACTION No. 2:10cv502-MHT, at *10-11 (M.D. Ala. Aug. 22, 2011).

Defendants are incorrect that I seek merely a declaration that my rights were violated, although the process of making such a declaration will also in addition inevitably produce a true and beneficial remedy. It is impossible to declare how and why my rights were violated without detailing the many factual inaccuracies, misleading statements and extremely one-sided presentation of my judicial review

– 5 –

case. And, although no remedy could completely stop the harm to me in my case, even a declarative remedy would still provide significant meaningful relief, which is all that the law requires. *See Consumer Data Indus. Ass'n v. King*, <u>678 F.3d 898, 903</u> (10th Cir. 2012), citing *Massachusetts v. EPA*, 549 U.S. at 526, 127 S.Ct. 1438 (2007). Furthermore, if declarative relief truly is inappropriate or unavailable, then § 1983 permits injunctive relief.

***Time Line and Other Issues***

Defendants cite my requests for extensions of time, and the time line of this case, as a reason for denying my motion to amend my Complaint (Response in Opposition, pp. 3, 6). I filed every one of my motions for extensions of time by carefully following court rules, and my motions were all timely. My Response to Memorandum in Support of Motion to Dismiss, for which the extensions were requested, was also timely filed. I did not ask for special consideration or exception from any rule. So, I was not aware that I was doing anything wrong. Defendants never opposed my motions for time extensions, and probably it would have been odd (and mean-spirited) for them to do so. A trained attorney, who is doing this sort of thing full-time for a living, is capable of speedier filings than I am. But it is reasonable for a *pro se* litigant to require more time to carefully research and understand legal issues, and it makes the Court's job easier if they do so. It is probably also common for it to be very distressing for a *pro se* litigant to work on legal filings, because legal cases so often involve financial or personal crises. For that reason, too, more time may be needed. The time extensions did not harm

anyone, and they should not influence whether or not my motion to amend my complaint is granted.

Similarly, I do not understand why my filing fee should be under discussion now (Response in Opposition, p. 3), since I have paid it and I am not requesting a waiver. And having requested it in my initial filing was not improper, which is why my request was granted. A plaintiff's financial situation or history should not matter when considering whether or not a routine motion to amend a complaint should be granted.[3]

### *This Case is Not Futile*

Defendants urge this court to not permit me to file my Amended Complaint, claiming that it is futile (Response in Opposition to Amend, pp. 4-5) and too much trouble to address (Response in Opposition to Amend, p. 6). But if the proposed Amended Complaint truly is essentially the same as the first filing of this case, and if Defendants' prior Memorandum in Support of Motion to Dismiss had already addressed both the Complaint and the proposed Amended Complaint "because it covers the same ground" (Response in Opposition to Amend, p. 6), then it should not cause excessive burden to permit this filing. Indeed, I do believe it would not be excessive burden because while the changes in the Amended Complaint are critical,

---

[3] Having to detail my financial situation even while not requesting a waiver of the filing fee seems inappropriate. But I suspect that the main reason that the issue was brought up (twice now) was to malign my character, so I reluctantly oblige with this brief explanation. When I initially filed my complaint, I had a credit card debt of ~ $90 thousand, and I was struggling to make payments, which I was doing in part by swapping balances among numerous cards. I also had (and have) a growing student loan debt. My situation improved because I now have short-term contract work for a year, and because I am taking one fewer course per semester, which allows me to keep more of my student financial aid for living expenses. Also, I should point out that the reason for every single one of the legal filings that I have ever made was that I have lost my source of livelihood. Even so, I have requested a waiver of a filing fee only one time, even though it was always a hardship to pay the fee, and it added to a growing debt that I might not be able to repay.

– 7 –

they are few and simple, and thus they should not be laborious to address, if not already addressed in prior filings.  If Defendants truly believed my case to be futile, they would not be so concerned that I might be permitted to file the Amended Complaint.

Causing serious harm to others is not irrelevant. Lives are not irrelevant. Trying to remedy harm is not irrelevant, or futile. That, after all, is why we have a justice system.

Dated: May 23, 2022

Respectfully submitted,

__s/ Edina Harsay____
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
e-mail: eharsay@icloud.com
*Plaintiff, pro se*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:
    Stephen Phillips, Attorney for Defendants
    Asst. A.G., Civil Litigation Div.
    Office of the Attorney General Derek Schmidt
    120 SW 10th Avenue, 2nd Floor
    Topeka, Kansas 66612-1597

__s/ Edina Harsay____
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

– 8 –

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDINA HARSAY,                         )
                                      )
              Plaintiff,              )
                                      )
       v.                             )        Case No. 21-cv-4080-EFM-ADM
                                      )
KANSAS SUPREME COURT, et al.,         )
                                      )
              Defendants.             )

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Edina Harsay ("Harsay") brings this action against the Kansas Supreme Court and six current Kansas Supreme Court members in their official capacities: Chief Justice Marla J. Luckert and Justices Eric S. Rosen, Dan Biles, Evelyn Z. Wilson, Keynen Wall, Jr., and Melissa Taylor Standridge ("defendants" or "Justices," as appropriate). This matter now comes before the court on Harsay's Motion for Leave of Court to File a First Amended Complaint. (ECF 17.) By way of this motion, Harsay seeks leave to amend her complaint to correct deficiencies noted in defendants' memorandum in support of their motion to dismiss (ECF 6) that Harsay argues "might prevent the Court from considering the merits of this case." (ECF 17, at 1.) Harsay says her proposed amended complaint clarifies the statutes under which this action is brought and "articulate[s] better the need for a remedy and the particular remedy sought." (ECF 17, at 1.) Defendants contend the court should deny Harsay's motion on the grounds that the proposed amended complaint is futile. For the reasons set forth below, the court agrees and recommends that the assigned district judge deny Harsay's motion to amend.[1]

---

[1] If a magistrate judge's order denies a motion to amend and a claim or defense is not permitted to be asserted in a case, courts have found such a ruling to be dispositive for which review may be sought pursuant to <u>28 U.S.C. § 636</u> and <u>Fed. R. Civ. P. 72</u>. *See Wilson v. Wal-Mart Stores, Inc.*, No. 07-2263-JWL, <u>2008 WL 2622895</u>, at *1 (D. Kan. June 30, 2008); *see also Sprint Commc'ns Co. v. Cable One, Inc.*, No. 11-2685-JWL, <u>2014 WL 588068</u>, at *1 (D. Kan. Feb. 14, 2014) (citing

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This is the second civil rights case Harsay has filed in this court concerning the same subject matter.  But this matter has been litigated in many courts over many years—more than a decade, in fact.

Years ago, Harsay was a non-tenured professor at The University of Kansas ("KU").  On April 23, 2010, KU told Harsay that then-Chancellor Bernadette Gray-Little had decided not to grant her tenure and to terminate her employment.  (ECF 1-1, at 57-58.)[2]  Harsay filed a petition in Douglas County District Court asking for judicial review of KU's decision pursuant to the Kansas Judicial Review Act ("KJRA"), KAN. STAT. ANN. § 77-601 *et seq*.  (*Id.*)  The court ultimately found in favor of KU, finding its decision "was supported by substantial evidence and was not unreasonable, arbitrary, or capricious."  (*Id.*)

The Kansas Court of Appeals reversed.  That court's opinion discussed the letter setting forth KU's final decision as to Harsay, which stated merely that KU's chancellor accepted the University Committee on Promotion and Tenure's ("University Committee") recommendation to deny Harsay tenure.  (*Id.* at 59-60, 91.)[3]  The Kansas Court of Appeals determined that the University Committee had incorrect information regarding the number of grants awarded to Harsay when it made the recommendation to deny Harsay tenure.  (*Id.* at 91-92.)  The chancellor's

---

*Navegante Grp., Inc. v. Butler Nat'l Serv. Corp.*, No. 09-2554-JWL, 09-2466-JWL, 2011 WL 1769088, at *3 (D. Kan. May 9, 2011) ("[F]or purposes of the standard of review, a magistrate judge's denial of a motion to amend *for reasons other than futility* is a nondispositive order) (emphasis added). Because the undersigned recommends denial of the motion to amend on the basis of futility, the magistrate judge issues a report and recommendation to the district judge.

[2] These facts are from the Kansas Supreme Court's opinion issued in this case, which is included in Exhibit 1 to Harsay's Complaint as Appendix A.  (ECF 1-1, at 48-69.)  The official case cite is *Harsay v. Univ. of Kan.*, 430 P.3d 30 (Kan. 2018).

[3] The Kansas Court of Appeals' opinion is included in Exhibit 1 to Harsay's Complaint as Appendix B.  (ECF 1-1, at 72-94.)  The official case cite is *Harsay v. Univ. of Kan.*, 376 P.3d 98, 2016 WL 4069604 (Kan. Ct. App. July 29, 2016), *rev'd*, 430 P.3d 30 (Kan. 2018).

letter did not contain specific findings, however, and the court refrained from "speculat[ing] on whether the chancellor's decision would have been different if she had before her a recommendation from the University Committee based on accurate information." (*Id.* at 92-93.) The Kansas Court of Appeals remanded the case for "further consideration by the University's various tenure committees . . . based on Dr. Harsay's correct history of research productivity and scholarly works." (*Id.* at 93.)

On appeal, the Kansas Supreme Court reversed the Court of Appeals and affirmed the Douglas County District Court's judgment in favor of KU. The Kansas Supreme Court acknowledged that the number of Harsay's funded grants was misstated twice in the tenure process record. But the court found this inaccuracy was just "one feature of one criterion in the three-criterion evaluation process [and] did not fatally pollute that process or necessarily detract from or destroy the many accurate elements the decision makers had before them." *Harsay*, <u>430 P.3d at 38</u>. The Kansas Supreme Court found KU's decision was supported by substantial evidence "in light of the record as a whole." *Id.*

Harsay filed a motion for rehearing or modification, arguing the Kansas Supreme Court applied a standard of review that was invalidated by 2009 amendments to the KJRA and incorrectly disregarded evidence in the tenure process record that detracted from the University's decision.[4] She also asked the court to correct statements in the opinion regarding herself and her tenure review that she characterized as "misleading." (*Id.*) The Kansas Supreme Court denied Harsay's motion.[5]

---

[4] The motion for rehearing or modification is included as Exhibit 2 to Harsay's Complaint. (ECF 1-2.)

[5] The Kansas Supreme Court's denial of Harsay's motion is included in Exhibit 1 to Harsay's Complaint as Appendix C. (ECF 1-1, at 95.)

Harsay then petitioned the United States Supreme Court for review.  The Supreme Court denied that petition.[6]

Undeterred, Harsay refused to give up the fight.  On March 1, 2021, she filed her first complaint in this court claiming the Kansas Supreme Court Justices deprived her of rights under the Fourteenth Amendment to the United States Constitution.  Specifically, she alleged that the Justices violated (1) her right to equal protection by denying her the benefit of the KJRA because of her status as an academic and a pro se litigant and (2) her right to substantive due process by "misrepresenting" her side of the case in their opinion and "making misleading or inaccurate statements."  (ECF 1, at 6, in Case No. 5:21-cv-04017 (hereinafter "*Harsay 1*").)  She asked the court to order the Justices to issue a revised opinion that "honestly presents [her] side of the case and omits or clarifies statements that are misleading and harmful"; acknowledges and addresses her legal arguments; and reprimands the Douglas County District Court for how it handled her case.  (*Id.* at 7.)  She did not seek damages or declaratory relief.

The court (specifically, the undersigned) granted Harsay leave to proceed *in forma pauperis* and screened her complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).  (ECF 4 in *Harsay 1*.)  In doing so, the court recommended that the presiding district judge dismiss her complaint because (1) Harsay sought injunctive relief for acts or omissions that the Justices took in their judicial capacity, which is unavailable under 42 U.S.C. § 1983; (2) the Justices are protected by Eleventh Amendment sovereign immunity; and (3) this court does not have authority to issue an order directing state judicial officers in the performance of their official duties.  The presiding

---

[6] Harsay's Petition for Writ of Certiorari is Exhibit 1 to Harsay's Complaint and includes Appendices A-D.  (ECF 1-1, at 1-98.)  Her petition for writ of certiorari to the Supreme Court of Kansas was denied on October 7, 2019, and her petition for rehearing was denied on November 25, 2019.  *Harsay v. Univ. of Kan.*, 140 S. Ct. 201, *reh'g denied*, 140 S. Ct. 568 (2019).

district judge agreed and dismissed Harsay's complaint as "legally deficient on account of (1) failure to state a claim under Section 1983, Title 42, U.S.C.; (2) Eleventh Amendment sovereign immunity; and (3) the court's inability to grant plaintiff the relief requested." (ECF 11 in *Harsay 1*.) On June 28, 2021, the court entered judgment and dismissed the case without prejudice. (ECF 12 in *Harsay 1*.)

Nearly five months later, on November 10, 2021, Harsay filed a nearly identical action in this court except that, in the current action, she names the Kansas Supreme Court as an additional defendant. Like in *Harsay 1*, she contends defendants violated her right to equal protection under the KJRA, and thus her constitutional rights under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause by allegedly ignoring her key legal arguments and making misleading, inaccurate statements in their opinion—all of which caused her emotional distress and harmed her reputation to the point she is "essentially unemployable" in her field. (ECF 1, at 11-13.) As a remedy, the complaint seeks an order compelling the Justices to issue a revised opinion "because it is the right thing to do." (ECF 1, at 16.)

On February 18, 2022, the defendants filed a motion to dismiss her complaint (ECF 5) in which they argue this lawsuit is nearly identical to *Harsay 1* and must be dismissed for the same reasons. (ECF 6, at 1.) That motion is currently pending before the assigned district judge. Meanwhile, Harsay filed the current motion to amend her complaint, in which she purportedly seeks to correct deficiencies noted in defendants' memorandum in support of their motion to dismiss (ECF 6) that "might prevent the Court from considering the merits of this case." (ECF 17, at 1.) Harsay identified these deficiencies as "a need to state an appropriate statute under which this action is brought, and a need to articulate better the need for a remedy and the particular remedy sought." (*Id.*)

Harsay's proposed amended complaint still contends that the defendants violated her rights to equal protection and substantive due process under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause.  It also seeks to add the Kansas Supreme Court as a defendant and requests both "[d]eclaratory and injunctive relief . . . under the Declaratory Judgment Act, U.S.C. §§ 2201, 2202, and either declaratory or injunctive relief . . . under the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983."  (ECF 17-1, at 2; *see also id.* at 13, 15-16.) Harsay's proposed amended complaint recognizes "that injunctive relief that would force a revised opinion would be very inappropriate" and seeks a declaratory remedy, "in addition to, or instead of," injunctive relief.  (*Id*. at 15-16; ECF 17, at 3.)

## II.    LEGAL STANDARDS

### A.  Amendment Under Rule 15

Once a responsive pleading has been filed, a party "may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given when justice requires.  FED. R. CIV. P. 15(a)(2).  The rule's purpose "is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties."  *SCO Grp., Inc. v. Int'l Bus. Machines Corp*., 879 F.3d 1062, 1085 (10th Cir. 2018) (quoting *Minter v. Prime Equip. Co*., 451 F.3d 1196, 1204 (10th Cir. 2006)).  The court may refuse leave to amend "only [upon] a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (same).  A court is justified in denying a motion to amend as futile if the proposed amendment could not withstand a motion to dismiss or otherwise fails to state a claim.  *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992).  Whether to grant a motion to amend is within the

court's sound discretion.  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, <u>771 F.3d 1230, 1240</u> (10th Cir. 2014).

### B.  Dismissal Under Rule 12(b)(6)

To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, <u>556 U.S. 662, 678</u> (2009) (quoting *Bell Atl. Corp. v. Twombly*, <u>550 U.S. 544, 570</u> (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim for relief.  *Id.*  Dismissal of a pro se plaintiff's complaint for failure to state a claim is "proper only where it is obvious that the plaintiff cannot prevail on the facts . . . alleged and it would be futile to give [plaintiff] an opportunity to amend."  *Curley v. Perry*, <u>246 F.3d 1278, 1281</u> (10th Cir. 2001).  The court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff."  *Mayfield v. Bethards*, <u>826 F.3d 1252, 1255</u> (10th Cir. 2016).

Because Harsay is proceeding pro se, the court construes her pleadings liberally and holds them "to a less stringent standard than those drafted by attorneys."  *Johnson v. Johnson*, <u>466 F.3d 1213, 1214</u> (10th Cir. 2006).  In doing so, the court does not "assume the role of advocate for the pro se litigant."  *Hall v. Bellmon*, <u>935 F.2d 1106, 1110</u> (10th Cir. 1991).  The plaintiff still bears "the burden of alleging sufficient facts on which a recognized legal claim could be based."  *Id.*

### III.  ANALYSIS

As explained below, Harsay's proposed amended complaint suffers from the same deficiencies as both her dismissed complaint in *Harsay 1* and her original complaint in this case.

Although Harsay insists her proposed amended complaint "addressed a serious and harmful factual error" in this court's report and recommendation to dismiss her claims in the previous case (ECF 19, at 2 (citing ECF 17-1, at 7)), Harsay acknowledges that her proposed amended complaint merely sets forth the "key facts more explicitly" (and assumes this court "missed" the key facts in the previous case because Harsay "simply cited page numbers from an attached exhibit").  (*Id.*) But the problem with Harsay's prior complaints is not that the court "missed" key facts.  It didn't. The problem is that the prior complaints failed to state a claim upon which relief can be granted, and the proposed amended complaint does not fix those issues.  Thus, for essentially the same reasons stated in this court's report and recommendation in *Harsay 1* (which are incorporated herein by reference), the court recommends that Harsay's motion to amend her complaint be denied because her proposed amendment would be futile.

First, Harsay's proposed amended complaint still does not and cannot overcome defendants' Eleventh Amendment sovereign immunity.  The Eleventh Amendment prevents Harsay from suing a state court or judicial department in federal court.  *See Blatchford v. Native Village of Noatak & Circle Village*, <u>501 U.S. 775, 785</u>–86 (1991); *see also Will v. Michigan Dep't of State Police*, <u>491 U.S. 58, 66</u>, <u>70</u>–71 (1989) (holding that "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); *Harper v. Office of Att'y Regul.*, No. 14-CV-02289, <u>2014 WL 5801173</u>, at *2 (D. Colo. Nov. 7, 2014) (finding Eleventh Amendment bars claims against the Colorado Supreme Court, Office of the Presiding Disciplinary Judge, and Office of Attorney Regulation Counsel).  Further, in suits for damages, neither a state nor its officials acting in an official capacity are "persons" under § 1983.  *See Ross v. Bd. of Regents*, <u>599 F.3d 1114, 1117</u> (10th Cir. 2010).

Harsay asserts that the Kansas Supreme Court "is actually the most proper defendant in this case" but for the problem that it does not fall under the definition of "person" under §1983. (ECF 17, at 2.)  But Harsay's proposed amendment is futile not because the Kansas Supreme Court is not a "person" as used in the statute, but because the Eleventh Amendment "provides absolute immunity from suit in federal courts for states and their agencies" absent an "unmistakable waiver by the state of its Eleventh Amendment immunity, or an unmistakable abrogation of such immunity by Congress."  *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 588 (10th Cir. 1994).  Harsay essentially recognizes this but states that she hopes defendants will waive immunity.  (ECF 17-1, at 5.)  But defendants have not done so.

Thus, a judge's immunity from civil liability is overcome in only two sets of circumstances: (1) "nonjudicial actions, i.e., actions not taken in the judge's judicial capacity" or (2) judicial actions "taken in the complete absence of all jurisdiction."  *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991).  The allegations in the proposed amended complaint establish that the actions of which Harsay complains relate to the Justices' roles as presiding judges in Harsay's appeal and were not actions taken in the complete absence of all jurisdiction.  Harsay therefore has not pled around Eleventh Amendment immunity or come within any exception to its jurisdictional bar.  Therefore, her proposed amended pleading does not rectify the fact that her claims against defendants should be dismissed for lack of subject matter jurisdiction as barred by Eleventh Amendment immunity.

Second, Harsay's proposed amended complaint still seeks injunctive relief for acts or omissions that the Justices took in their judicial capacity.  But this relief is unavailable under 42 U.S.C. § 1983.  *Ysais v. New Mexico*, 373 F. App'x 863, 866 (10th Cir. 2010) (stating that judicial officers are generally "explicitly immunized not only against damages but also against suits for injunctive relief under 42 U.S.C. § 1983"); 42 U.S.C. § 1983 (stating that "in any action brought

against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable").  Harsay's proposed amended complaint does not allege that a declaratory decree was violated or that declaratory relief was unavailable.  Her claim for injunctive relief is therefore barred by the statute's plain language.

Harsay acknowledges that "injunctive relief that would force a revised opinion would be very inappropriate" (ECF 17-1, at 16), but she nevertheless proceeds to seek the same type of corrective action (i.e., injunctive relief) with respect to defendants' ruling.  *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1222 (10th Cir. 2009) ("[T]his court defines injunctive relief as all equitable decrees compelling obedience under the threat of contempt." (quotation omitted)).  Harsay again asks that defendants take corrective action:

> I recognize that injunctive relief that would force a revised opinion would be very inappropriate, regardless of whether or not it is legally possible.  However, requesting that the Defendants publish a corrective statement, and/or cite a declaratory judgment from this case whenever my KJRA case is cited, seems reasonable and proper.  Even if injunctive relief is not possible or deemed as not proper, I can ask that the Defendants take corrective action, regardless of the outcome of the present case, because it is the right thing to do.

(ECF 17-1, at 16.)  As explained in this court's report and recommendation in *Harsay 1*, such relief is not available.  (ECF 4 in *Harsay 1* (citing, e.g., *Rahimi v. Sweat*, 748 F. App'x 849, 850-53 (10th Cir. 2018) (affirming summary judgment in a § 1983 case where the pro se plaintiff sought an order requiring the defendant state court judge to take action after allegedly ignoring plaintiff's case and allowing trespass on plaintiff's property).)

Third, Harsay requests that this court issue a declaration that defendants' "inaccurate, misleading factual statements, as well as the omission of uncontested facts in [Harsay's] favor, have caused, and continue to cause, severe harm to [Harsay], in violation of [her] constitutional

rights" and a declaration of "the existence of [Harsay's] key legal arguments." (ECF 17-1, at 15-16.)   But this does not seek a mere declaration of the parties' rights.   In substance, Harsay essentially seeks a declaratory judgment that would have the practical effect of overturning the state court's decision.   This court's report and recommendation in *Harsay 1* explained that this court does not have the authority to issue an order directing state judicial officers in the performance of their duties.   (*See* ECF 4 in *Harsay 1*.)

In sum, Harsay's proposed amendment fails to state a claim upon which relief can be granted for essentially the same reasons stated in the court's report and recommendation in *Harsay 1*.   The court therefore recommends that the presiding district judge deny her motion to amend because the proposed amendment would be futile.

\* \* \* \* \*

Pursuant to 28 U.S.C. § 636(b)(1), FED. R. CIV. P. 72(b)(2), and D. KAN. RULE 72.1.4(b), plaintiff may file written objections to this report and recommendation within fourteen days after being served with a copy.   If plaintiff fails to file objections within the fourteen-day time period, no appellate review of the factual and legal determinations in this report and recommendation will be allowed by any court.   *See In re Key Energy Res. Inc.*, 230 F.3d 1197, 1199-1200 (10th Cir. 2000).

**IT IS THEREFORE RECOMMENDED** that plaintiff Edina Harsay's Motion For Leave to File a First Amended Complaint (ECF 17) be denied for the reasons set forth above.

**IT IS FURTHER ORDERED** that the clerk's office mail a copy of this Order to Harsay via regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

Dated May 31, 2022, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

# In the United States District Court
## for the
## District of Kansas

EDINA HARSAY,          )
        *Plaintiff*,    )
            )    Case No. 21-cv-04080-EFM-ADM
vs.           )
            )
Kansas Supreme Court, et al.,   )
    *Defendants*.   )
_____)

## MOTION FOR EXTENSION OF TIME
### to file Response to Motion to Dismiss

The Plaintiff, Edina Harsay, asks for a 14-day extension of time to file an Objection to the Report and Recommendation for Plaintiff's Motion For Leave to File a First Amended Complaint, for a due date on June 28, 2022. In support of her motion, the Plaintiff states:

1. *Background:* The Objection to the Report and Recommendation is now due on June 14, 2022. No prior extension of time for filing this Objection has requested. This request for extension of time is timely made and the time previously provided has not expired.

2. *Authority*: D. Kan. Rule 6.1(a,d).

3. *Reason:* Plaintiff has not been able to work on this filing due to illness.

1

Dated: June 13, 2022

Respectfully submitted,

__s/ Edina Harsay____
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

__s/ Edina Harsay____
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

2

```
MIME-Version:1.0
From:KSD_CMECF@ksd.uscourts.gov
To:ksd_nef@localhost.localdomain
Bcc:
--Case Participants: Stephen O. Phillips (chelsea.zamora@ag.ks.gov,
connie.deckard@ag.ks.gov, donna.wells@ag.ks.gov, steve.phillips@ag.ks.gov), Edina Harsay
(eharsay@icloud.com), Chief District Judge Eric F. Melgren
(ksd_melgren_chambers@ksd.uscourts.gov), Magistrate Judge Angel D. Mitchell
(ksd_mitchell_chambers@ksd.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:5598193@ksd.uscourts.gov
Subject:Activity in Case 5:21-cv-04080-EFM-ADM Harsay v. Luckert et al Order on Motion for
Extension of Time to File Response/Reply
Content-Type: text/html
```

## U.S. District Court

## DISTRICT OF KANSAS

**Notice of Electronic Filing**

The following transaction was entered on 6/13/2022 at 4:32 PM CDT and filed on 6/13/2022

| | |
|---|---|
| **Case Name:** | Harsay v. Luckert et al |
| **Case Number:** | 5:21−cv−04080−EFM−ADM |
| **Filer:** | |
| **Document Number:** | 22(No document attached) |

**Docket Text:**
**ORDER granting [21] MOTION for Extension of Time, [20] REPORT AND RECOMMENDATIONS. Response deadline 6/28/2022. Signed by Chief District Judge Eric F. Melgren on 6/13/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm)**

**5:21−cv−04080−EFM−ADM Notice has been electronically mailed to:**

Stephen O. Phillips     steve.phillips@ag.ks.gov, chelsea.zamora@ag.ks.gov, connie.deckard@ag.ks.gov, donna.wells@ag.ks.gov

Edina Harsay     eharsay@icloud.com

**5:21−cv−04080−EFM−ADM Notice has been delivered by other means to:**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF KANSAS

EDINA HARSAY,    )
    *Plaintiff,*  )
       )  Case No. 21-cv-04080-EFM-ADM
vs.      )
       )
Kansas Supreme Court, et al.,  )
    *Defendants.* )
_____)

## MOTION FOR EXTENSION OF TIME
### to file Objection to Report and Recommendation
### for Plaintiff's Motion For Leave to File a First Amended Complaint

  The Plaintiff, Edina Harsay, asks for a 14-day extension of time to file an Objection to the Report and Recommendation for Plaintiff's Motion For Leave to File a First Amended Complaint, for a due date on July 12, 2022. In support of her motion, the Plaintiff states:

1. *Background:* The Objection to the Report and Recommendation was originally due on June 14, 2022. One prior extension of time for filing this Objection has requested, for a due date of July 28, 2022. This request for extension of time is timely made and the time previously provided has not expired.

2. *Authority*: D. Kan. Rule 6.1(a,d).

3. *Reason:* Plaintiff has not been able to work on this filing due to illness.

Dated: June 27, 2022

Respectfully submitted,

   s/ Edina Harsay
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

   s/ Edina Harsay
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

```
MIME-Version:1.0
From:KSD_CMECF@ksd.uscourts.gov
To:ksd_nef@localhost.localdomain
Bcc:
--Case Participants: Stephen O. Phillips (chelsea.zamora@ag.ks.gov,
connie.deckard@ag.ks.gov, donna.wells@ag.ks.gov, steve.phillips@ag.ks.gov), Edina Harsay
(eharsay@icloud.com), Chief District Judge Eric F. Melgren
(ksd_melgren_chambers@ksd.uscourts.gov), Magistrate Judge Angel D. Mitchell
(ksd_mitchell_chambers@ksd.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:5607457@ksd.uscourts.gov
Subject:Activity in Case 5:21-cv-04080-EFM-ADM Harsay v. Luckert et al Order on Motion for
Extension of Time
Content-Type: text/html
```

## U.S. District Court

## DISTRICT OF KANSAS

## Notice of Electronic Filing

The following transaction was entered on 6/27/2022 at 2:48 PM CDT and filed on 6/27/2022

| | |
|---|---|
| **Case Name:** | Harsay v. Luckert et al |
| **Case Number:** | 5:21–cv–04080–EFM–ADM |
| **Filer:** | |
| **Document Number:** | 24(No document attached) |

**Docket Text:**
 **ORDER: Plaintiff's second motion for an extension of time of 14 days in which to file her objections to the Report and Recommendation, Doc. 23, is GRANTED. Plaintiff's two extensions have been sought, and granted, based on her representation of illness. Any further extensions will be granted only upon a good cause showing of a more detailed or compelling need for a continuance. Objections to R&R due by 7/12/2022. Signed by Chief District Judge Eric F. Melgren on 6/27/2022. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (cm)**

**5:21–cv–04080–EFM–ADM Notice has been electronically mailed to:**

Stephen O. Phillips     steve.phillips@ag.ks.gov, chelsea.zamora@ag.ks.gov, connie.deckard@ag.ks.gov, donna.wells@ag.ks.gov

Edina Harsay     eharsay@icloud.com

**5:21–cv–04080–EFM–ADM Notice has been delivered by other means to:**

# In the United States District Court
### for the
## District of Kansas

Edina Harsay,           )
           *Plaintiff,*     )
                      )     Case No. 21-cv-04080-EFM-ADM

vs.                       )
                      )

Kansas Supreme Court, et al.,    )
          *Defendants.*   )
                      )

## Plaintiff's Objection
### to the Court's Report and Recommendation

**Introduction**

       This filing is an objection to the *Report and Recommendation* ("*Report,*" Doc. 20), filed by this Court on May 31, 2022, for the above captioned case. The *Report* recommended denying my *Motion for Leave to File a First Amended Complaint* (Doc. 17), which I filed on May 5, 2022. The reason given for the recommendation is that my proposed *Amended Complaint* was deemed futile, and the bulk of the legal analysis in the *Report* argued for the dismissal of my case (Doc. 20, pp. 7-11). Thus, the *Report* is in essence a recommendation to dismiss this case.

       The *Report* does not address or even acknowledge many of my legal arguments in which I had already addressed most of the arguments that the *Report* presents. I made those arguments in my *Response to Defendants' Motion to Dismiss* (Doc. 15, only 13 pages), and to a lesser extent also in my *Reply to Defendant's Response in Opposition to Motion to Amend* (Doc. 19, less than 8 pages). I will minimize

– 1 –

duplicating material from prior filings in this *Objection*. But those prior filings, especially Doc. 15, are important for a full consideration of my legal arguments.

Furthermore, the *Report* gave a summary of the prior court case that led to my *Complaint*, but that summary was based entirely on the Defendants' *Opinion*, with no reference to factual statements in my *Complaint* that contradicted or clarified statements in the *Opinion*, even though those contradictions and clarifications are essential for a fair presentations of the facts for this case. At this stage of the case, the court must "accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) (cited in *Report*, Doc. 20, p. 7). It is thus crucial that this Court not rely solely on the *Report*, but also read the proposed *Amended Complaint* (Doc. 17, Exhibit 1). That document contains a succinct summary of the relevant facts for this case, and it explains why I filed this case much more clearly than what the *Report* reveals. Defendants also requested that this Court read the *Amended Complaint* prior to a decision on my motion to file it (Doc. 18, p. 4). I recognize that courts are over-burdened, and the purpose of the *Report* is to alleviate some of that burden on district judges. But it is not possible to fairly consider this case based solely on the *Report*.

Two clarifications will aid the evaluation of the proposed *Amended Complaint*. First, it cites two exhibits, and these are critical for fairly evaluating the *Complaint*. They had been attached to the original *Complaint* (Doc. 1) but not to the proposed *Amended Complaint*, which itself was an attachment to a *Motion to Amend* (Doc. 17). I had assumed that I would be allowed to file the *Amended Complaint* and had

– 2 –

intended to file the two exhibits again at that time. The exhibits are important because they elaborate (succinctly) on every factual statement that I made in the *Amended Complaint*, and each factual statement within the exhibits meticulously cites precisely to court records. Therefore, in addition to providing slightly more detail, the exhibits indicate that every factual statement I made is documented and verifiable from court records. Those records may be judicially noticed. Importantly, my factual statements are not contradicted in legal filings by the opposing party in the case that was before the Kansas Supreme Court, and thus the Defendants were not tasked with resolving conflicting factual claims between opposing parties. This case is not about a disagreement with the Defendants' resolution of factual contradictions. It is about the misrepresentation of the facts, and misrepresentation of my case, and misrepresentation of me, which has led to severe, continuing harm.

Second, the proposed *Amended Complaint* refers repeatedly to a *Report and Recommendation* from Judge Mitchell (Doc. 17, Exhibit 1, pp. 4, 7, 14). That report was for the prior filing of this case, as the current *Report and Recommendation* (Doc. 20) did not yet exist. It is not necessary for this Court to consult the prior *Report*, but should it wish to do so, the Defendants subsequently attached it to Doc. 18 as Exhibit 1.


**Arguments and Authorities**

The Report states that the subject matter of this case "has been litigated in many courts over many years...." (Doc. 20, p. 2). But at least with my limited legal research abilities, I have not been able to find case law that is truly analogous to

this case.[1] Indeed, until modern times and the "internet age," it would have been ridiculous to bring a suit such as this, even for a *pro se* litigant. This is because courts could do only limited damage, if any, purely by mis-stating the facts or presenting facts in a misleading way in orders or opinions. Furthermore, plaintiffs usually seek a monetary award when state officials, including judges, cause unjust harm. That is primarily the type of case that has been "litigated in many courts over many years." Litigants also sometimes seek to overturn a judgment by suing courts or judges, but I have not sought such a remedy in this Court, and I have stated explicitly that such a remedy is neither sought nor possible (Doc. 17, Exhibit 1, p. 14-16; Doc. 15, pp. 1-4).

The *Report* cites four cases in support of an assertion that "the proposed amended complaint still does not and cannot overcome defendants' Eleventh Amendment sovereign immunity" (Doc. 20, p. 8). But plaintiffs in those cases sought monetary awards, whereas I do not. The relevant case law can be confusing because most often, when court opinions refer to a "claim" in a general way, this is an abbreviation for "damages claim," and yet not all claims are for damages. The distinction is critical with respect to Eleventh Amendment immunity. When a suit is brought against state officials in their official capacities, and a monetary award is sought, any award would come from the state, not the state official, and hence the state official is perhaps reasonably considered as being "a state" and not "a person"

---

[1] The closest analogies to my case are suits against state officials in which plaintiffs request correcting academic or employment records, because the harm and relief sought are similar to my case. The relief in those cases, as the relief sought in this case, is properly considered as "prospective injunctive relief." The *Report* does not address my arguments that I am seeking prospective relief, so I will not address this point further here. But I had addressed this in most detail in Doc. 19, pp. 4-5.

with respect to the Eleventh Amendment and § 1983. But when injunctive or declaratory relief is sought, then a state official is considered to be "a person" and not "a state," and it is possible to overcome Eleventh Amendment Immunity. *See* Doc. 15, pp. 6, 8-9 for more elaboration and case law in support of this argument.[2]

Citing *Ross v. Bd. of Regents*, 599 F.3d 1114, 1117 (10th Cir. 2010), the *Report* states that "in suits for damages, neither a state nor its officials acting in an official capacity are 'persons' under § 1983." (Doc. 20, p. 8.) But I have never sought damages in any filing for this case, or for that matter, in any legal case. In *Blatchford* (Doc. 20, p. 8), the plaintiffs were seeking an order requiring payment to them. *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 778 (1991). In *Harper* (Doc. 20, p. 8), the plaintiff sought "compensatory and punitive damages. " *Harper v. Office of Attorney Regulation*, Civil Action No. 14-cv-02289-BNB, at *2 (D. Colo. Nov. 7, 2014). The fourth cited case, *Will* (Doc. 20, p. 8), explicitly supports rather than contradicts allowing my case to proceed. I had already cited this case (Doc. 19, p. 3, Note 1). That case, too, involved a suit for monetary award, and in its opinion, a divided U.S. Supreme Court somewhat clarified the "person-state" issue with respect to § 1983 and Eleventh Amendment Immunity. *Will* is most often cited in support of dismissing suits against state officials because they should be considered as a "state," and thus immune from suit. But in a footnote, the opinion also makes clear that in a case such as mine, in which a plaintiff seeks not a monetary award but injunctive or prospective relief, state officials are "people," not "states":

---

[2] Using these arguments, the Kansas Supreme Court can be considered as a "person," which is no more ridiculous than considering a state official a non-person "state." Thus, it is a proper defendant in this case. The *Report* incorrectly states that my *Amended Complaint* added the Kansas Supreme Court as a defendant (Doc. 20, p. 6). The Kansas Supreme Court had been a defendant also in the original *Complaint* (Doc. 1).

– 5 –

> Of course a state official in his or her official capacity, when sued for
> injunctive relief, would be a person under § 1983 because "official-
> capacity actions for prospective relief are not treated as actions against
> the State." *Kentucky v. Graham*, 473 U.S., at 167, n. 14; *Ex parte Young*,
> 209 U.S. 123, 159-160 (1908). This distinction is "commonplace in
> sovereign immunity doctrine," L. Tribe, American Constitutional Law §
> 3-27, p. 190, n. 3 (2d ed. 1988)....
> *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989).

Following the citations to the above four cases, the *Report* further discusses "immunity from civil liability" (Doc. 20, p. 9), but again those arguments refer to liability for monetary damages. The *Report* does eventually address injunctive relief, but it states that I had not alleged that "a declaratory decree was violated or that declaratory relief was unavailable" and thus injunctive relief was not available under § 1983. (Doc. 20, pp. 9-10). But in my *Complaint*, I had addressed this point:

> The Defendants did not violate a declaratory judgment, ... a declaratory
> judgment was not available, or appropriate, for my judicial review
> case.... Thus a declaratory relief was not a relevant aspect of my prior
> case, and the restriction related to declaratory relief does not bar this
> Court from hearing this case. (Doc. 1, pp. 14-15).

However, the Defendants ridiculed the above statements, perhaps justly, stating that the above arguments are "difficult to comprehend." (Doc. 6, p. 10). In my interpretation, Defendants indicated that the relevant issue is whether declaratory judgment is available for the current case, rather than for my prior case that was before the Defendants (Doc. 6, p. 10), and thus I concluded that I had misunderstood § 1983. In my proposed *Amended Complaint*, I removed the above statements and instead sought declaratory relief from this Court (Doc. 17, Exhibit 1, pp. 15-16). It was my expectation that it would be up to this Court whether or not

it makes my request for declaratory relief available. If it is deemed to be an inappropriate or unavailable relief, then the wording of § 1983 explicitly allows for injunctive relief in a suit against judicial officials in their official capacities.

The confusion (or at least my confusion) concerning declaratory judgment could be avoided by considering this case as brought directly under the Fourteenth Amendment, as I had indicated both in my initial *Complaint* (Doc. 1) and in the proposed *Amended Complaint* (Doc. 17, Exhibit 1, p. 2). The Fourteenth Amendment does not state any restrictions concerning remedy. Furthermore, the U.S. Supreme Court has left open the possibility of hearing a case directly under the Fourteenth Amendment when monetary award is not sought (Doc. 15, pp. 4-5). Nevertheless, due to objections from the Defendants (Doc. 6, p. 5, which I addressed in a *Response*, Doc. 15, pp. 4-7), I was concerned that this Court would not permit or favor such an option. Thus in my *Amended Complaint*, I added the option of hearing this case under § 1983 (Doc. 17, Exhibit 1, p. 2). The *Report* only vaguely refers to the matter of appropriate statue by briefly citing my explanation for why I sought to file an amended complaint (Doc. 20, p. 5). If this Court permits the filing of my *Amended Complaint*, I will add back to it a sentence stating that no declaratory decrees were violated, and no declaratory relief was available prior to the filing of this case. However, this detail is already readily apparent from the history of this case.

**Factual Issues**

The *Report* mis-states the factual background for this case. It cites solely the Defendant's *Opinion*, and not my *Complaint*, even when the facts stated in the *Complaint* (which were carefully documented and thus verifiable) contradicted the factual background as it was presented in the *Opinion*. Thus, the *Report* mis-represents my case, in a very harmful manner, in a document that is now published on the World Wide Web. I had assumed that this was unintentional in the first report that was filed for the prior filing of this case, and I thought I had made a mistake by citing mostly attached exhibits rather than more explicitly stating the most critical facts within the body of the complaint. But the *Report* now makes clear that the omission of the facts that led me to file this case was intentional in both of the reports (Doc. 20, p. 8). Thus, one cannot truly discern why I filed this case, and yet that is the purpose of providing a factual background for a case. I do not believe that it is typical or fair for court documents to present only one side of a case and completely ignore the existence of all contradictions from the other side, especially at an early stage of a case when the factual statements made by the plaintiff must be presumed to be correct, for a case that is *not an appeal*. (The Kansas Supreme Court also did not depend on prior court opinions for factual statements because this was a KJRA case rather than a normal appellate case; Doc. 15, p. 12).

As in the previous report, the *Report* now once again cited a statement from the Defendant's *Opinion* that falsely indicated that factors other than the "quantity" of my research led to a negative tenure decision (Doc. 20, p. 3), even though in my complaint I stated that *there was no evidence in either the University's record or in*

– 8 –

*its court filings that there were any other weaknesses in my case*; in fact the other review criteria, including the *quality* of my research and teaching, were consistently praised (Doc. 17, Exhibit 1, p. 6-8). To cite the *Opinion* on this point but not my contradictions to it is misleading and harmful, and I do not understand why this was done. After all, that misleading quote, and the resulting harm from it, is among the reasons that I gave for why I filed this case in all versions of my complaint (Doc. 17, Exhibit 1, p. 7).

Likewise, the *Report* implies that the only inaccuracy in the University's review was the number of my grants (two rather than the actual five) (Doc. 20, p. 3). Indeed, that is the only inaccuracy acknowledged in the *Opinion*. Yet, as detailed in my complaint (Doc. 17, Exhibit 1, p. 6), the number of my papers was also misrepresented in two decision letters, a fact that I argued at every stage of litigation, and thus it was a preserved issue. A Department-level of review and copies of my papers in the University's record support my claim that I had three papers, and not two (Doc. 17, Exhibit 1, pp. 6-7). In legal filings, the University gave no explanation whatsoever for why the numbers of my papers were mis-stated (Doc. 17, Exhibit 1, p 7). And yet the inaccurate paper count, along with the inaccurate grant count, and thus "quantity" of research, was the sole reason given for the University's decision (Doc. 17, Exhibit 1, p 8). Again, to cite that only grant count was mis-represented, without mentioning that this contradicted the facts cited in my complaint, was misleading and misrepresents the factual aspects of this case. Thus, the *Report* does not truly reveal why I filed this case.

I will give one final example of "incomplete facts" in the *Report*, because it helps to explain why the facts matter even at this early stage of the case. The *Report* cited the district court's conclusion concerning my KJRA case (Doc. 20, p. 2), without also stating that the court's interpretation of "supported by substantial evidence and was not unreasonable, arbitrary, or capricious" (with respect to the University's decision) was based on case law that had been explicitly invalidated by amendments to the KJRA and by subsequent case law (Doc. 17, Exhibit 1, p. 10). The district court's outdated interpretation of the KJRA meant that it disregarded any evidence that contradicted the University's decision (including the mis-stating of the grant count and paper count) (Doc 17, Exhibit 1, 10). This detail is important even at this early stage of the present case because citing that decision without the verifiable caveats affects the perceived merits of my case. And the perceived merits, and surely some interest in providing justice, could well influence how my case is handled.

Contrary to an assertion in the *Report*, revealing the facts does not equate to "overturning the court's decision" (Doc. 20, p. 11). The judgement and the facts are two very different things (Doc. 15, p. 2). One is generated by a court; the other already exists prior to any consideration by the court. Thus, unlike judgments, facts are not created by courts and cannot ever be "overturned." In the case that was before the Defendants, and in this current case also, one might make subjective arguments as to whether or not I was, or now am, entitled to a decision in my favor. But I am certain that I was, and now am, entitled to the truth. The truth is not

hard to discern when facts are uncontested between opposing parties or when they are objectively verifiable.

Prior to the routine publication of court documents on the World Wide Web, the only thing that truly mattered to litigants was the judgment in a case. Thus, as far as I am aware, case law does not clearly address the situation presented in this case. Case law cited in the *Report* concerns judgments. Importantly, a judgment that is not in my favor, even if unjust, is, of course, not a violation of constitutional rights. But mis-stating the facts or presenting factual aspects in a misleading and harmful manner in order to make an opinion appear as just is a violation of my constitutional right to due process.

There are important parallels between my University review, the KJRA case, and now my current Complaint. University decision-makers must delegate responsibility for the significant amount of labor involved in the faculty tenure review process; the Chancellor and Provost do not peruse hundreds of pages of faculty records to conduct their independent reviews. There were over 50 faculty members evaluated for tenure and promotion at the University during my review year.[3] The Chancellor also respects the decisions of high-level administrator colleagues and generally (likely always) accepts their recommendations in tenure decisions. Thus I do not believe that the Chancellor or University-level administrators were aware of the inaccuracies in decision letters that were introduced at a lower (College-level) of review. Had they been aware, University-

---

[3] *See* Doc. 1, Exhibit 2, p. 15.

level reviewers would have corrected or clarified the inaccuracies, since they had a responsibility to provide accurate information to the Chancellor.

Similarly, as a necessary practical matter, courts must delegate responsibility for handling cases. A case such as mine is not likely to have been deemed to be of sufficiently high importance such that all of the Justices were significantly involved in crafting the *Opinion* for the case. For many cases, and almost certainly mine, such a task is delegated to a judicial clerk and to a Justice who takes primary responsibility for the case.[4] Only one Justice (now retired) signed the *Opinion* that is the focus of my complaint. Most likely, in many cases that are not deemed to be highly important or contentious, fellow Justices trust and accept the recommendation of the Justice to whom the case is assigned. This explains why the decision was unanimously in my favor from a three-judge Court of Appeals panel and yet unanimously against me in the Kansas Supreme Court. Thus, as with the University decision, is seems highly unlikely that all decision-makers were aware of the inaccuracies and misleading statements. And as with university decisions in general, there is likely great hesitancy, once a decision is made and an opinion is filed, to admit fallibility and to correct mistakes. Yet to be fallible is to be human, and it is the "courts' business" to correct mistakes and to remedy harm.

**Plaintiff should be permitted to file the proposed Amended Complaint**

Defendants stated that because Judge Vratil had pointed out that I could refile this case, I was effectively already granted the filing of one amended complaint

---

[4] *See generally*, Gerald Lebovits et al., *Ethical Judicial Opinion Writing*, 21 Geo. J. Legal Ethics 237, 304 (2008).

(Doc. 18, p. 6). Thus, defendants urge this Court not to follow its "practice is to grant pro se litigants one amendment, no matter what...." (Doc. 18, p. 6). But with the initial filing of my case, I had not yet had an opportunity to consider the Defendants' objections to my complaint because I was not allowed to serve the Defendants with that complaint (Doc. 20, p. 4). My proposed *Amended Complaint* addresses new objections raised by the Defendants. As I explained in my *Motion to Amend* (Doc. 17), the *Amended Complaint* contains corrections concerning important legal issues regarding the nature of the remedy sought and the statutes under which this case could be considered. Thus, a decision on wether or not the case should be dismissed that is based solely on the initial *Complaint* would be unjust.

Allowing the filing of the *Amended Complaint* would not create significant additional burden for this Court. The *Amended Complaint* has already been considered both in the *Report* and by the Defendants. The Defendants stated that because the *Amended Complaint* is essentially the same as the original one, they had already addressed all of the issues in their *Response* to the initial *Complaint* (Doc. 18, p. 6). Therefore, it would not significantly burden the Defendants if I were permitted to file the proposed *Amended Complaint*.

**Conclusions**

For the aforementioned reasons, I request that this Court allow the filing of my proposed *Amended Complaint* before rendering a decision on whether or not this case should be allowed to proceed.

– 13 –

Dated: July 12, 2022

Respectfully submitted,

___s/ Edina Harsay_____
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

___s/ Edina Harsay_____
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDINA HARSAY,

       *Plaintiff,*

  vs.                               Case No. 21-CV-4080-EFM-ADM

MARLA LUCKERT, et al.,

       *Defendants.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion to Dismiss (Doc. 5) and Magistrate Judge Angel D. Mitchell's Report and Recommendation (Doc. 20) that the Court deny Plaintiff's Motion for Leave to Amend (Doc. 17). Plaintiff filed an objection to the Magistrate Judge's Report and Recommendation (Doc. 25). For the reasons stated below, the Court grants Defendants' Motion to Dismiss, overrules Plaintiff's objections, and adopts the recommended decision of the Magistrate Judge.

### I.      Factual and Procedural Background

Proceeding pro se, Plaintiff Edina Harsay brings this Complaint against the Kansas Supreme Court and six of its justices, Marla Luckert, Dan Biles, Evelyn Wilson, Keynen Wall, Jr., Melissa Standridge, and Eric Rosen, in their official capacities. Harsay alleges that the Kansas

Supreme Court made serious factual mistakes and presented misleading statements in addressing her case before it in 2018[1] and requests a revised opinion correcting those errors.

Defendants have since moved to dismiss Harsay's claims and Harsay has requested leave to amend her Complaint.   Magistrate Judge Mitchell has recommended that the Court deny Harsay's request.

## II.    Legal Standard

### A.    Motions to Dismiss for Lack of Subject-Matter Jurisdiction

"Federal courts are courts of limited jurisdiction."[2]    A presumption exists against jurisdiction and "the burden of establishing the contrary rests upon the party asserting jurisdiction."[3]  "Motions to dismiss for lack of subject matter jurisdiction 'generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based.' "[4]  If the motion challenges the sufficiency of the complaint's jurisdictional allegations, the district court must accept all factual allegations in the complaint as true.[5]

---

[1] *Harsay v. Univ. of Kan.*, 308 Kan. 1371, 430 P.3d 30 (2018), *cert. denied*, 140 S. Ct. 201 (2019), *reh'g denied*, 140 S. Ct. 568 (2019).

[2] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

[3] *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936)).

[4] *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 906 (10th Cir. 2004) (citation omitted).

[5] *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (citation omitted), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425 (2001).

-2-

**B.      Objections to a Magistrate Judge's Dispositive Order**

The Court reviews de novo any part of a magistrate judge's disposition on dispositive motions to which parties properly object.[6]  When a magistrate judge's order denies a motion to amend and a claim or defense is not permitted to be asserted in the case, that ruling is to be treated as dispositive.[7]  A party's objections to a magistrate's order must be timely and specific.[8]  The court "may accept, reject, or modify the recommended decision; receive further evidence, or recommit the matter to the magistrate judge with instructions."[9]

**C.      Pro Se Litigants**

Because Harsay appears pro se in this case, the Court must liberally construe her pleadings.[10]  If a court can reasonably read a pro se complaint in such a way that it could state a claim on which the plaintiff could prevail, it should do so despite "failure to cite proper legal authority . . . confusion of various legal theories . . . or [Plaintiff's] unfamiliarity with pleading requirements."[11]  The Court, however, is not an advocate for the pro se litigant.[12]

---

[6] Fed. R. Civ. P. 72(b)(3); *see also Summers v. State of Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991).

[7] *Pedro v. Armour Swift-Eckrich*, 118 F. Supp. 2d 1155, 1157 (D. Kan. 2000) (citing *Allendale Mut. Ins. Co. v. Rutherford*, 178 F.R.D. 1, 2 (D. Me. 1998)).

[8] *See* Fed. R. Civ. P. 72(b)(2) (stating objections must be timely filed within fourteen days of the magistrate judge's issuance of a recommendation).

[9] Fed. R. Civ. P. 72(b)(3).

[10] See *Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1243 (10th Cir. 2007) ("Because [the plaintiff] appears pro se, we review his pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys.") (citation omitted).

[11] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citation omitted).

[12] *Id.*

### III.    Analysis

**A.    The Court lacks subject-matter jurisdiction over Harsay's claims.**

Defendants move to dismiss Plaintiff's Complaint on multiple grounds, including for lack of subject-matter jurisdiction and for failure to state a claim.[13]  Because the Court cannot look to the merits of a case where it lacks jurisdiction, the Court will first address Defendant's argument under the *Rooker-Feldman* doctrine.[14]

The *Rooker-Feldman* doctrine bars federal review of state court judgments "where (1) the plaintiff lost in state court, (2) the state-court judgment caused the plaintiff's injuries, (3) the state court rendered judgment before the federal claim was filed, and (4) the plaintiff is asking the district court to review and reject the state judgment."[15]  *Rooker-Feldman* does not apply to claims that would be identical to state court claims, nor to "claims that do not rest on any allegation concerning the state-court proceedings or judgment."[16]  Applicability of the *Rooker-Feldman* doctrine is determined by the relief sought.[17]

Here, Plaintiff requests a revised opinion from the Kansas Supreme Court.  Harsay asserts that *Rooker-Feldman* is inapplicable because she does not seek to *overturn* the state court judgment

---

[13] *See* Fed. R. Civ. P. 12(b)(1) and (b)(6).

[14] *See Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). The *Rooker-Feldman* doctrine is a bar to subject-matter jurisdiction.  *See Market v. City of Garden City*, 723 F. App'x 571, 575 (10th Cir. 2017) (directing district court to vacate portion of district court's opinion dismissing for failure to state a claim where the district court lacked jurisdiction under *Rooker-Feldman*).

[15] *Market*, 723 F. App'x at 572–73 (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

[16] *Bolden v. City of Topeka*, 441 F.3d 1129, 1145 (10th Cir. 2006).

[17] *See PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010) ("Additionally, our recent *Rooker-Feldman* jurisprudence has emphasized the relief sought by federal-court plaintiffs.") (citing *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006)).

-4-

but, instead, requests a mandate that the Kansas Supreme Court make reasonable and fair corrections to the factual basis for its opinion.  Essentially, Harsay argues that because she does not demand reversal of the Kansas Supreme Court's decision, but asks only for factual corrections, *Rooker-Feldman* is inapplicable.

This Court disagrees.  Harsay alleges that purported factual inaccuracies in the Kansas Supreme Court's opinion have harmed her reputation.  To provide the relief Harsay seeks, this Court would have to review and reject the Kansas Supreme Court's findings.  This is the exact circumstance *Rooker-Feldman* prohibits.[18]  The Court therefore lacks subject-matter jurisdiction over Harsay's claims and her case must be dismissed.

**B.      Amendment of Harsay's Complaint Would Be Futile.**

Since Defendants' filing of their Motion to Dismiss, Harsay has moved for leave to amend her Complaint.  Magistrate Judge Mitchell recommended that the motion be denied, and Harsay has objected to that recommendation.  Because denial of a motion to amend is treated as disposition of a dispositive motion, the Court reviews the portions of the Magistrate Judge's order to which Harsay objects de novo.[19]

First, Harsay objects to the Magistrate Judge's presentation of the history of Harsay's tenure case.[20]  In reviewing the Report & Recommendation, however, the Magistrate Judge did not make any factual findings regarding Harsay's original case.  She simply presented the history

---

[18] *See generally Kline v. Biles*, 2016 WL 6680940 (D. Kan. 2016), *aff'd*, 861 F.3d 1177 (10th Cir. 2017) (rejecting claims as barred by the *Rooker-Feldman* doctrine where "[a]lthough phrased nine different ways, the remaining claims are nothing more than an attempt to appeal the Kansas Supreme Court's decision in a lower federal court").

[19] *See Pedro*, 118 F. Supp. 2d at 1157.

[20] Although Harsay addressed Magistrate Judge Mitchell's presentation of the facts after her legal arguments, for clarity, the Court addresses this issue first.

of Harsay's case as laid out in the record, including in Harsay's own attached exhibits.  The Court finds no material error in this recitation of the facts.  Nonetheless, the Court notes that Harsay has asserted that there was no evidence of any weaknesses in her tenure case, other than those weaknesses which were misrepresented.  The Court also notes that Harsay has asserted that the Kansas Supreme Court relied on an outdated and invalid interpretation of case law in deciding her case.

Next, Harsay argues that the cases cited by the Magistrate Judge are not relevant because they involve cases in which plaintiffs sought monetary damages, which Harsay does not seek.[21] Harsay is correct that the cited cases involved requests for monetary damages and a request for an order requiring payment, rather than injunctive relief.  The Court believes it likely, however, that the Magistrate Judge cited those cases merely as a background explanation of Eleventh Amendment sovereign immunity and § 1983.  Regardless, the Court recognizes that Harsay is not seeking monetary damages, so her Motion for Leave to Amend is not denied on that basis.

As noted by Magistrate Judge Mitchell, injunctive relief against judicial officers is prohibited under § 1983 absent a showing that a declaratory decree was violated, or declaratory relief was unavailable.[22]  In her objection to the Magistrate's report, Harsay notes that she had alleged in her original Complaint that declaratory relief was unavailable in her tenure case at the Kansas Supreme Court.[23]  Harsay's original Complaint explained that declaratory relief was not

---

[21] *See Blatchford v. Native Vill. of Noatak*, 501 U.S. 775 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Harper v. Off. of Att'y Regul.*, 2014 WL 5801173 (D. Colo. 2014); *Ross v. Bd. of Regents of the Univ. of N.M.*, 599 F.3d 1114 (10th Cir. 2010).

[22] *Ysais v. New Mexico*, 373 F. App'x 863, 866 (10th Cir. 2010); *see also* 42 U.S.C. § 1983.

[23] Harsay asserts that she removed this language in her proposed amended complaint because she misunderstood Defendants' argument in their Motion to Dismiss.  She asserts that she will add that language back into her Amended Complaint if the Court permits filing.

available in her tenure case because she did not seek a declaratory judgment. But that Harsay did not seek declaratory relief does not mean it was unavailable.[24]  Thus, this argument cannot save Harsay's case.

Having addressed Harsay's objections and reviewed the Magistrate Judge's Report and Recommendation, the Court adopts Magistrate Judge Mitchell's conclusion that Harsay's Motion for Leave to Amend should be denied on the basis of futility.[25]  Although the Court understands Harsay's allegation that the Kansas Supreme Court misrepresented or omitted critical factual details in her tenure case and understands Harsay's desire to correct the record, federal district courts are simply not granted the authority to provide the remedy Harsay seeks.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 5) is **GRANTED.**

**IT IS FURTHER ORDERED** that Magistrate Judge Angel D. Mitchell's Report and Recommendation (Doc. 20) is adopted.  Plaintiff's Motion for Leave to File a First Amended Complaint (Doc. 17) is **DENIED.**

---

[24] *See Grove v. Groom*

e, 2018 WL 10879451, at *6 (D. Colo. 2018), *aff'd and remanded*, 817 F. App'x 551 (10th Cir. 2020) ("While Plaintiff does allege 'declaratory relief was unavailable to him,' this allegation is a legal conclusion that is not entitled to the presumption of truth.") (citations and alteration omitted).

[25] The Court notes that it has reviewed all of Harsay's filings, exhibits, and legal arguments, even if each argument has not been explicitly addressed in this Order.

-7-

**IT IS SO ORDERED.**

Dated this 16th day of August, 2022.

This case is closed.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

-8-

# United States District Court

-------------------------- DISTRICT OF KANSAS----------------------------

EDINA HARSAY,

                Plaintiff,

v.                                    Case No:   21-4080-EFM

MARLA LUCKERT, DAN BILES,
EVELYN Z. WILSON, KEYNEN WALL,
JR., MELISSA STANDRIDGE, ERIC
ROSEN, and THE KANSAS SUPREME
COURT,

                Defendants,

## JUDGMENT IN A CIVIL CASE

☐      Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒      Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.  IT IS ORDERED

that pursuant to the Memorandum and Order filed on August 16, 2022, Doc. 26, Defendants' Motion to Dismiss, Doc. 5, is GRANTED.

IT IS FURTHER ORDERED that Magistrate Judge Mitchell's Report and Recommendation, Doc. 20, is ADOPTED and Plaintiff's Motion to Amend Complaint, Doc. 17, is DENIED.

This case is closed.

_August 16, 2022_____
        Date

                                    SKYLER O'HARA
                                    CLERK OF THE DISTRICT COURT

                                    by:  _s/  Cindy McKee_____
                                          Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| EDINA HARSAY, | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 21-cv-04080-EFM |
| vs. | ) | |
| | ) | Judge Eric F. Melgren |
| MARLA LUCKERT, DAN BILES, | ) | |
| EVELYN Z. WILSON, | ) | |
| KEYNEN WALL, JR., | ) | |
| MELISSA STANDRIDGE, | ) | |
| ERIC ROSEN, and | ) | |
| THE KANSAS SUPREME COURT, | ) | |
| *Defendants*. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Edina Harsay hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Order Dismissing this Case (Doc #26), and a final judgment (Doc #27), entered in this action on the 16th day of August, 2022.

Dated: September 15, 2022

Respectfully submitted,

   s/ Edina Harsay
Edina Harsay, Ph.D.
1100 Stone Meadows Dr.
Lawrence, Kansas 66049
Phone: (785) 813-1757
Email: eharsay@icloud.com
*Plaintiff, Pro se*

1

CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022, the above and foregoing was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all those individuals currently electronically registered to receive notices of filings for this case, including the following:

Stephen Phillips, Attorney for Defendants
Asst. A.G., Civil Litigation Div.
Office of the Attorney General Derek Schmidt
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597


___s/ Edina Harsay____
Edina Harsay, Ph.D.
*Plaintiff, Pro se*

2